1

1          UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                ORLANDO DIVISION

3   - - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA,   :
4                                :
                                 :   Case No.:
5          Plaintiff,            :   6:19-cr-26-Orl-41TBS
                                 :
6    vs.                         :
                                 :   Orlando, Florida
7    ROBERT FRANCIS PRATERSCH,   :   April 29, 2019
                                 :
8                                :   Excerpt of Testimony of
              Defendant.         :   Greta Hasler
9                                :
     - - - - - - - - - - - - - -X
10
          EXCERPT OF TRANSCRIPT OF TRIAL VOLUME 1 OF 2
11         BEFORE THE HONORABLE CARLOS E. MENDOZA
                UNITED STATES DISTRICT JUDGE
12

13
     APPEARANCES:
14
      Counsel for Plaintiff:      Vincent Chiu
15
      Counsel for Defendant:      Alisha Marie Nair
16

17

18

19
     Proceedings recorded by mechanical stenography.
20   Transcript produced by computer-aided transcription.

21
     Court Reporter:   Suzanne L. Trimble, CCR, CRR, RPR
22                     Federal Official Court Reporter
                       401 West Central Boulevard, Suite 4600
23                     Orlando, Florida 32801
                       e-mail: trimblecourtreporter@gmail.com
24

25

2

# T A B L E   O F   C O N T E N T S

PROCEEDINGS                                                    PAGE

                              April 29, 2019

EXCERPT OF TESTIMONY

 **GRETA HASLER**, called by Government
     Direct Examination By Mr. Chiu.................. 3
     Cross-Examination By Ms. Nair................... 13
     Redirect Examination By Mr. Chiu................ 22

```
 1                    P R O C E E D I N G S
 2                           Excerpt
 3                       GRETA HASLER,
 4    called by Government, was duly sworn by the courtroom deputy,
 5    and in answers to questions propounded, testified as follows:
 6               THE COURTROOM DEPUTY:  Have a seat there, please.
 7               THE COURT:  Good morning, ma'am.  Once seated,
 8    please make yourself comfortable with the chair's proximity to
 9    the microphone and then state your full name into the
10    microphone and please spell your last name.
11               THE WITNESS:  My full name is Greta Johanna Hasler.
12    My last name is spelled H-a-s-l-e-r.
13               THE COURT:  Thank you, Ms. Hasler.  Your witness,
14    Mr. Chiu.
15               MR. CHIU:  Thank you, Your Honor.
16                       DIRECT EXAMINATION
17    BY MR. CHIU:
18    Q    Good morning, ma'am.  Ms. Hasler, are you employed?
19    A    Yes.
20    Q    Who are you employed with?
21    A    Senator Bernard Sanders.
22    Q    And what do you do for Senator Bernard Sanders?
23    A    I'm a staff assistant.
24    Q    What does being a staff assistant involve?
25    A    So I answer the phones at the front desk for half of the
```

1  day.  I share my office responsibilities with another staff

2  assistant, and he answers the phone for the other half of the

3  days, which includes taking legislative comments for the

4  senator as well as speaking with constituents when they may

5  have an issue with a federal agency.  Our office is a

6  constituent services office, so intaking whatever they need

7  help with and opening it as a case so that we can assist them.

8  Q    How long have you worked for that office?

9  A    I started on April 1st, 2018.

10  Q    Now, who is technically your employer?  Like, who sends

11  you your paychecks?

12  A    The United States Senate.

13  Q    But you're assigned to Senator Bernard Sanders?

14  A    Correct.

15  Q    And where do you work out of?

16  A    His Burlington, Vermont, senate office.

17  Q    When you say "Senator Bernard Sanders," is this

18  individual a member of the United States Senate?

19  A    Yes.

20  Q    Now, I'm going to take you back to on or about

21  September 29, 2018.  Were you working with that same office

22  then?

23  A    Yes.

24  Q    Do you recall receiving some voicemails that contained

25  some threats to Senator Sanders?

1    A    Yes.

2    Q    Can you tell us about what happened, please?

3    A    Sure.  So I came in on Monday, October 1st.  The interns

4    in our office listen to the voicemails every day and send us

5    an e-mail with the contents of all of the voicemails, which my

6    staff assistant partner Liam and I review, whichever one of us

7    is not on the front desk phones.

8            There was flagged -- three voicemails were flagged

9    in the initial e-mails from the interns as being threatening.

10   So I dialed into the phone system and listened to them and

11   transcribed them as well as I could.

12   Q    And these messages were left on what telephone line?

13   A    Our main Burlington, Vermont, office number.

14   Q    And what is that number?

15   A    It's (802) 862-0697.

16   Q    And when someone calls that line and no one picks up,

17   what does that -- you know, what is on the other end of the

18   line?

19            MS. NAIR:  Objection, Your Honor, hearsay.

20            THE COURT:  All right.  I'm going to overrule the

21   objection.  I don't think he's asking for hearsay.  I think

22   he's asking what generally is on the other side of the line.

23   But if it starts coming out, jump in.  So it's overruled for

24   now.  It's premature.  Go on ahead and ask your question.  And

25   please tailor it specifically to what you're trying to elicit.

1   BY MR. CHIU:

2   Q    Let me put it this way.  What does the answering machine

3   message say?

4              MS. NAIR:  Objection, Your Honor, hearsay.

5              THE COURT:  Okay.  So what is the response to that?

6   Out-of-court statement used in court for the truth of the

7   matter asserted, that's the objection.  What's the response to

8   the objection?

9              MR. CHIU:  Your Honor, I'm not seeking to admit

10  anything for the truth of the matter asserted, simply for what

11  is the content of the answering machine message.  There's no

12  matter asserted in that.  It's --

13             THE COURT:  All right.  What's the defense's

14  response to that?

15             MS. NAIR:  He's seeking to -- may we approach

16  sidebar?

17             THE COURT:  Sure.

18             (At the bench.)

19             MS. NAIR:  Mr. Chiu is seeking to introduce it to

20  say what Mr. Pratersch heard and specifically in that when you

21  listen to the voice message it says that you're leaving a

22  message for Bernard Sanders.  That is for the truth of the

23  matter asserted because it goes to the specific issue of

24  whether or not Mr. Pratersch heard information and then left a

25  message for Senator Sanders.  Additionally, the other

1   information is relevancy because what he heard is not a matter

2   of whether or not he made a threat, and so it doesn't go to

3   prove or establish or disprove or establish any of the

4   elements of the offense.

5            THE COURT:  What's your response?

6            MR. CHIU:  I think we're looking at the wrong matter

7   asserted.  The matter asserted is what's actually said in the

8   answering machine message, mainly, you have reached the office

9   of United States Senator Bernie Sanders.

10           THE COURT:  So you're trying to establish when

11  someone calls the office what they heard.  I guess her problem

12  is that you're connecting it to him.

13           MR. CHIU:  Well, Your Honor, the testimony is that

14  that's what the person -- a person calling hears, and it's

15  relevant because my understanding is that the defense is --

16  one of the defenses is going to be that the defendant didn't

17  intend to threaten the official in the course of their

18  official business.

19           THE COURT:  So if anyone calls the office, that's

20  what they hear if no one picks up personally?

21           MR. CHIU:  Yes, Your Honor.

22           MS. NAIR:  May I respond briefly?

23           THE COURT:  Sure.

24           MS. NAIR:  So there's no way to establish whether

25  that's accurate or not.  The information that she's going to

1    testify to is something she was interviewed about in January

2    and if you call that same line today it is a different

3    message.  So we don't know the exact message that was heard or

4    was an individual calling in would have heard.  So it's

5    hearsay on top of hearsay.

6              THE COURT:  Well, I'm going to overrule on hearsay.

7    But now she's objecting to predicate.  How do you know the

8    message she's testifying to was the one that was playing at

9    the time he called?

10             MR. CHIU:  I can lay that predicate.

11             THE COURT:  You'll have to lay that predicate.

12   Overruled as to hearsay but sustained as to predicate at this

13   time.

14             MR. CHIU:  Thank you, Your Honor.

15             (In open court.)

16             THE COURT:  All right.  Thank you.

17             Mr. Chiu, feel free to proceed.

18   BY MR. CHIU:

19   Q    Ma'am, at the time of -- let's go back to September 29th.

20   Back in that time period, do you know what the answering

21   machine from the office line said if somebody didn't pick up

22   at the office?

23   A    Not verbatim, no.

24   Q    Okay.  What is it -- what did it generally say?

25   A    It generally --

1       MS. NAIR:  Objection, Your Honor.  I restate my

2  objections.

3       THE COURT:  Okay.  You can state your objections.

4       MS. NAIR:  I object for predicate, relevancy, and

5  hearsay.

6       THE COURT:  Okay.  I'm going to give you leeway on

7  cross-examination, but the objection is going to be overruled.

8  She can answer your question.

9  BY MR. CHIU:

10 Q    What did that answering machine message state?

11 A    Generally, it stated our office hours, that if you were

12 calling during office hours all of the lines were full, but if

13 you were calling outside of office hours you could leave a

14 message for Senator Bernard Sanders.  If you were requesting

15 assistance, you were to leave your contact information and

16 someone would call you back.

17 Q    And did that message identify that line as the line for

18 the office of Senator Bernard Sanders?

19 A    Yes.

20 Q    Is it Bernie Sanders or Bernard Sanders that's usually --

21 A    His full name is Bernard, but it's typically Bernie.

22 Q    Okay.  So let's go back to September -- I guess it would

23 be October 1, 2018, when you came into the office.  You

24 mentioned you heard three calls?

25 A    Yes, three voicemails.

```
 1   Q    Three voicemails.
 2            MR. CHIU:  Can we play Government's Exhibit 1,
 3   please?
 4   BY MR. CHIU:
 5   Q    Have you recently relistened to any of these voicemails?
 6   A    Yes.
 7            (The above referenced exhibit was published.)
 8   BY MR. CHIU:
 9   Q    Is what you heard as Government's Exhibit 1, is that a
10   fair and accurate depiction of what you heard that Monday
11   morning?
12   A    Yes.
13            MR. CHIU:  If we could play Government's Exhibit 2,
14   please.
15            (The above referenced exhibit was published.)
16   BY MR. CHIU:
17   Q    Government's Exhibit 2, is that also a fair and accurate
18   depiction of what you heard?
19   A    Yes.
20            MR. CHIU:  And if we can play Government's
21   Exhibit 3, please.
22            (The above referenced exhibit was published.)
23   BY MR. CHIU:
24   Q    Now, Government's Exhibit 3, was that also one of the
25   calls you heard that morning?
```

1    A    Yes.

2    Q    After hearing these voicemail messages, what did you do?

3    A    As I was listening to them, I typed them and e-mailed

4    them to my state director David Weinstein.

5    Q    Now, do you listen to every voicemail that comes in?

6    A    No.  I read a transcript of every voicemail that's sent

7    to us by the interns.

8    Q    Now, your office in Burlington, Vermont, can you tell us

9    about what are the operations of that senate office?

10   A    So we take legislative comments, just like the DC office,

11   and share them with the senator, but we also are a constituent

12   services office.  So we have a number of caseworkers who

13   specialize in specific federal agency casework, and we, you

14   know, help constituents who may be having issues with the

15   I.R.S. or Social Security or the Veterans Administration.  So

16   my colleague Liam, the other staff assistant, and I hear

17   constituents as far as what problems they're facing with

18   federal agencies and take that information and assign it to a

19   caseworker.  That's the core function of the office.

20   Q    Who works out of that office?

21   A    The senator, our state director David, a number of

22   caseworkers, as I said, and then a number of outreach

23   representatives who take meetings throughout the state on

24   specific legislative areas, as well as two staff assistants,

25   myself and Liam, and senior press advisor Dan McLean, and four

1   interns.

2   Q    And how often does Senator Sanders work out of the

3   Burlington, Vermont, office?

4   A    Generally when the Senate is in session, the senator is

5   in the Burlington, Vermont, office Mondays and Fridays.  His

6   home is in Vermont.  So he's in Vermont on the weekends and

7   then he flies back to DC on generally Monday afternoon and

8   flies back to Vermont, generally, Thursday night to be in the

9   Burlington office on Fridays.

10  Q    And when senate is not in session?

11  A    He's in the Burlington office generally all week.

12  Q    Now, when you received these voicemail messages, did you

13  receive any -- did the system show any kind of identifying

14  information for the caller?

15  A    Yes.

16  Q    What did it show?

17  A    It showed -- the caller ID was "KISSIM," K-I-S-S-I-M,

18  believe and then the full phone number.

19  Q    Okay.  And did you write that down?

20  A    I did, yes.

21  Q    And did you pass that on?

22  A    Yes.

23       MR. CHIU:  May I have one moment, Your Honor?

24       THE COURT:  You may.

25       MR. CHIU:  I have no further questions.  Thank you.

1          THE COURT:  Ms. Nair, cross-examination.

2          MS. NAIR:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MS. NAIR:

5    Q    Ms. Hasler, when is senate in session?

6    A    When is the senate in session?  I can't say specifically

7    the weeks that it's in session.

8    Q    Do you know the months it's in session?

9    A    It's in session for most of the year.  There's a few

10   weeks that are recess weeks, but I don't know them off the top

11   of my head.

12   Q    How is the senate session determined?  Who determines

13   when it's in session versus when it's not in session?

14   A    I don't know.

15   Q    So you come in on October 1st and the interns give you a

16   message?

17   A    The interns sent us an e-mail with all of the voicemail

18   messages from the weekend, up until Monday morning.

19   Q    So you're not the first person to hear the voice message?

20   A    Correct.

21   Q    It would be your interns?

22   A    Correct.

23   Q    And after the interns listen to it, do they send you all

24   of the messages or just some messages?

25   A    All of them.

1    Q    You said that there were three that were flagged --

2    A    Correct.

3    Q    -- as possibly being threatening?

4    A    Correct.

5    Q    Did they separate those three out from the other calls

6    that were received?

7    A    So all of the calls are typed up as individual calls.

8    The three that were threatening were highlighted in red font,

9    and I don't believe the intern typed them up verbatim.  It

10   just said, three threatening messages.

11   Q    The third message that you heard where it said, you're

12   dead, your effing dead, do you recall that message?

13   A    Yes.  It said, "You're fucking dead."

14   Q    Okay.  There was no one saying, I'm going to kill you, in

15   that message, correct?

16   A    I don't recall specifically.

17          MS. NAIR:  May I approach the witness, Your Honor?

18          THE COURT:  You may.

19   BY MS. NAIR:

20   Q    Now that you have in front of you what's previously

21   marked as Government's Exhibit 6, that is the third call,

22   correct?

23   A    Yes.  It says, "Transcript of Exhibit 3."

24   Q    Okay.  But the tab next to it is a six?

25   A    Correct.

1    Q    Okay.  So that was the third call that was transcribed or

2    was heard on that voice line, correct?

3    A    Yes.

4    Q    Inside of that call, it does not say, I'm going to kill

5    you.

6    A    Correct.

7    Q    It just says, "You're dead"?

8    A    It says, "You're dead, you're fucking dead."

9    Q    Is that the part that you view to be threatening?

10   A    In this particular message?

11   Q    Yes.

12   A    Yes.

13   Q    When the voicemails were sent to you, did you take them

14   collectively as a threat?

15   A    Yes.

16   Q    Now, these messages were left within a short time frame

17   on Saturday, September 29th, correct?

18   A    That is my understanding, yes.

19   Q    You testified earlier that when you call into the system,

20   you receive a message, the person calling in would receive a

21   message, correct?

22   A    Yes.

23   Q    And that would generally tell you that you have the

24   ability to leave a message?

25   A    Yes.

1    Q    And you said you don't know what it says verbatim,

2    correct?

3    A    Correct.

4    Q    But that message system has changed over time?

5    A    Not to my knowledge.

6    Q    Have you listened to the message today?

7    A    The voicemails?

8    Q    When you call in.

9    A    No.

10   Q    So do you know if the message, the answering system, says

11   today what it said in September?

12   A    I believe it does, yes.

13   Q    Okay.  If it were different, would that surprise you?

14   A    Yes.

15        MS. NAIR:  Okay.  May I retrieve?

16        THE COURT:  You may.

17        MS. NAIR:  Thank you.

18   BY MS. NAIR:

19   Q    Do you have any control over the message that is left for

20   an individual calling in?

21   A    No.

22   Q    So that is not your voice on the machine when you call

23   in?

24   A    No.

25   Q    Do you know whose voice it is?

1    A    No.

2    Q    Do you know when the person changes out the messages?

3    A    What do you -- can you rephrase the question?

4    Q    Do you know when the person who is on the messaging

5    system changes out the messages?

6    A    No.

7    Q    Okay.  So when you were asked the question about what it

8    generally says, how do you have information on what it

9    generally says?

10   A    Because I've listened to it.

11   Q    When was the last time you listened to it?

12   A    In January.

13   Q    Prior to January, when was the last time you listened to

14   it?

15   A    I can't say for sure.

16   Q    What made you listen to it in January?

17   A    An agent called our office and asked me what it said when

18   somebody called in.

19   Q    Prior to -- is this around January 30th?

20   A    Correct.

21   Q    Prior to January 30th, would there have ever been an

22   instance where you would have needed to know what that

23   information said?

24   A    I'm not sure.

25   Q    Do you call into that office?

1    A    I have, yes.

2    Q    Okay.  And do you reach the voice messaging system?

3    A    I have, yes.

4    Q    When you listened to the voice messaging system, do you

5    leave a message?

6    A    I don't believe I've ever left a message, no.

7    Q    Do you listen to it all the way through?

8    A    Yes, you have to.

9    Q    But you don't leave a message?

10   A    No.

11   Q    So you listen to it all the way through and then you hang

12   up?

13   A    Yes.

14   Q    And you don't know when the last time you did that was?

15   A    In January.

16   Q    Prior to January, do you know when the last time you did

17   that?

18   A    No.

19   Q    Okay.  So then you can't say with any degree of certainty

20   whether the message that was left in January that you heard

21   was a message that was heard in September?

22   A    Can you rephrase the question?

23   Q    Yes.  You have no idea whether when Mr. Pratersch called

24   in in September if he heard the exact same message that you

25   heard in January.

1   A    To my knowledge, it did not change between September and

2   January.

3   Q    Who would have given you that information?

4   A    Likely my state director David.

5   Q    You're saying "likely."  Did someone tell you that it did

6   not change between September and January?

7   A    Nobody told me that it did not change.

8   Q    Did anyone tell you that it did change?

9   A    No.

10  Q    Did you ask that specific question?

11  A    No.

12  Q    So you don't know today whether or not it changed?

13  A    To my knowledge, it did not change.

14  Q    And you don't know whether or not it changed from January

15  to today?

16  A    To my knowledge, it has not changed at all since I began

17  working there.

18  Q    Just for clarity, you stated that it says, if you're

19  calling to leave a message for the senator, leave your name,

20  and if you're calling during office hours, leave your name,

21  mailing address, and message, correct?

22  A    I can't say for sure.  Is it possible for me to look at

23  that?

24  Q    If you recall what your testimony was earlier or not,

25  that's fine.

1  A    My -- are you asking about my conversation on

2  January 30th?

3  Q    I'm asking you about your testimony today, ma'am.

4  A    Okay.  Can you repeat the question?

5  Q    Your testimony today was when you call the number, you

6  receive a message saying, if you would like to leave a message

7  for the senator, leave your name, and we'll get back to you.

8  A    No.  The voicemail asks if you would like assistance to

9  leave your name and contact information, and we'll get back to

10 you.  We don't return calls for people that are just leaving a

11 message for the senator, leaving a legislative comment.  So

12 it's likely a separation between if you're leaving a message

13 or if you're requesting assistance.

14 Q    So you're saying that there are two separate ways that

15 you can leave a message on that message machine, on the

16 voicemail?

17 A    I'm saying that the recording that you hear when you're

18 leaving a message differentiates between whether you're

19 calling with a comment for the senator or whether you're

20 requesting assistance from our office.

21 Q    I understand.  Now, you said that you don't -- or do you

22 know whether the session was in -- whether the senate was in

23 session on September 29th?

24 A    I don't recall specifically.  That was a weekend day

25 though.

1    Q    So are sessions -- are the senate in session during

2    weekends?

3    A    No.

4    Q    Do you know if the senate was in session on October 1st?

5    A    I don't recall.

6    Q    Do you know whether Mr. Sanders was working on

7    September 29th?

8    A    I don't know.

9    Q    You would have the ability to know his schedule, correct?

10   A    I do have access to his schedule, yes.

11   Q    Do you know if Mr. Sanders had any speaking engagements

12   on September 29th?

13   A    I don't recall.

14   Q    Do you know if Mr. Sanders had any speaking engagements

15   on October 1st?

16   A    I don't recall.

17   Q    On October 1st, was Mr. Sanders in the office?

18   A    I don't recall.

19   Q    You recalled receiving the voicemails from your interns

20   and then taking those voice messages to your superior,

21   Mr. Weinstein, correct?

22   A    I e-mailed them to David Weinstein, yes.

23   Q    Was Mr. Weinstein in the office on that day?

24   A    Yes.

25   Q    Did you all have any conversation about it outside of the

1    e-mail?

2    A    I don't recall.

3    Q    Would you pass on these communications to Mr. Sanders, or

4    would someone else pass that on?

5    A    I don't know.

6    Q    You don't know if you would do that?

7    A    I personally did not.

8    Q    Would you?  Is that a part of your job duties?

9    A    No.

10         MS. NAIR:  I have nothing further for this witness,

11   Your Honor.  Thank you.

12         THE COURT:  Thank you.  Redirect.

13         MR. CHIU:  Thank you, Your Honor.

14                   REDIRECT EXAMINATION

15   BY MR. CHIU:

16   Q    You mentioned on cross that you've called into the office

17   before and heard the answering machine message; is that

18   correct?

19   A    Yes.

20   Q    And had you done that prior to, you know, September 29,

21   2018?

22   A    Likely, yes.

23   Q    And after?

24   A    Yes.

25   Q    And have you done this on multiple occasions?

GRETA HASLER - Redirect Examination by Mr. Chiu                    23

1   A    Yes.

2   Q    Every time, to the extent you've heard that answering

3   machine message, has it identified the office that's -- or the

4   phone line as belonging to the office of Senator Bernie

5   Sanders?

6   A    Yes.

7   Q    And has it afforded the caller an opportunity to leave a

8   message for the senator?

9   A    Yes.

10  Q    These calls, did you take the content of these calls

11  seriously when you first heard this?

12  A    Yes.

13  Q    You mentioned you have to listen to the message all the

14  way through to leave a message.  Can you, like, press a button

15  or something to kind of cut the message short?

16  A    No, not to my knowledge.

17          MR. CHIU:  I have no further questions thank you.

18          (WHEREUPON, this excerpt was concluded.)

19                         *   *   *

20                  CERTIFICATE OF REPORTER

21
    I certify that the foregoing is a correct transcript of the
22  record of proceedings in the above-entitled matter.

23
     _/s/ Suzanne L. Trimble_____            7/18/19_
24   Suzanne L. Trimble, CCR, CRR, RPR             Date
     Official Court Reporter
25