1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,      :
                               :
                               :   Case No.:
         Plaintiff,            :   6:19-cr-26-Orl-41TBS
                               :
vs.                            :
                               :   Orlando, Florida
ROBERT FRANCIS PRATERSCH,      :   April 29, 2019
                               :   8:32 a.m.
                               :
         Defendant.            :
                               :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF TRIAL VOLUME 1 OF 2
BEFORE THE HONORABLE CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE


APPEARANCES:

  Counsel for Plaintiff:        Vincent Chiu

  Counsel for Defendant:        Alisha Marie Nair



Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

Court Reporter:  Suzanne L. Trimble, CCR, CRR, RPR
                 Federal Official Court Reporter
                 401 West Central Boulevard, Suite 4600
                 Orlando, Florida 32801
                 e-mail: trimblecourtreporter@gmail.com

2

# T A B L E   O F   C O N T E N T S

PROCEEDINGS                                                          PAGE

April 29, 2019

TESTIMONY
  **GRETA HASLER**, called by Government
       Direct Examination By Mr. Chiu................... 157
       Cross-Examination By Ms. Nair.................... 166
       Redirect Examination By Mr. Chiu................ 176
  **KENNETH LECESNE**, called by Government
       Direct Examination By Mr. Chiu................... 180
       Cross-Examination By Ms. Nair.................... 186
  **OMAR FIGUEROA**, called by Government
       Direct Examination By Mr. Chiu................... 196
       Cross-Examination By Ms. Nair.................... 207
  **JOHN PRATERSCH**, called by Defense
       Direct Examination By Ms. Nair.................. 222
       Cross-Examination By Mr. Chiu................... 230
  **KATHY GENUNG-PRATERSCH**, called by Defense
       Direct Examination By Ms. Nair.................. 232
       Cross-Examination By Mr. Chiu................... 236
       Redirect Examination By Ms. Nair............... 237
  **STEVEN PRATERSCH**, called by Defense
       Direct Examination By Ms. Nair.................. 238
       Cross-Examination By Mr. Chiu................... 245
       Redirect Examination By Ms. Nair............... 246
  **ROBERT PRATERSCH**, called by Defense
       Direct Examination By Ms. Nair.................. 250
       Cross-Examination By Mr. Chiu................... 263
       Redirect Examination By Ms. Nair............... 265


OTHER
Pretrial Colloquy.................................... 3
Colloquy Re: Motions in Limine....................... 6
Jury Voir Dire...................................... 18
Reading of Preliminary Jury Instructions............ 141
Government's Opening Statement By Mr. Chiu.......... 150
Defense Opening Statement By Ms. Nair............... 153
Colloquy Re: Motion For Judgment of Acquittal....... 212
Judge Mendoza's Ruling on Motion For Judgment of
Acquittal........................................... 248
Jury Charge Conference.............................. 268

# E X H I B I T S

    NO.                                    MARKED/ADMITTED   PAGE

 Government's Exhibits
     Nos. 1 through 9                       admitted........ 156

3

<pre>
                        P R O C E E D I N G S

          THE COURT:  All right.  Please be seated, everyone.

All right.  Let's call the case.

          THE COURTROOM DEPUTY:  This is the case of the

United States of America v. Robert Francis Pratersch, Case

No. 6:19-cr-26.

          Will counsel please state their appearances for the

record?

          MR. CHIU:  Good morning, Your Honor.  Vincent Chiu

on behalf of the United States.  I'm joined by F.B.I. task

force officer Omar Figueroa.

          MS. NAIR:  Good morning, Your Honor.

Alicia Marie Nair here on behalf of Mr. Robert Pratersch.

          THE COURT:  All right.  Good morning.  I have a few

things and then I'll hear from you.

          All right.  You said Omar Figueroa?

          MR. CHIU:  Yes, Your Honor.  I'm sorry.  It's F.B.I.

Special Agent Omar Figueroa.

          THE COURT:  And special agent, F.B.I.?

          MR. CHIU:  Yes, Your Honor.

          THE COURT:  All right.  Will either side be

requesting the imposition of the Rule of Sequestration?

          MS. NAIR:  Yes, Your Honor.

          THE COURT:  How about the Government?

          MR. CHIU:  Yes, Your Honor.  Without objection to
</pre>

4

1    defense's request.

2            THE COURT:  I don't know who your witnesses are, so

3    please make sure that you're aware of who's in the courtroom

4    at all times.

5            All right.  Next, I'm going to read you the

6    statement of the case and ask for input on it.

7            In Count 1 of the superseding indictment, the United

8    States alleges that on or about September 29, 2018, in the

9    Middle District of Florida, the defendant

10   Robert Francis Pratersch did knowingly threaten to assault and

11   murder United States Senator Bernard Sanders with the intent

12   to intimidate and retaliate against Senator Sanders while he

13   was engaged in the performance of his official duties.

14           In Count 2 of the superseding indictment, the United

15   States alleges that on or about September 29, 2018, in the

16   Middle District of Florida, the defendant

17   Robert Francis Pratersch did knowingly and for the purposes of

18   issuing a threat and with the knowledge that the communication

19   would be viewed as a threat, transmit in interstate commerce,

20   from the state of Florida to the state of New Hampshire, a

21   communication to the Burlington, Vermont, office of Senator

22   Sanders, a communication that contained a threat to behead

23   Senator Sanders.  United States alleges that both acts were

24   committed in violation of federal law.

25           Is there any objection from the Government as to the

1  statement of the case?  If there's something wrong --

2          Ms. Nair, you have a Cheshire Cat smile, so go on

3  and tell me what your concerns are.

4          MS. NAIR:  Mr. Chiu just noticed a mistake in the

5  indictment.

6          THE COURT:  All right.  State that again.

7          MS. NAIR:  Mr. Chiu just noticed a mistake in the

8  indictment.

9          THE COURT:  Okay.

10         MR. CHIU:  Yes, Your Honor.  In the indictment it

11  states New Hampshire rather than Vermont in the -- in the

12  second statement of where the --

13         THE COURT:  So you're saying there's a scrivener's

14  error in the indictment in that you meant to say Vermont, but

15  instead wrote, New Hampshire?

16         MR. CHIU:  That's correct, Your Honor.

17         THE COURT:  All right.  I'm glad you found that

18  because I go off the indictment.

19         What is the defense position on that?

20         MS. NAIR:  The defense position is, the Government

21  has the ability to supersede or to correct an error in their

22  indictment any time prior to trial.  Trial has not begun.  I

23  understand that.  They've noticed it.

24         THE COURT:  And I appreciate that.  I know you

25  probably weren't confused thinking that Senator Sanders was

6

1   from New Hampshire, and I appreciate your candor on that.

2           MS. NAIR:  I do take one issue, however, Your Honor.

3           THE COURT:  Sure.

4           MS. NAIR:  In the indictment, the prosecution -- or

5   the Government has noted, not in the -- excuse me.  In Count 2

6   they have not listed him as Senator Sanders; they've listed

7   him as Bernard Sanders.  So the Court read, Senator Sanders,

8   and I would ask that that not be read.

9           THE COURT:  All right.  And we'll take your motion

10  up in a moment.  So that's the defense's only objection.

11          Does the Government have any objections --

12          MR. CHIU:  No, Your Honor.

13          THE COURT:  -- to the statement of the case?  And

14  I'll make the amendment changing New Hampshire to Vermont.

15          MR. CHIU:  Thank you, Your Honor.

16          THE COURT:  All right.  Having said that, the rule

17  of sequestration has been imposed.  There's one objection

18  pending with regard to statement of the case, and there are

19  two pending motions.  One's a motion in limine filed by the

20  defense.

21          Would you like to supplement your motion with any

22  additional argument at this time?  It's the one where you

23  don't want Sanders -- Mr. Sanders -- you want Mr. Sanders

24  versus Senator Sanders.

25          MS. NAIR:  Yes, Your Honor.  I took note that the

7

1    Court has a preference in the rules for jury trials and that

2    the Court has also stated that all parties must comply with

3    local Rule 5.03 when appearing before this Court.  The

4    Government opposes the motion, but that ultimately opposes a

5    standing order that this Court has set out.  The titles are

6    silent in the local Rule 5.03; however, the essence of the

7    rule is to lay an equal playing field for all involved, to not

8    give one weight -- one party greater weight than another.

9            Additionally, the title that the Government is

10   seeking to give Mr. Pratersch is "defendant," which is also

11   constitutionally impermissible, as the Constitution, even,

12   given the title for an individual who is accused of a crime,

13   is "the accused" not "the defendant."  It is a derogatory term

14   that is meant to inflame the jury's conscience on the guilt of

15   Mr. Pratersch, not laying an equal playing field for him to be

16   presumed innocent until and unless proven guilty.

17           THE COURT:  So you're objecting to your client being

18   referred to as "the defendant"?

19           MS. NAIR:  That is correct.

20           THE COURT:  Okay.  Does the Government want to be

21   heard on that?

22           MR. CHIU:  Yes, Your Honor.  I mean, first of all,

23   local Rule 5.03, the rule regarding surnames -- I don't have

24   any objection to the enforcement of that rule, but the --

25           THE COURT:  The purpose of that rule is so someone

8

1  doesn't refer to him as Bernie or the defendant as Robert or

2  Bobby.

3         MR. CHIU:  Exactly, Your Honor.

4         THE COURT:  I've had plenty of circumstances where

5  defendants who have been physicians have been referred to by

6  "doctor," experts referred to by "doctor."  And here's the

7  dilemma.  I understand the defense's concern over

8  Senator Sanders being used routinely, but that sort of ignores

9  the elephant in the room.  The whole purpose of bringing 50

10  people in here and conducting extensive voir dire, which I

11  will open up with, is the fact that the jury will know

12  undoubtedly that the alleged victim in this case is an elected

13  U.S. senator.  So I think the horse is out of the barn at that

14  point.  I understand that Ms. Nair might not want it

15  repeatedly said during the trial, but, I mean, these are smart

16  people, and they're going to know right out of the gate that

17  the reason we're here is because the Government is alleging

18  who the victim is.

19         So I understand what the motion is.  I don't really

20  need to hear argument.  No one is going to be referred to by

21  their first names.  The only time I allow that is when you

22  have people with the same surname and we need to draw a

23  distinction between them.  But that's who he is.  So the

24  objection is noted but overruled, and I'm going to make very

25  clear to the jury that it doesn't matter that it's

9

1   Senator Sanders or someone else who fits the criteria for that

2   crime.  The only question here is whether or not the

3   Government can prove their case beyond a reasonable doubt,

4   irrespective of who the victim is.

5          So that motion in limine is going to be denied.  The

6   objection on the statement of the case is going to be

7   overruled.  And I'm going to let them know the statement of

8   the case is not evidence or facts, they're simply my attempt

9   to make sure that if they recognize or have any kind of bias

10  that can be revealed in voir dire, that we can identify that

11  and get them off the jury.

12         There is another motion that's been filed.  I think

13  it was filed yesterday.  It's a motion to dismiss, and it's a

14  multiplicity issue where, apparently -- I haven't had a chance

15  to review it carefully.  I just read it as fast as I could

16  before I came in here -- and it sounds like the defense is

17  arguing that you're squeezing two crimes out of one event.

18         So, Ms. Nair, would you like to supplement the

19  record?  By the way, I'm not going to be able to make a ruling

20  on this until the charging conference -- and I can clean it up

21  at that point -- because I just saw it for the first time

22  about 15 minutes ago.  But Ms. Nair if you'd like to argue

23  your motion, you're certainly welcome to do so.

24         MS. NAIR:  Your Honor, and I do apologize.  I read

25  the rules and I antagonize --

1    THE COURT:  Sometimes the epiphany comes at the last

2    minute.  You have to recognize your client.  I don't offer any

3    criticism on that.  Feel free to proceed.

4    MS. NAIR:  Yes.  The agony came in that I spoke with

5    the Government about this in great depths.  The Government's

6    position is that they oftentimes charge two different separate

7    offenses for the same crime for the same act and the same

8    offense.  My concern here is that because, given the

9    individual who is charged -- or, excuse me, who is the alleged

10   victim in the case -- and the fact that in both instances the

11   Government is laying out that it occurred in two separate

12   manners, that the jury is going to be confused and believe

13   that my client then committed two separate crimes against

14   Mr. Bernard Sanders, and that could thereby prejudice

15   Mr. Pratersch in them believing that he, Mr. Pratersch, is

16   continuously harassing or threatening Mr. Bernard Sanders.

17   And then the other issue that could take place is

18   that the jury could then wish to split the baby, in essence,

19   and find him not guilty of one of the offenses but find him

20   guilty of the other.

21   THE COURT:  So is it your position the Government's

22   going for an either/or situation, that they acknowledge that

23   he can't be found guilty of both?

24   MS. NAIR:  The Government has informed me that he

25   can't be sentenced for both.  They have not expressly stated

1  that he can not be found guilty of both.

2        THE COURT:  I understand.

3        MS. NAIR:  We talked about the fact that one is not

4  a lesser included of the other because they include separate

5  facts.  So it passes the *Blockburger* test, but that's not the

6  issue here which is why there is an avenue or procedure for

7  doing multiplicity arguments because there's some times when

8  Congress will charge it in separate manners.  And in this

9  case, it's because of the nature of who the alleged victim is

10  that he can be charged under 18 United States Code,

11  Section 115.  If the alleged victim were any other individual,

12  then the Government would have had to charge it under 824(c),

13  and that is what the Government then realized when they did

14  their superseding indictment and then brought that charge as

15  well as like a catch-all for it just being any individual and

16  saying, well you can be found guilty of this offense.

17        THE COURT:  I understand.

18        What's the Government's position on that?  Are you

19  in agreement that if found guilty of both, he can only be

20  sentenced on one?

21        MR. CHIU:  No, Your Honor.  I'm in agreement that

22  that's what I had said on a spur of the moment to defense

23  counsel, but --

24        THE COURT:  So if he's found guilty on Count 1 and

25  Count 2, it's your position he could theoretically be

12

1    sentenced consecutively on both counts?

2            MR. CHIU:  Theoretically, yes.  And the case on this

3    that's really on all four corners is *Blackburger v.*

4    *United States*.  I have a copy for the Court here.  I've

5    already highlighted the relevant portion if I may approach.

6            THE COURT:  Sure.  Please deliver it to Ms. Darleen.

7    I'd appreciate that.

8            MR. CHIU:  And I'll read directly from the opinion,

9    which states:  "The applicable rule is that where the same act

10   or transaction constitutes a violation of two distinct

11   statutory provisions, the test to be applied to determine

12   whether there are two offenses or only one is whether each

13   provision requires proof of a fact which the other does not."

14           Here we've got the same act or transaction

15   constituting two different statutory provisions.  Count 1

16   involves a threat made with the intent to intimidate a public

17   official in the performance of official duties.  The second

18   count involves a threat made in interstate commerce.  The

19   interstate commerce element is not present in the first count

20   and the interference with official duties or intimidating

21   official duties is not present in the second count.  So each

22   of those has an element which is not present in the other.  I

23   mean, looking at *Blockburger*, you know, each of those

24   provisions requires proof of a fact, which the other does not.

25           THE COURT:  All right.  This is a decision I'm going

13

1   to have to make at the charging conference.  If the defense is

2   granted the relief they're requesting, then obviously, the

3   verdict form will be amended to include only one offense.  I

4   need a chance to review this for myself, but thank you for

5   your arguments.  The Court will take that matter under

6   advisement.

7            All right.  I'm planning on doing something a little

8   different.  I've tried cases with you both before, but just,

9   right out of the gate, I'm going to ask -- I'm going to tell

10  the jury who -- I'm going to read them a statement of the case

11  after I do the typical intro.  I'm going to tell them who the

12  Government alleges the victim is, and I'm going to make it

13  clear to them that it does not matter and it should not matter

14  whether they agree or disagree philosophically with the

15  alleged victim in this case or whether they like or dislike

16  the victim in the case.  And if they feel strongly one way or

17  the other to the point where they are concerned that it might

18  affect their ability to remain fair and impartial, pro or

19  against, to raise their hand.  And if those persons raise

20  their hands, I'm going to get them out of here because I don't

21  want them talking about what they think or what their opinions

22  are.  If they feel that strongly for or against the alleged

23  victim in this case, that they don't -- that they're concerned

24  about their impartiality from the outset, then I'm going to

25  excuse them immediately.  That's why we have 50 people here.

1   I'd like to think that that kind of thing isn't going to

2   matter.  It shouldn't matter, but it may matter.  And we're

3   all human, so if they have a bias that they can't get past,

4   then I want them out of here as soon as possible, not talking

5   about the bias in front of the other jurors or during the

6   breaks or coming up or down from the courtroom.

7          All right.  So the rule of sequestration's been

8   imposed.  We've gone through the statement of the case.  I

9   hope to do openings this morning if we can get through voir

10  dire.

11         Approximately how many witnesses will the Government

12  be calling in this case?

13         MR. CHIU:  Most likely I'm looking at about three in

14  the case in chief, Your Honor.

15         THE COURT:  All right.  Thank you.

16         And if you'd like to -- you don't have to -- give me

17  an idea how many you plan on calling.

18         MS. NAIR:  Approximately three as well.

19         THE COURT:  All right.  And if you'd make sure that

20  Mr. Chiu has the names of your witnesses, Ms. Nair, so he

21  doesn't have to -- you don't have to give the names when asked

22  that the jurors be informed of all the potential witnesses in

23  the case.

24         Mr. Pratersch, if you'd be kind enough to stand at

25  counsel table with your attorney.  After you stand, please

15

1  raise your right hand.  You're going to be placed under oath

2  at this time.

3            (Robert Francis Pratersch sworn.)

4            THE COURT:  All right.  You can put your hand down,

5  sir.  There's a very important decision you're going to need

6  to make at the close of the Government's case, and that's

7  whether or not you're going to choose to become a witness in

8  your own defense.  You don't need to decide that now, but I

9  would encourage you to engage in open conversations with

10  Ms. Nair as to the advantages and disadvantages of becoming a

11  witness in your own case because once the Government rests,

12  I'm going to ask you whether, (A) you've had enough time to

13  talk to Ms. Nair about this very important decision and (B)

14  what that decision is going to be.  So I'd encourage you to be

15  talking with Ms. Nair about that decision between now and the

16  close of the Government's case.  Mr. Pratersch, did you hear

17  and understand that?

18            THE DEFENDANT:  Yes, sir.

19            THE COURT:  All right.  Thank you, sir.  Feel free

20  to be seated.

21            All right.  And I know we're going to have a lot to

22  talk about during the charging conference, including probably

23  a battle over a special jury instruction that I would imagine

24  defense may be requesting.  So we'll put that on hold until

25  now, and we can move forward with what we have going at this

16

1   point.

2          Is there anything further from the Government before

3   we begin the process of bringing the jurors up?

4          MR. CHIU:  No, Your Honor.  I guess the only thing I

5   can think of, on the witness list there is one potential

6   witness -- I don't necessarily intend on calling in the case

7   in chief, but it might be wise for me to mention in front of

8   the jury when determining whether someone knows somebody.

9          THE COURT:  Okay.  Potential witnesses, yeah, that

10  would be good.

11         MR. CHIU:  Thank you, Your Honor.

12         THE COURT:  Anything, Ms. Nair?

13         MS. NAIR:  No, Your Honor.  Thank you.

14         THE COURT:  All right.  Are they ready?  All right.

15  Relax for a minute.  We are going to stand in recess until I

16  return with Ms. Darleen.  She's going to print out the chart

17  for you, and then we'll be ready to move forward with voir

18  dire.  Thank you.

19         All right.  Have a seat.  Let's talk about this.

20  I'm going to tell you this now.  Please come up at sidebar.

21     (At the bench.)

22         THE COURT:  There's one juror in particular -- his

23  name is Herman Gonzales -- who doesn't want his employment

24  announced publicly.  He transports prisoners and mentioned

25  that he's concerned for his safety.  So you know what he does.

1   If that's a concern, feel free to challenge it for cause or

2   peremptory, but I'm not going to ask him what he does for a

3   living.

4           MS. NAIR:  Is he law enforcement?  Is he sworn law

5   enforcement?  Because that would make me think that he is, and

6   if he is, then it will be a challenge for cause.

7           THE COURT:  If he transports jurors, then I think

8   he -- or, I mean --

9           MS. NAIR:  Prisoners.

10          THE COURT:  -- transports prisoners, he has to be

11  law enforcement.

12          MS. NAIR:  Right.  That's what I'm thinking.  So I

13  don't know how to, except for by sidebar, challenge that.

14          THE COURT:  Well, when we leave, I mean, that sounds

15  like a cause challenge.  I mean, can we just agree now that

16  he's a cause challenge?

17          MR. CHIU:  Yeah, I'm not going to object to that,

18  so --

19          MS. NAIR:  Okay.

20          THE COURT:  And I'll go quickly over him so we don't

21  have to do that.

22          MS. NAIR:  Thank you.

23      (In open court.)

24          THE COURT:  All right.  Court's in recess.  Thank

25  you.

18

1        (Recess at 8:50 a.m., until 9:07 a.m.)

2              THE COURT:  All right.  Please be seated, everyone.

3              Is the Government ready to begin voir dire?

4              MR. CHIU:  Yes, Your Honor.

5              THE COURT:  Ms. Nair, are you ready?

6              MS. NAIR:  Yes, Your Honor.

7              THE COURT:  We're only bringing 40 in for now,

8  correct?

9              THE COURTROOM DEPUTY:  Yes, Judge.

10             THE COURTROOM SECURITY OFFICER:  All rise for the

11  jury.

12       (The jury entered the courtroom at 9:07 a.m.)

13             THE COURT:  All right.  Please be seated in the

14  courtroom.  Ladies and gentlemen of the jury, Ms. Darleen is

15  going to place you under oath.  Please remain seated and raise

16  your right hand.

17             (Jury panel sworn.)

18             THE COURT:  All right.  Good morning, everyone.  My

19  name is Carlos Mendoza.  I'm a district judge here in the

20  Middle District of Florida.  You're here for a three-day jury

21  trial that's going to begin today and going to conclude no

22  later than Wednesday.  This is a criminal trial, and I'm going

23  to go over a lot of information with you.  One thing I'd ask

24  you to start thinking about now is your availability during

25  the next three days.  I'm going to ask at some point whether

1   or not you have a conflict in your schedule, a scheduled

2   surgery, a prepaid vacation, some kind of family obligation

3   that you want me to be aware of so that we can consider it in

4   determining who's going to be on this panel.

5          Most of you are not going to be on this panel.

6   There are 40 of you in the courtroom; no more than 14 of you

7   are going to serve on this panel.  I don't want you to think

8   that that's a negative reflection on you.  We have to start at

9   a larger number to arrive at a smaller number and it's just

10  about numbers.  So understand that, again, the attorneys are

11  going to listen carefully, and we're going to make an informed

12  decision based on the answers that you give.

13         But before we get started, let me introduce you to

14  some very important people in the courtroom.  Seated directly

15  in front of me is Ms. Darleen Darley.  She's the deputy clerk

16  of court.  She's sort of my courtroom general.  She reminds me

17  when I need reminding.  She's in charge of all the exhibits

18  when they get admitted.  She sort of keeps everything moving

19  forward.

20         To her right is Ms. Suzanne Trimble.  She is the

21  court reporter.  Please excuse the fact that she will not be

22  standing when you arrive and depart because anything that's

23  said in the courtroom, she has to type out verbatim because

24  when appellate courts review what goes on in federal trial

25  courts, they rely exclusively on the written record, and if

1   she doesn't type it out, it's treated as if it was never said.

2          To my left is Mr. Ron Carter, he's a deputy marshal.

3   He is here for your security and mine.  If at any time you

4   need anything -- because I have to watch a lot of things

5   simultaneously in the courtroom -- if you need anything, a

6   break, you need to get out of here for a minute, you think you

7   need to contact a loved one, please make eye contact with

8   Mr. Carter.  He will let me know.  And we will meet your

9   needs.

10          Seated to my right is my law clerk,

11  Mr. Vaughn Glinten.

12          Mr. Glinten, if you would be kind enough to stand.

13          He helps me with any --

14          Thank you.  Feel free to be seated.

15          If there are any legal matters that arise during the

16  course of this trial, we want to do realtime research and

17  resolve these issues.  So I might be texting IM'ing or doing

18  something here because if we see a legal issue coming down the

19  road, we don't want to waste your time.  We want to make sure

20  that we have answers quickly so that we can move forward and

21  not keep you waiting until we answer legal questions.

22          All right.  Representing the United States in this

23  matter is Assistant United States Attorney, Mr. Vincent Chiu.

24  Seated with Mr. Vincent Chiu is F.B.I. Special Agent

25  Omar Figueroa.

21

1          Thank you, gentlemen.  Feel free to be seated.

2          Across from them is the defendant in this case.  His

3     name is Mr. Robert Francis Pratersch, and he's represented by

4     attorney Alisha Marie Nair.

5          Thank you.  Feel free to be seated.

6          All right.  There are a group of witnesses that may

7     potentially be called in this case, and I'm going to have

8     Mr. Chiu read all of the potential witnesses.

9          And Mr. Chiu, if you'd be kind enough to give me a

10    pause in between each witness.

11         If you recognize or think you recognize anyone on

12    that witness list, please raise your hand when we give you

13    that short pause.

14         Thank you, Mr. Chiu.

15         MR. CHIU:  Thank you, Your Honor.  David Weinstein,

16    Greta Hasler, Kenneth LeCesne, Jeffrey Hardy, Omar Figueroa,

17    Nester Mercado, Alex Brignoni, Jeffrey Barner.

18         THE COURT:  All right.  The record will reflect that

19    none of the jurors raised their hands.  Just a couple of

20    ground rules before we move into the meat of the voir dire

21    session.  Just a couple of general instructions.

22         MS. NAIR:  May we approach?

23         THE COURT:  Yes, you may approach sidebar.

24    (At the bench.)

25         MS. NAIR:  I think that Mr. Chiu may not have --

22

1          MR. CHIU:  Yeah, I think I misunderstood.

2          MS. NAIR:  He didn't read my witnesses.

3          MR. CHIU:  I didn't realize I was supposed to.

4          THE COURT:  Do you want to give him your list right

5    now?

6          MS. NAIR:  He has it.

7          MR. CHIU:  I have it.

8          THE COURT:  All right.  Let's read it.  All right.

9          MR. CHIU:  Okay.

10      (In open court.)

11          THE COURT:  All right.  Mr. Chiu is going to read

12    you a few more potential witnesses that may be called.

13          Mr. Chiu, if you'd be so kind.

14          MR. CHIU:  David Pratersch, John Pratersch, and

15    Kathy Genung Pratersch.

16          THE COURT:  All right.  The record will reflect that

17    none of the jurors have raised their hands.

18          All right.  Just a couple of ground rules.  I've

19    instructed the attorneys that they're to have no contact with

20    you.  So if they see you in the hallway, if you're on an

21    elevator and they're about to get on, they're going to avoid

22    you.  If they're talking as a group and you walk by, they're

23    going to stop talking.  Understand that we need to make sure

24    that not only is there no impropriety in this trial, but

25    there's not even the appearance of impropriety.  So you might

23

1    observe that their behavior might be odd in your presence, but

2    understand that that's a result of my instructions to them.

3         As I indicated, this case is starting today as soon

4    as we finish voir dire and it will wrap up by Wednesday.  I

5    will update the jury on where we're at in terms of timing, and

6    I will make sure, and I commit to using your time wisely.  So

7    moving on, now.

8         Everywhere in the United States, criminal cases are

9    initiated by what's called an "information" or an

10   "indictment."  In this case it's an indictment.  It's sort of

11   a more serious version of a traffic ticket, which I suppose

12   most of us have seen one time or another.  The indictment

13   informs the defendant that he or she is charged with a crime.

14   There is an indictment in this case, and I'll show it to you

15   later.

16        However, everywhere in the United States, defendants

17   are presumed to be innocent.  That presumption of innocence

18   remains with each and every defendant throughout the course of

19   every criminal trial.  It is up to the United States to prove

20   that a defendant is guilty.  Not only does the United States

21   have to prove it, but it has to prove it beyond a reasonable

22   doubt, and it has to prove it by evidence which you'll hear

23   about and see during this trial.  Unless the Government does

24   so, every defendant is innocent.  You're going to hear a lot

25   more about that as we proceed, but right now, as we're

24

1    talking, the defendant is innocent because the Government has

2    not proven otherwise beyond a reasonable doubt.

3          So if I were to ask you right now:  What are your

4    thoughts?  What's your best guess as to what happened here?

5          Some of you might say, I don't know because I

6    haven't heard the evidence.

7          But the correct answer would be, He's not guilty --

8    because the Government either does or does not meet their

9    burden; and at this time, the Government has not.

10         So let me read you a statement of the case.  This is

11   not evidence, and these are not the facts, they're just my

12   trying to trigger any memory you might have about this matter.

13   If you've heard about it, read about it, this is the time to

14   talk about that.

15         So in Count 1 of the superseding indictment, the

16   United States alleges that on or about September 29, 2018, in

17   the Middle District of Florida, the defendant

18   Robert Francis Pratersch did knowingly threaten to assault and

19   murder United States Senator Bernard Sanders with the intent

20   to intimidate and retaliate against Senator Sanders while he

21   was engaged in the performance of his official duties.

22         In Count 2 of the superseding indictment, the United

23   States alleges that on or about September 29, 2018, in the

24   Middle District of Florida, the defendant

25   Robert Francis Pratersch did knowingly and for the purpose of

25

1    issuing a threat and with the knowledge that the communication

2    would be viewed as a threat, transmit in interstate commerce

3    from the state of Florida to the state of Vermont a

4    communication to the Burlington, Vermont office of

5    Senator Sanders a communication that contained a threat to

6    behead Senator Sanders.  The United States alleges that both

7    acts were committed in violation of federal law.

8            So let's go on ahead and address a couple of issues

9    before we move on to the individual questioning.  Has anyone

10   heard about this case, either on TV or read it about in

11   newspapers?  If so, please indicate by raising your hand.  All

12   right.

13           And that's Ms. Lindquist?  I have your name wrong.

14           PROSPECTIVE JUROR:  Ledford.

15           THE COURT:  We'll take that up in a moment.  Anyone

16   else heard anything about this case?

17           All right.  In row two, we have Ms. Roman.

18           PROSPECTIVE JUROR:  Yes, but if I may speak?  I

19   haven't heard exactly about the case.  I didn't get anything

20   what you said.

21           THE COURT:  Oh.  You're having trouble understanding

22   me?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Okay.  And I appreciate that.

25           Anyone else on row two?  All right.

26

1             And that's Ms. Nolan?

2             PROSPECTIVE JUROR:  Yes.

3             THE COURT:  Anyone else on row two?  All right.

4             What about our front row?  Has anyone heard anything

5       about this case?

6             How about the last row?

7             All right.  In the front pews, has anyone heard

8       anything about this case?  All right.  We have two gentlemen.

9       And everyone is sort of out of order there.

10            What is your name, sir?  He'll hand you the

11      microphone.

12            PROSPECTIVE JUROR:  Harry Amesbury.

13            THE COURT:  All right, Mr. Amesbury.  And seated

14      next to you, is that Mr. Herrera?

15            PROSPECTIVE JUROR:  Allan Morseth.

16            THE COURT:  Mr. Morseth.

17            And in the second pew, has anyone heard anything

18      about this case?  All right.  We will take that up with all of

19      you individually in just a moment.

20            All right.  Here's sort of the foundation that this

21      trial is going to be built on.  The defendant is presumed to

22      be innocent until or unless proven guilty.  The indictment

23      brought against the defendant by the Government is only an

24      accusation, it is not proof of guilt or anything else.

25            Second, the burden in this case will always be on

1    the Government.  The United States has no burden to prove --

2    the defendant has no burden to prove his innocence or to

3    present any evidence at all or to even testify.  Since the

4    defendant has the right to remain silent and may choose on

5    whether or not to testify, you cannot legally put any weight

6    on a defendant's decision not to testify.  That would not be

7    any evidence.

8         Does anyone have any personal or philosophical

9    problems with those two sort of building blocks I just read to

10   you?  If so, please indicate by raising your hands.

11        All right.  So let's address the elephant in the

12   room.  The Government alleges the victim in this case is an

13   elected United States senator.  This case is not about whether

14   or not you like or dislike this particular United States

15   senator or whether or not you agree or disagree

16   philosophically with this senator.  The only thing this case

17   is about is whether or not the United States can meet their

18   burden.  So if it was a different elected person or another

19   person that fits the criteria that's intended to be protected

20   in the statute, it wouldn't matter; it just happens to be that

21   person.

22        So I need to ask, does anyone feel so strongly, in

23   either direction, for or against Senator Bernard Sanders or

24   for or against him philosophically that you think that is

25   going to have any chance of interfering with your ability to

28

1    remain fair and impartial?  If so, please raise your hand.

2          So, ma'am, you feel strongly.  You don't have to

3    tell me which way.  One way or the other, you think this could

4    affect your ability to remain fair and impartial?

5          PROSPECTIVE JUROR:  Definitely.

6          THE COURT:  And this is Ms. Naimoli?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Thank you, Ms. Naimoli.  I appreciate

9    that.

10         Is there anyone else on the panel?  All right.

11   Thank you for your candor on that.  So I will address the

12   issues with the one, two, three, four, five people that have

13   heard about this case, but what I'm going to do is go through

14   the general questioning first, and then I'll have all of you

15   remain behind, and then we'll have a conversation with less

16   people while everyone is downstairs.

17         So we're going to start.  The purpose of these

18   questions are not to embarrass you or put you in an

19   uncomfortable situation; it's to try to whittle down from the

20   larger group we have to the smaller group.  Everyone is going

21   to have the same questions asked of them with maybe a few

22   different follow-up questions, and then I'm going to ask a set

23   of group questions.  So if we can take the microphone to

24   Mr. Berkauzer.

25         All right.  You can remain seated while you answer

1  my questions, Mr. Berkauzer.  Thank you.

2        PROSPECTIVE JUROR:  Thank you.

3        THE COURT:  Please state your full name for the

4  record.

5        PROSPECTIVE JUROR:  Jacob Berkauzer.

6        THE COURT:  And sir, what is your date of birth?

7        PROSPECTIVE JUROR:  April 2, 1996.

8        THE COURT:  Where do you currently reside?

9        PROSPECTIVE JUROR:  In Deltona, Volusia.

10        THE COURT:  And, sir, how long have you lived in

11  Florida?

12        PROSPECTIVE JUROR:  My whole life, 23 years.

13        THE COURT:  What do you do for a living?

14        PROSPECTIVE JUROR:  I'm a sales executive.

15        THE COURT:  And for what type of company?

16        PROSPECTIVE JUROR:  Vacation Marriott.

17        THE COURT:  Are you married?

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  Do you have any children?

20        PROSPECTIVE JUROR:  I do not.

21        THE COURT:  Do you have any friends or relatives

22  that work in law enforcement?

23        PROSPECTIVE JUROR:  Not that I know of, no.

24        THE COURT:  Have you, your friends, or relatives

25  ever been the victim of a crime?

30

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Other than a traffic citation, have you

3    ever been confused of committing a crime?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  And finally, have you ever served on a

6    jury panel before?

7            PROSPECTIVE JUROR:  I have not.

8            THE COURT:  All right.  Thank you, sir.  If you

9    could hand that microphone to your right.

10           PROSPECTIVE JUROR:  Yeah.  Thank you.

11           THE COURT:  Thank you.

12           Good morning, ma'am.

13           PROSPECTIVE JUROR:  Hello.

14           THE COURT:  Please state your full name for the

15   record.

16           PROSPECTIVE JUROR:  Catherine Bolling.

17           THE COURT:  And Ms. Bolling, what is your date of

18   birth?

19           PROSPECTIVE JUROR:  5/27/94.

20           THE COURT:  And where do you currently reside?

21           PROSPECTIVE JUROR:  Orlando.

22           THE COURT:  What do you do for a living?

23           PROSPECTIVE JUROR:  Second grade teacher.

24           THE COURT:  Are you married?

25           PROSPECTIVE JUROR:  No.

31

1           THE COURT:  Do you have any children?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Do you have any friends or relatives

4    that work in law enforcement?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  Have you, your friends or relatives ever

7    been the victim of a crime?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  Other than a traffic citation, ever been

10   accused of committing a crime?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  And finally, ma'am, have you ever served

13   on a jury before?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  All right.  Thank you.

16          Good morning.

17          PROSPECTIVE JUROR:  Good morning.

18          THE COURT:  Please state your full name for the

19   record.

20          PROSPECTIVE JUROR:  Emma Harris.

21          THE COURT:  Ms. Harris, what is your date of birth?

22          PROSPECTIVE JUROR:  September 6, 1995.

23          THE COURT:  Where do you currently reside?

24          PROSPECTIVE JUROR:  Here in Orlando.

25          THE COURT:  What do you do for a living?

32

1          PROSPECTIVE JUROR:  I'm a receptionist at a law
2     firm.
3          THE COURT:  And what type of law firm do you work
4     at?
5          PROSPECTIVE JUROR:  In insurance defense.
6          THE COURT:  Do you ever come in contact with, say,
7     an attorney, helping out an attorney working on a criminal
8     case or a pro bono criminal case or anything like that?
9          PROSPECTIVE JUROR:  I would believe so.
10         THE COURT:  Ma'am, are you married?
11         PROSPECTIVE JUROR:  I am not.
12         THE COURT:  Do you have any children?
13         PROSPECTIVE JUROR:  I do not.
14         THE COURT:  Do you have any friends or relatives
15    that work in law enforcement?
16         PROSPECTIVE JUROR:  No, I do not.
17         THE COURT:  Have you, your friends or relatives ever
18    been the victim of a crime?
19         PROSPECTIVE JUROR:  No.
20         THE COURT:  Other than a traffic citation, ever been
21    accused of committing a crime?
22         PROSPECTIVE JUROR:  No.
23         THE COURT:  And finally, have you ever served on a
24    jury?
25         PROSPECTIVE JUROR:  I have not.

33

1      THE COURT:  All right.  Thank you, ma'am.

2      Good morning, sir.

3      PROSPECTIVE JUROR:  Good morning.

4      THE COURT:  Please state your full name for the

5 record.

6      PROSPECTIVE JUROR:  Edgar Blair.

7      THE COURT:  And, Mr. Blair, what is your date of

8 birth?

9      PROSPECTIVE JUROR:  4/21/59.

10     THE COURT:  And, sir, where do you currently reside?

11     PROSPECTIVE JUROR:  New Smyrna Beach.

12     THE COURT:  Sir, what do you do for a living?

13     PROSPECTIVE JUROR:  A small business owner.

14     THE COURT:  And what type of business do you own?

15     PROSPECTIVE JUROR:  Construction.

16     THE COURT:  Are you married?

17     PROSPECTIVE JUROR:  Yes.

18     THE COURT:  And is your spouse employed?

19     PROSPECTIVE JUROR:  No.

20     THE COURT:  Do you have any children?

21     PROSPECTIVE JUROR:  Yes.

22     THE COURT:  Are they grown or school age?

23     PROSPECTIVE JUROR:  School age.

24     THE COURT:  Do you have any friends or relatives

25 that work in law enforcement?

34

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you, your friends, or relatives

3    ever been the victim of a crime?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Other than a traffic citation, ever been

6    accused of committing a crime?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  And finally, have you ever served on a

9    jury?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  All right.  Thank you, sir.  You can

12   hand that microphone to your right.

13          Good morning.

14          PROSPECTIVE JUROR:  Good morning.

15          THE COURT:  Please state your full name for the

16   record.

17          PROSPECTIVE JUROR:  Thien Nguyen.

18          THE COURT:  Ms. Nguyen, what is your date of birth?

19          PROSPECTIVE JUROR:  November 16, 1989.

20          THE COURT:  Where do you currently reside?

21          PROSPECTIVE JUROR:  Orlando.

22          THE COURT:  And what do you do for a living?

23          PROSPECTIVE JUROR:  A mental health therapist.

24          THE COURT:  Are you married?

25          PROSPECTIVE JUROR:  No.

35

1          THE COURT:  Do you have any children?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Do you have any friends or relatives

4    that work in law enforcement?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Are they friends or relatives or both?

7          PROSPECTIVE JUROR:  Friends.

8          THE COURT:  Okay.  Are they close personal friends

9    or acquaintances?

10          PROSPECTIVE JUROR:  Friend through a friend.

11          THE COURT:  Okay.  And without telling me their

12    names, what agency or agencies do they work for?

13          PROSPECTIVE JUROR:  Um, Coral Spring Police

14    Department.

15          THE COURT:  Do they ever have occasion to talk to

16    you about what they do for a living?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Is there anything about that

19    relationship or those relationships that you are concerned

20    might interfere with your ability to remain fair and

21    impartial?

22          PROSPECTIVE JUROR:  Not that I know of.

23          THE COURT:  All right.  And let me just expand on

24    that a little bit.  There may be persons testifying in this

25    case that represent law enforcement.  The idea here is that

1    you don't get a free pass on credibility.  Everybody gets the

2    same observations when they're testifying.  That means if

3    someone comes in here wearing a uniform, they're not

4    automatically believed or disbelieved just because they're

5    wearing that uniform.  You have to take an approach where you

6    objectively view the evidence and come to your own conclusions

7    based on the instructions the Court gives you.

8           So are you concerned, for example -- I'll put it in

9    little bit more clumsy terms -- that if someone who is a cop

10   comes in here, you're going to believe everything they say or

11   automatically disbelieve everything they have say just because

12   they're a cop?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Okay.  And I appreciate that.

15           Have you, your friends, or relatives ever been the

16   victim of a crime?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  Other than a traffic citation, ever been

19   accused of committing a crime?

20           PROSPECTIVE JUROR:  No.

21           THE COURT:  And finally, have you ever served on a

22   jury before?

23           PROSPECTIVE JUROR:  No, I have not.

24           THE COURT:  All right.  Thank you, ma'am.  If you

25   could hand that microphone to your right.

37

1          Good morning.

2          PROSPECTIVE JUROR:  Good morning.

3          THE COURT:  Please state your full name for the

4  record.

5          PROSPECTIVE JUROR:  Sandra Lynne Sluder.

6          THE COURT:  Ms. Sluder, what is your date of birth?

7          PROSPECTIVE JUROR:  February 15, 1970.

8          THE COURT:  And where do you currently reside?

9          PROSPECTIVE JUROR:  Melbourne.

10         THE COURT:  And what do you do for a living?

11         PROSPECTIVE JUROR:  Customer service at a call

12  center.

13         THE COURT:  And what type of call center for what

14  type of business?

15         PROSPECTIVE JUROR:  For a cable company.

16         THE COURT:  Okay.  Are you married?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Do you have any children?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Do you have any friends or relatives

21  that work in law enforcement?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Have you, your friends, or relatives

24  ever been the victim of a crime?

25         PROSPECTIVE JUROR:  Yes.

38

1      THE COURT:  And who was the victim?

2      PROSPECTIVE JUROR:  My mom.

3      THE COURT:  What was your mother a victim of?

4      PROSPECTIVE JUROR:  Robbery.

5      THE COURT:  How long ago was that?

6      PROSPECTIVE JUROR:  Oh, had to have been somewhere,

7  a good 15, 20 years ago.

8      THE COURT:  Did your family get into contact with

9  law enforcement because of that offense?

10      PROSPECTIVE JUROR:  She did.

11      THE COURT:  Do you feel she was treated fairly?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  Is there anything about her experience

14  that you're concerned in this case might interfere with your

15  ability to remain fair and impartial?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  All right.  Other than a traffic

18  citation, ever been accused of committing a crime?

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  And without getting into any detail on

21  that, do you feel you were treated fairly in that process?

22      PROSPECTIVE JUROR:  No.

23      THE COURT:  Is there anything about that

24  experience -- because we're all human -- is there anything

25  about that experience that you're concerned might interfere

39

1   with your ability to remain fair and impartial in this case?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  All right.  Thank you, ma'am, I

4   appreciate that.  Finally, have you ever served on a jury?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  All right.  Thank you, ma'am.  If you

7   could hand that microphone to your right.

8          Good morning.

9          PROSPECTIVE JUROR:  Good morning.

10          THE COURT:  Please state your full name for the

11   record.

12          PROSPECTIVE JUROR:  Gail Sheldon.

13          THE COURT:  Ms. Sheldon, what is your date of birth?

14          PROSPECTIVE JUROR:  12/31/56.

15          THE COURT:  Where do you currently reside?

16          PROSPECTIVE JUROR:  Port Orange.

17          THE COURT:  And what do you do for a living?

18          PROSPECTIVE JUROR:  Flight attendant.

19          THE COURT:  Are you married?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Do you have any children?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Are they grown or school age?

24          PROSPECTIVE JUROR:  Grown.

25          THE COURT:  Without telling me their names, what are

40

1    their occupations?

2             PROSPECTIVE JUROR:  Hair dresser.

3             THE COURT:  Okay.  One child?

4             PROSPECTIVE JUROR:  Just one.

5             THE COURT:  Okay.  Do you have any friends or

6    relatives that work in law enforcement?

7             PROSPECTIVE JUROR:  No.

8             THE COURT:  Have you, your friends, or relatives

9    ever been the victim of a crime?

10            PROSPECTIVE JUROR:  No.

11            THE COURT:  Other than a traffic citation, ever been

12   accused of committing a crime?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  And finally, have you ever served on a

15   jury before?

16            PROSPECTIVE JUROR:  No.

17            THE COURT:  Thank you, ma'am.  I appreciate that.

18            Good morning.

19            PROSPECTIVE JUROR:  Good morning.

20            THE COURT:  Please state your full name for the

21   record.

22            PROSPECTIVE JUROR:  Joy Ussery.

23            THE COURT:  Ms. Ussery, what is your date of birth?

24            PROSPECTIVE JUROR:  February 21, 1951.

25            THE COURT:  And where do you currently reside?

41

1          PROSPECTIVE JUROR:  Altamonte Springs, Florida.

2          THE COURT:  And what do you do for a living?

3          PROSPECTIVE JUROR:  I'm a registered nurse.

4          THE COURT:  Are you married?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And is your spouse employed?

7          PROSPECTIVE JUROR:  He's retired.

8          THE COURT:  And what is your spouse retired from?

9          PROSPECTIVE JUROR:  Air Force.

10          THE COURT:  Thank you for that service.  Do you have

11   any children?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Are they grown or school age?

14          PROSPECTIVE JUROR:  Grown.

15          THE COURT:  And what do they do for a living?

16          PROSPECTIVE JUROR:  She's in the cosmetology

17   business.

18          THE COURT:  Do you have any friends or relatives

19   that work in law enforcement?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Have you, your friends, or relatives

22   ever been the victim of a crime?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  And who was the victim?

25          PROSPECTIVE JUROR:  My ex-husband.

42

 1          THE COURT:  What was your ex-husband a victim of?

 2          PROSPECTIVE JUROR:  Money laundering with a drug

 3   ring.

 4          THE COURT:  Did your family come into contact with

 5   law enforcement based on that experience?

 6          PROSPECTIVE JUROR:  Yes.

 7          THE COURT:  Do you feel that your family was treated

 8   fairly by law enforcement?

 9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Is there anything about that experience

11   that you think might interfere with your ability to remain

12   fair and impartial here?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Okay.  I appreciate you telling me that.

15   Other than a traffic citation, ever been accused of committing

16   a crime?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  And finally, ma'am, have you ever served

19   on a jury before?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  All right.  Thank you, ma'am, if you can

22   hand the microphone to your right.

23          Good morning.

24          PROSPECTIVE JUROR:  Good morning.

25          THE COURT:  Please state your full name for the

43

1   record.

2            PROSPECTIVE JUROR:  Dawn Louise Naimoli.

3            THE COURT:  And, Ms. Naimoli, what is your date of

4   birth?

5            PROSPECTIVE JUROR:  December 12, '66.

6            THE COURT:  And where do you currently reside?

7            PROSPECTIVE JUROR:  Ormond Beach.

8            THE COURT:  And, ma'am, what do you do for a living?

9            PROSPECTIVE JUROR:  Behavior analyst.

10           THE COURT:  Are you married?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Do you have any children?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Are they grown or school age?

15           PROSPECTIVE JUROR:  Grown.

16           THE COURT:  And what do they do for a living?

17           PROSPECTIVE JUROR:  He owns a company.  He sells

18   health insurance.

19           THE COURT:  And, ma'am, do you have any friends or

20   relatives in law enforcement?

21           PROSPECTIVE JUROR:  Colleagues.

22           THE COURT:  Could you give me an idea -- colleagues,

23   are they -- would you consider them friends?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  What agency or agencies do they work

44

1    for?

2              PROSPECTIVE JUROR:  FDLE.

3              THE COURT:  Do they ever have occasion to talk to

4    you about what they do?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  And is there anything about those

7    relationships that you're concerned might interfere with your

8    ability to remain fair and impartial here?

9              PROSPECTIVE JUROR:  Not at the moment.

10             THE COURT:  All right.  Thank you, ma'am.  I

11   appreciate that.  Have you, your friends, or relatives ever

12   been the victim of a crime?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Who was the victim?

15             PROSPECTIVE JUROR:  Well, I've been a victim of

16   several, but just as friends or relatives?

17             THE COURT:  Yes.

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  In the circumstances where you were a

20   victim, did you come into contact with law enforcement?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Do you feel you were treated fairly by

23   law enforcement?

24             PROSPECTIVE JUROR:  No, not at all.

25             THE COURT:  And are those experiences something that

45

1   you think might interfere with your ability to remain fair and

2   impartial here?

3           PROSPECTIVE JUROR:  Probably.

4           THE COURT:  Thank you, ma'am.  I appreciate you

5   telling me that.

6           PROSPECTIVE JUROR:  Thank you.

7           THE COURT:  And other than a traffic citation, have

8   you ever been accused of committing a crime?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  And finally, have you ever served on a

11  jury?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  All right.  Thank you, ma'am.  I

14  appreciate it.

15          PROSPECTIVE JUROR:  Thank you.

16          THE COURT:  Good morning.

17          PROSPECTIVE JUROR:  Good morning.

18          THE COURT:  Please state your full name for the

19  record.

20          PROSPECTIVE JUROR:  Kerry Augustin.

21          THE COURT:  Ms. Augustin, what is your date of

22  birth?

23          PROSPECTIVE JUROR:  5/14/1987.

24          THE COURT:  And where do you currently reside?

25          PROSPECTIVE JUROR:  Orlando.

46

1          THE COURT:  And what do you do for a living?

2          PROSPECTIVE JUROR:  Guest service representative at

3    Orlando Health.

4          THE COURT:  Are you married?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Do you have any children?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Do you have any friends or relatives

9    that work in law enforcement?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Have you, your friends, or relatives

12    ever been the victim of a crime?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Other than a traffic citation, ever been

15    accused of committing a crime?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  And finally, ma'am, have you ever served

18    on a jury before?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  All right.  Thank you.  If you can hand

21    that microphone to the gentleman directly in front of you.

22          PROSPECTIVE JUROR:  Thank you.

23          THE COURT:  All right.  Good morning, sir.

24          PROSPECTIVE JUROR:  Good morning.

25          THE COURT:  Please state your full name for the

47

1  record.

2  　　　　　PROSPECTIVE JUROR:  Scott Dalrymple.

3  　　　　　THE COURT:  Mr. Dalrymple, what is your date of

4  birth?

5  　　　　　PROSPECTIVE JUROR:  3/23/1960.

6  　　　　　THE COURT:  All right.  So where do you currently

7  reside?

8  　　　　　PROSPECTIVE JUROR:  Palm Bay, Florida.

9  　　　　　THE COURT:  What do you do for a living?

10  　　　　　PROSPECTIVE JUROR:  I'm self-employed, small

11  business.

12  　　　　　THE COURT:  And what type of business is it?

13  　　　　　PROSPECTIVE JUROR:  Upholstery.

14  　　　　　THE COURT:  Are you married?

15  　　　　　PROSPECTIVE JUROR:  Yes.

16  　　　　　THE COURT:  Is your spouse employed?

17  　　　　　PROSPECTIVE JUROR:  Yes.

18  　　　　　THE COURT:  What does your spouse do for a living?

19  　　　　　PROSPECTIVE JUROR:  She's a travel agent.

20  　　　　　THE COURT:  Do you have any children?

21  　　　　　PROSPECTIVE JUROR:  Yes.

22  　　　　　THE COURT:  Are they grown or school age?

23  　　　　　PROSPECTIVE JUROR:  They -- one's still in high

24  school, 18; and then I have another boy, he's in college; then

25  I've got a daughter that works for Grumman.

48

1              THE COURT:  All right.  Thank you, sir.  Do you have

2      any friends or relatives that work in law enforcement?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Have you, your friends, or relatives

5      ever been the victim of a crime?

6              PROSPECTIVE JUROR:  I have.

7              THE COURT:  And what were you a victim of?

8              PROSPECTIVE JUROR:  I had burglary on my home.

9              THE COURT:  How long ago was that?

10             PROSPECTIVE JUROR:  That was probably 30, 35 years

11     ago.

12             THE COURT:  Where was that?

13             PROSPECTIVE JUROR:  They broke into my house,

14     like --

15             THE COURT:  I mean the location.

16             PROSPECTIVE JUROR:  Palm Bay, Florida.

17             THE COURT:  Palm Bay?

18             PROSPECTIVE JUROR:  Yeah.

19             THE COURT:  Did you come in contact with law

20     enforcement?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Do you feel you were treated fairly in

23     that process?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Is there anything about -- you heard all

49

1    the witnesses --

2          PROSPECTIVE JUROR:  Mm-hm.

3          THE COURT:  -- no Palm Bay police officers coming

4    here today, but I need to ask, nonetheless.

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Is there anything about that experience

7    that you're concerned might interfere with your ability to

8    remain fair and impartial here?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  I appreciate you telling me that.

11         PROSPECTIVE JUROR:  Okay.

12         THE COURT:  Other than a traffic citation, ever been

13    accused of committing a crime?

14         PROSPECTIVE JUROR:  I got caught hunting deer at

15    night.

16         THE COURT:  Do you feel you were treated fairly by

17    law enforcement in that case?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Okay.  And again, on that particular

20    issue, do you think that might interfere with your ability to

21    remain fair and impartial here?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  And finally, have you ever served on a

24    jury?

25         PROSPECTIVE JUROR:  No.

                                                                    50

1               THE COURT:  All right.  Thank you, sir.  If you
2       could hand that microphone to your left.
3               Good morning.
4               PROSPECTIVE JUROR:  Good morning.
5               THE COURT:  Please state your full name for the
6       record.
7               PROSPECTIVE JUROR:  Ashley Ledford.
8               THE COURT:  Ms. Ledford, what is your date of birth?
9               PROSPECTIVE JUROR:  10/4/79.
10              THE COURT:  And where do you currently reside?
11              PROSPECTIVE JUROR:  Orlando.
12              THE COURT:  What do you do for a living?
13              PROSPECTIVE JUROR:  A medical sales representative.
14              THE COURT:  Are you married?
15              PROSPECTIVE JUROR:  No.
16              THE COURT:  Do you have any children?
17              PROSPECTIVE JUROR:  No, sir.
18              THE COURT:  Do you have any friends or relatives
19      that work in law enforcement?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Are they friends or relatives?
22              PROSPECTIVE JUROR:  Friends.
23              THE COURT:  Are they -- could you give me an idea of
24      where they work, just the agencies?
25              THE DEFENDANT:  Sure.  Maitland P.D., Sanford P.D.,

51

1   and DEA.

2        THE COURT:  Do they ever talk to you about what they

3   do for a living?

4        PROSPECTIVE JUROR:  Not specifically in passing.

5        THE COURT:  Is there anything about those

6   relationships that you're concerned might interfere with your

7   ability to remain fair and impartial here?

8        THE MOTHER:  No, sir.

9        THE COURT:  All right.  Have you, your friends, or

10  relatives ever been the victim of a crime?

11       PROSPECTIVE JUROR:  Yes, sir.

12       THE COURT:  Who was the victim?

13       PROSPECTIVE JUROR:  A friend.

14       THE COURT:  And did you come into contact with law

15  enforcement based on your friend's experience?

16       PROSPECTIVE JUROR:  No, sir.

17       THE COURT:  Do you feel that your friend was treated

18  fairly?

19       PROSPECTIVE JUROR:  It was murder, so I don't know.

20       THE COURT:  Sorry to hear that.

21       PROSPECTIVE JUROR:  Thank you.

22       THE COURT:  Is there anything about that experience

23  that you're concerned might interfere with your ability to

24  remain fair and impartial here?

25       PROSPECTIVE JUROR:  No, sir.

52

1          THE COURT:  Other than a traffic citation, ever been
2     accused of committing a crime?
3          PROSPECTIVE JUROR:  No, sir.
4          THE COURT:  And finally, have you ever served on a
5     jury?
6          PROSPECTIVE JUROR:  No, sir.
7          THE COURT:  All right.  Thank you.
8          Good morning.
9          PROSPECTIVE JUROR:  Good morning.
10         THE COURT:  Please state your full name for the
11    record.
12         PROSPECTIVE JUROR:  Joseph Boone.
13         THE COURT:  And, Mr. Boone, what is your date of
14    birth?
15         PROSPECTIVE JUROR:  January 14, 1975.
16         THE COURT:  Where do you currently reside?
17         PROSPECTIVE JUROR:  Kissimmee.
18         THE COURT:  And what do you do for a living?
19         PROSPECTIVE JUROR:  I'm a software implementation
20    manager.
21         THE COURT:  Are you married?
22         PROSPECTIVE JUROR:  No.
23         THE COURT:  Do you have any children?
24         PROSPECTIVE JUROR:  No.
25         THE COURT:  Do you have any friends or relatives

1   that work in law enforcement?

2           PROSPECTIVE JUROR:  Do not.

3           THE COURT:  Have you, your friends, or relatives

4   ever been the victim of a crime?

5           PROSPECTIVE JUROR:  I have and my parents have.

6           THE COURT:  All right.  And what were you a victim

7   of?

8           PROSPECTIVE JUROR:  Home -- excuse me, home robbery.

9           THE COURT:  Okay.  And what about your parents?

10          PROSPECTIVE JUROR:  Same.

11          THE COURT:  How long ago were these?

12          PROSPECTIVE JUROR:  Mine was about four years ago;

13  theirs was about five years ago.

14          THE COURT:  Did you come into contact with law

15  enforcement on either of these occasions?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And do you feel you were treated fairly

18  by law enforcement?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Is there anything about those

21  experiences that you're concerned might interfere with your

22  ability to remain fair and impartial in this case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Other than a traffic citation, ever been

25  accused of committing a crime?

54

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  And finally, sir, have you ever served

3     on a jury before?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  All right.  So for anyone else who's

6     served on the jury, this is generally applicable.  There are

7     three types of juries you can serve on.  One is a grand jury.

8     You'll know if you've been on grand jury because you come in

9     over and over again, repeatedly, over an extended period of

10    time, sometimes six months, sometimes a year.  The grand jury

11    will convene to determine whether or not they're going to

12    issue indictments or true bills.  That's one type of jury.

13         The other type is a civil jury that involves a

14    dispute between parties that involves money or property.  It's

15    generally someone suing their landlord; someone gets in a car

16    accident, sues someone for that.

17         The third type of jury that you can serve on is what

18    this jury is is a criminal jury.  It's when a government

19    entity accuses an individual or a business entity of

20    committing a crime.

21         So, sir, do you recall what type jury you served

22    on -- criminal, civil, or grand?

23         PROSPECTIVE JUROR:  I believe it was criminal.

24         THE COURT:  Do you recall how long ago that was?

25         PROSPECTIVE JUROR:  It was probably four years ago.

55

1          THE COURT:  And where was that?

2          PROSPECTIVE JUROR:  Osceola County.

3          THE COURT:  And without telling me what went on

4   behind closed doors, was that jury able to reach a verdict?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  All right.  Thank you, sir.  If you

7   could hand that microphone to your left.

8          Good morning.

9          PROSPECTIVE JUROR:  Good morning.

10         THE COURT:  Please state your full name for the

11  record.

12         PROSPECTIVE JUROR:  Angela Liquori.

13         THE COURT:  Ms. Liquori, what is your date of birth?

14         PROSPECTIVE JUROR:  9/22/66.

15         THE COURT:  And where do you currently reside?

16         PROSPECTIVE JUROR:  Apopka.

17         THE COURT:  And what do you do for a living?

18         PROSPECTIVE JUROR:  I am a trial clerk for Orange

19  County.

20         THE COURT:  A clerk of court?

21         PROSPECTIVE JUROR:  Yes, sir.

22         THE COURT:  You know the system very well.  All

23  right.  By the way, what kind of docket do you preside over?

24  Do you generally oversee everything, or is there one

25  particular area you --

56

1          PROSPECTIVE JUROR:  Infractions and criminal cases.

2          THE COURT:  Okay.  So --

3          PROSPECTIVE JUROR:  County criminal cases, not

4   felonies.

5          THE COURT:  Okay.  Are you married?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Do you have any children?

8          PROSPECTIVE JUROR:  I do, one.

9          THE COURT:  Is your child grown or school age?

10          PROSPECTIVE JUROR:  She's grown and she's a dental

11   assistant.

12          THE COURT:  Do you have any friends or relatives

13   that work in law enforcement?

14          PROSPECTIVE JUROR:  Lots.

15          THE COURT:  All right.  And any relatives?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And friends also?

18          PROSPECTIVE JUROR:  Correct.

19          THE COURT:  What agency or agencies do they work

20   for?

21          PROSPECTIVE JUROR:  My nephew works for Winter Park

22   P.D. now; my father is retired chief of police for Altamonte

23   Springs.  I know officers from O.P.D., O.C.S.O., Ocoee P.D.,

24   Apopka P.D., Maitland P.D.

25          THE COURT:  Are those relationships -- are you

57

1    concerned that those relationships might interfere with your

2    ability to remain fair and impartial in this case?

3              PROSPECTIVE JUROR:  I don't think so, no.

4              THE COURT:  Okay.  Do you have any doubts about

5    that?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Okay.  And I appreciate that.  Have you,

8    your friends, or relatives ever been the victim of a crime?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Other than a traffic citation, ever been

11   accused of committing a crime?

12             PROSPECTIVE JUROR:  No, sir.

13             THE COURT:  And finally, ma'am, have you ever served

14   on a jury before?

15             PROSPECTIVE JUROR:  I have not.

16             THE COURT:  All right.  Thank you, ma'am.  I

17   appreciate that.

18             So ma'am, you indicated previously that you're

19   having trouble understanding me.  Is it because I'm talking

20   too fast, or do you have general problems with English?

21             (Juror Anna Roman.)

22             PROSPECTIVE JUROR:  The English.

23             THE COURT:  (Speaker speaking in foreign language.)

24             PROSPECTIVE JUROR:  (Speaker speaking in foreign

25   language.)

58

1          THE COURT:  Thank you.  I asked her if she could

2    speak Spanish.  She said yes.  I asked her if she can speak

3    English.  She said a little bit, she can hold a conversation,

4    but it's quite a challenge.

5          So would both counsel please approach sidebar?

6       (At the bench.)

7          THE COURT:  All right.  I don't see how she can

8    serve.

9          MR. CHIU:  I agree.

10          MS. NAIR:  I'm with you.

11          THE COURT:  If it's okay with you, I'm going to

12    excuse her.

13          MR. CHIU:  Yes, Your Honor.

14          MS. NAIR:  Yes.

15       (In open court.)

16          THE COURT:  All right.  Ma'am, because we're not

17    going to have an interpreter available during this trial, I'm

18    going to go on ahead and ask you to hand the microphone to

19    your left, and as soon as we finish here, we're going to go on

20    ahead and excuse you.

21          Sir, please state your full name for the record.

22          THE DEFENDANT:  Jonathan Kukor.

23          THE COURT:  Mr. Kukor, what is your date of birth?

24          PROSPECTIVE JUROR:  12/30/77.

25          THE COURT:  And where do you currently reside?

59

1        PROSPECTIVE JUROR:  Orlando, Florida.

2        THE COURT:  Sir, what do you do for a living?

3        PROSPECTIVE JUROR:  I'm an acupuncture physician.

4        THE COURT:  Are you married?

5        PROSPECTIVE JUROR:  No.

6        THE COURT:  Do you have any children?

7        PROSPECTIVE JUROR:  No.

8        THE COURT:  Do you have any friends or relatives

9   that work in law enforcement?

10        PROSPECTIVE JUROR:  Friends.

11        THE COURT:  And what agency or agencies do they work

12   for?

13        PROSPECTIVE JUROR:  Orange County, F.B.I., Tampa,

14   and Fairfax County Police.

15        THE COURT:  Do they ever have occasion to talk to

16   you about what they do for a living?

17        PROSPECTIVE JUROR:  Yes.

18        THE COURT:  And obviously, you didn't hear any of

19   their names called or you would have recognized them, so they

20   won't be testifying in this trial; however, I must ask

21   nonetheless, is there anything about those relationships that

22   you're concerned might interfere with your ability to remain

23   fair and impartial here?

24        PROSPECTIVE JUROR:  No.

25        THE COURT:  All right.  Thank you, sir, I appreciate

60

1  that.  Have you, your friends, or relatives ever been the

2  victim of a crime?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Other than a traffic citation, have you

5  ever been accused of committing a crime?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  And finally, Mr. Kukor, have you ever

8  served on a jury before?

9          PROSPECTIVE JUROR:  I have not.

10          THE COURT:  All right.  Thank you, sir.  Can you

11  hand that microphone to your left?

12          Good morning.

13          PROSPECTIVE JUROR:  Good morning.

14          THE COURT:  Please state your full name for the

15  record.

16          PROSPECTIVE JUROR:  Amanda Evans.

17          THE COURT:  Ms. Evans, what is your date of birth?

18          PROSPECTIVE JUROR:  12/04/83.

19          THE COURT:  Where do you currently reside?

20          PROSPECTIVE JUROR:  Orlando.

21          THE COURT:  And what do you do for a living?

22          PROSPECTIVE JUROR:  Day care.

23          THE COURT:  Are you married?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Do you have any children?

61

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Are they grown or school age?

3          PROSPECTIVE JUROR:  School age.

4          THE COURT:  Do you have any friends or relatives

5    that work in law enforcement?

6          PROSPECTIVE JUROR:  Relatives.

7          THE COURT:  And what agency or agencies do they work

8    for?

9          PROSPECTIVE JUROR:  Orlando Police Department and

10   the third -- and the county jail, the third county jail.

11         THE COURT:  In the Orange County Jail.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  All right.  Is there anything about

14   those relationships that you're concerned might interfere with

15   your ability to remain fair and impartial here?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Have you, your friends, or relatives

18   ever been the victim of a crime?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And who was the victim?

21         PROSPECTIVE JUROR:  My dad, brother, and recently,

22   my little cousin.

23         THE COURT:  And what were they victims of?

24         PROSPECTIVE JUROR:  Murder.  My dad got killed by

25   Orange County Police Department, and my brother was murdered

62

1    in '07, and my little cousin just got killed two weeks ago --

2    well, a week ago because we just had the funeral Saturday.

3            THE COURT:  Well, I'm sorry to hear that.  Is there

4    anything about those experiences that you're concerned might

5    interfere with your ability to remain fair and impartial here?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Okay.  And that's very understandable.

8    Thank you for telling me that.  I'm sorry I have to ask.

9            Other than a traffic citation, have you ever been

10   accused of committing a crime?

11           PROSPECTIVE JUROR:  I had identity theft.

12           THE COURT:  And do you feel you were treated fairly

13   in that process?

14           PROSPECTIVE JUROR:  Not in the beginning, but later,

15   I did.

16           THE COURT:  Okay.  And would that experience, in any

17   way, interfere with your ability to remain fair and impartial

18   in this case?

19           PROSPECTIVE JUROR:  No, I don't think so.

20           THE COURT:  All right.  We have a juror that wants a

21   comfort break.

22           We have a restroom on the other side this door if

23   you want to go on ahead in.

24           PROSPECTIVE JUROR:  I'm so sorry.

25           THE COURT:  No.  That's okay.  Don't be sorry.

63

1            And finally, ma'am, have you ever served on a jury

2    before?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  All right.  Thank you, ma'am.  I

5    appreciate that.  If you can hand the microphone to your left.

6            Good morning.

7            PROSPECTIVE JUROR:  Good morning.

8            THE COURT:  Please state your full name for the

9    record.

10           PROSPECTIVE JUROR:  Mary Nolan.

11           THE COURT:  And, Ms. Nolan, what is your date of

12   birth?

13           PROSPECTIVE JUROR:  September 14th, '67.

14           THE COURT:  Where you do you currently reside?

15           PROSPECTIVE JUROR:  Port Saint John, Florida.

16           THE COURT:  And what do you do for a living?

17           PROSPECTIVE JUROR:  Programmer analyst.

18           THE COURT:  Are you married?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Is your spouse employed?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  What does your spouse do for a living?

23           PROSPECTIVE JUROR:  He's a comm technician.

24           THE COURT:  Do you have any children?

25           PROSPECTIVE JUROR:  Yes.

64

1          THE COURT:  And are they grown or school age?

2          PROSPECTIVE JUROR:  Well, they're grown, but one is

3   still a student; the other one is undecided, probably going

4   back to school.

5          THE COURT:  Okay.  Do you have any friends or

6   relatives that work in law enforcement?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Are they friends or relatives?

9          PROSPECTIVE JUROR:  I have a relative, my brother is

10  with the corrections with Sanford jail; and my friend, my

11  brother-in-law's brother is with the Orange County Sheriff's

12  Department.

13         THE COURT:  Do they ever have occasion to talk to

14  you about what they do for a living?

15         PROSPECTIVE JUROR:  Occasionally.

16         THE COURT:  Is there anything about those

17  relationships that you're concerned might interfere with your

18  ability to remain fair and impartial if you were to remain as

19  a juror on this case?

20         PROSPECTIVE JUROR:  No, I don't believe so.

21         THE COURT:  Okay.  Let me tackle that with you.  The

22  attorneys are listening to every word you say carefully.  So

23  imagine hypothetically if you're getting ready to land at

24  Orlando International Airport and the pilot were to say, We're

25  about to land the plane, I'm pretty sure I can land this

65

1    thing.  You'd probably have a lot of questions, right?

2          So if your answer is, I think so -- that's okay.

3    But if "I think so" is sort of a way of saying "I can be fair

4    or impartial," precision in your wording means everything

5    here.  So do you have any doubts as to whether or not you can

6    be fair and impartial?

7          PROSPECTIVE JUROR:  No doubts.

8          THE COURT:  I appreciate that.  Have you, your

9    friends, or relatives ever been the victim of a crime?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Other than a traffic citation, ever been

12   accused of committing a crime?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  And finally, have you ever served on a

15   jury before?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  All right.  Thank you, ma'am.

18         PROSPECTIVE JUROR:  Thank you.

19         THE COURT:  Good morning.

20         PROSPECTIVE JUROR:  Good morning.

21         THE COURT:  Please state your full name for the

22   record.

23         PROSPECTIVE JUROR:  Maribelys Sanchez.

24         THE COURT:  And, ma'am, what is your date of birth?

25         PROSPECTIVE JUROR:  July 24th, '88.

66

1       THE COURT:  Where do you currently reside?

2       PROSPECTIVE JUROR:  Kissimmee.

3       THE COURT:  And what do you do for a living?

4       PROSPECTIVE JUROR:  Store associate at Aldi's.

5       THE COURT:  Are you married?

6       PROSPECTIVE JUROR:  Yes.

7       THE COURT:  And is your spouse employed?

8       PROSPECTIVE JUROR:  Yes.

9       THE COURT:  And what does your spouse do for a

10  living?

11      PROSPECTIVE JUROR:  Music industry.

12      THE COURT:  Do you have any children?

13      PROSPECTIVE JUROR:  No.

14      THE COURT:  Do you have any friends or relatives

15  that work in law enforcement?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  Have you, your friends, or relatives

18  ever been the victim of a crime?

19      PROSPECTIVE JUROR:  No.

20      THE COURT:  Other than a traffic citation, ever been

21  accused of committing a crime?

22      PROSPECTIVE JUROR:  No.

23      THE COURT:  All right.  And finally, ma'am, have you

24  ever served on a jury?

25      PROSPECTIVE JUROR:  No.

67

1          THE COURT:  All right.  Thank you, ma'am.

2          PROSPECTIVE JUROR:  Thank you.

3          THE COURT:  Good morning.

4          PROSPECTIVE JUROR:  Good morning.

5          THE COURT:  Please state your full name for the

6    record.

7          PROSPECTIVE JUROR:  Janice Clift.

8          THE COURT:  And, ma'am, what is your date of birth?

9          PROSPECTIVE JUROR:  10/10/58.

10          THE COURT:  Where do you currently reside?

11          PROSPECTIVE JUROR:  Melbourne.

12          THE COURT:  What do you do for a living?

13          PROSPECTIVE JUROR:  I'm retired.

14          THE COURT:  And what are you retired from, ma'am?

15          PROSPECTIVE JUROR:  I was a business manager.

16          THE COURT:  For what type of business?

17          PROSPECTIVE JUROR:  A doctor.

18          THE COURT:  Are you married?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Is your spouse employed?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  And what does your spouse do for a

23    living?

24          PROSPECTIVE JUROR:  He's an engineer.

25          THE COURT:  Do you have any children?

68

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Are they grown or school age?

3          PROSPECTIVE JUROR:  Grown.

4          THE COURT:  What do they do for a living?

5          PROSPECTIVE JUROR:  One is a doctor, and one is a

6    full-time mom.

7          THE COURT:  Do you have any friends or relatives

8    that work in law enforcement?

9          PROSPECTIVE JUROR:  No, sir.

10         THE COURT:  Have you, your friends, or relatives

11   ever been the victim of a crime?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Who was the victim?

14         PROSPECTIVE JUROR:  We had a home robbery.

15         THE COURT:  And how long ago was that?

16         PROSPECTIVE JUROR:  Forty-one years ago.

17         THE COURT:  And where was that?

18         PROSPECTIVE JUROR:  In West Melbourne.

19         THE COURT:  Did you come into contact with law

20   enforcement?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Do you feel you were treated fairly in

23   that process?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Is there anything about that experience

1    that you're concerned might interfere with your ability to

2    remain fair and impartial here?

3              PROSPECTIVE JUROR:  No, sir.

4              THE COURT:  Other than a traffic citation, ever been

5    accused of committing a crime?

6              PROSPECTIVE JUROR:  No, sir.

7              THE COURT:  All right.  And finally, Ms. Clift, have

8    you ever served on a jury?

9              PROSPECTIVE JUROR:  No, sir.

10             THE COURT:  All right.  Thank you.  If you can hand

11   the microphone directly in front of you.

12             Good morning.

13             PROSPECTIVE JUROR:  Good morning.

14             THE COURT:  Please state your full name for the

15   record.

16             PROSPECTIVE JUROR:  Lamia Mosrie.

17             THE COURT:  Ms Mosrie, what is your date of birth?

18             PROSPECTIVE JUROR:  January 17, 1957.

19             THE COURT:  And where do you currently reside?

20             PROSPECTIVE JUROR:  Merritt Island.

21             THE COURT:  All right.  We have another person that

22   raised their hand for a comfort break.  If you want to,

23   Mr. Carter will go on ahead and take you over.

24             All right.  I'm sorry, I'll ask again.  What do you

25   do for a living?

70

1            PROSPECTIVE JUROR:  I'm a VPK teacher.

2            THE COURT:  Are you married?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Is your spouse employed?

5            PROSPECTIVE JUROR:  Retired.

6            THE COURT:  And what is your spouse retired from?

7            PROSPECTIVE JUROR:  NASA.

8            THE COURT:  Do you have any children?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Are they grown or school age?

11           PROSPECTIVE JUROR:  Grown.

12           THE COURT:  What do they do for a living?

13           PROSPECTIVE JUROR:  He's a server.

14           THE COURT:  Okay.  Do you have any friends or

15  relatives that work in law enforcement?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Are they friends or relatives?

18           PROSPECTIVE JUROR:  Friends.

19           THE COURT:  What agencies do they work for?

20           PROSPECTIVE JUROR:  Brevard County Sheriff.

21           THE COURT:  Do they ever talk to you about what they

22  do for a living?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  Is there anything about that

25  relationship or those relationships that you're concerned

71

1   might interfere with your ability to remain fair and impartial

2   here?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Other than a traffic citation, ever been

5   accused of committing a crime?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Have you, your friends, or relatives

8   ever been the victim of a crime?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And who was the victim?

11          PROSPECTIVE JUROR:  My mother.

12          THE COURT:  What was your mother a victim of?

13          PROSPECTIVE JUROR:  Robbery.

14          THE COURT:  How long ago was that?

15          PROSPECTIVE JUROR:  30 years ago.

16          THE COURT:  And did you come into contact with law

17  enforcement?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Do you feel your family was treated

20  fairly in that process?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Is there anything about that experience

23  that you're concerned might interfere with your ability to

24  remain fair and impartial here?

25          PROSPECTIVE JUROR:  No.

72

1           THE COURT:  And finally, have you ever served on a

2     jury?

3           PROSPECTIVE JUROR:  No, sir.

4           THE COURT:  All right.  Thank you, ma'am, I

5     appreciate that.  If you can hand the microphone to your

6     right.

7           Good morning.

8           PROSPECTIVE JUROR:  Good morning.

9           THE COURT:  Please state your full name for the

10    record.

11          PROSPECTIVE JUROR:  Genevieve Nicholas.

12          THE COURT:  Ms Nicholas, what is your date of birth?

13          PROSPECTIVE JUROR:  8/23/61.

14          THE COURT:  Where do you currently reside?

15          PROSPECTIVE JUROR:  Kissimmee, Florida.

16          THE COURT:  And what do you do for a living?

17          PROSPECTIVE JUROR:  I'm homemaker right now, but I

18    take care of my grandson.

19          THE COURT:  Are you married?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  And is your spouse employed?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  What does your spouse do for a living?

24          PROSPECTIVE JUROR:  Software engineer.

25          THE COURT:  Do you have any children?

73

1            PROSPECTIVE JUROR:  Three.

2            THE COURT:  Are they grown or school age?

3            PROSPECTIVE JUROR:  One is school age and two is

4     working.

5            THE COURT:  The ones that are working, what do they

6     do for a living?

7            PROSPECTIVE JUROR:  One is receptionist at Disney,

8     and one is a software engineer as well.

9            THE COURT:  Do you have any friends or relatives

10    that work in law enforcement?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Have you, your friends, or relatives

13    ever been the victim of a crime?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Other than a traffic citation, ever been

16    accused of committing a crime?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  And finally, ma'am, have you ever served

19    on a jury before?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Do you recall what type of jury that

22    was?

23           PROSPECTIVE JUROR:  I was in Osceola County.

24           THE COURT:  Do you remember what it was about?

25           PROSPECTIVE JUROR:  Traffic, a citation, a traffic

74

1   citation.

2          THE COURT:  That's probably a criminal misdemeanor.

3   And you said it was in Osceola County?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Do you recall how long ago that was?

6          PROSPECTIVE JUROR:  I did one, February 6th --

7   February 13th, but I wasn't chosen.  But that one was, like,

8   two years ago.

9          THE COURT:  Without telling me what went on behind

10  closed doors, did that jury reach a verdict?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  All right.  Thank you, ma'am.  I

13  appreciate that.

14         Good morning.

15         PROSPECTIVE JUROR:  Good morning.

16         THE COURT:  Please state your full name for the

17  record.

18         PROSPECTIVE JUROR:  Angela Whitt.

19         THE COURT:  And Ms. Whitt, what is your date of

20  birth?

21         PROSPECTIVE JUROR:  1966.

22         THE COURT:  Where do you currently reside?

23         PROSPECTIVE JUROR:  Orange County.

24         THE COURT:  And what do you do for a living?

25         PROSPECTIVE JUROR:  I'm a business owner.

75

1          THE COURT:  And what type of business do you own?

2          PROSPECTIVE JUROR:  It's a turn-key renovation

3    business.

4          THE COURT:  Are you married?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Do you have any children?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Are they grown or school age?

9          PROSPECTIVE JUROR:  Grown.

10         THE COURT:  What do they do for a living?

11         PROSPECTIVE JUROR:  They work for me.

12         THE COURT:  Do you have any friends or relatives

13   that work in law enforcement?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Are they friends or relatives?

16         PROSPECTIVE JUROR:  A boyfriend.

17         THE COURT:  And what agency or agency does he work

18   for?

19         PROSPECTIVE JUROR:  Seminole County Sheriff.

20         THE COURT:  Is there -- you obviously didn't hear

21   his name called earlier --

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  -- but is there anything about that

24   relationship that you're concerned might interfere with your

25   ability to remain fair and impartial in this case?

76

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Have you, your friends, or relatives

3    ever been the victim of a crime?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Who was the victim?

6           PROSPECTIVE JUROR:  Myself.

7           THE COURT:  And what were you a victim of?

8           PROSPECTIVE JUROR:  Assault with a deadly weapon and

9    kidnapping.

10           THE COURT:  Do you recall how long ago that was?

11           PROSPECTIVE JUROR:  Four years.

12           THE COURT:  And did you come into contact with law

13    enforcement?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Do you feel you were treated fairly in

16    that process?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  Is there anything about that experience

19    that you're concerned might interfere with your ability to

20    remain fair and impartial here?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Okay.  And I appreciate you telling me

23    that.

24           Finally, ma'am, have you ever served on a jury

25    before?

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  And do you recall what type of jury that

3    was?

4           PROSPECTIVE JUROR:  Criminal.

5           THE COURT:  And where was that?

6           PROSPECTIVE JUROR:  In Michigan.

7           THE COURT:  Was that jury able to reach a verdict?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  All right.  Thank you, ma'am.  I

10   appreciate that.

11          Good morning.

12          PROSPECTIVE JUROR:  Good morning.

13          THE COURT:  Please state your full name for the

14   record.

15          PROSPECTIVE JUROR:  Krystal Marie Hunter.

16          THE COURT:  Ms. Hunter, what is your date of birth?

17          PROSPECTIVE JUROR:  9/14/85.

18          THE COURT:  Where do you currently reside?

19          PROSPECTIVE JUROR:  Winter Garden.

20          THE COURT:  And what do you do for a living?

21          PROSPECTIVE JUROR:  I'm a human resources

22   professional for a healthcare company.

23          THE COURT:  Are you married?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  And is your spouse employed?

78

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  What does your spouse do for a living?

3          PROSPECTIVE JUROR:  He has two jobs.  He's a ramp

4    agent at the airport and then a bellman at a Disney resort.

5          THE COURT:  When you say, "ramp agent," is that in

6    any way associated with law enforcement?

7          PROSPECTIVE JUROR:  No.  No.  It's dealing with the

8    luggage that comes off of the flights.

9          THE COURT:  I understand.  Do you have any kids?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Do you have any friends or relatives

12    that work in law enforcement?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Have you, your friends, or relatives

15    ever been the victim of a crime?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Other than a traffic citation, ever been

18    accused of committing a crime?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  And finally, ma'am, have you ever served

21    on a jury before?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Do you recall what type of jury that

24    was?

25          PROSPECTIVE JUROR:  Criminal, and it was aggravated

79

1    assault in a county case.

2         THE COURT:  All right.  That would be criminal, and

3    that's criminal felony.  Do you recall what county that

4    occurred in?

5         PROSPECTIVE JUROR:  Polk.

6         THE COURT:  How long ago was that?

7         PROSPECTIVE JUROR:  Five to seven years.  I don't

8    recall exactly.

9         THE COURT:  And was that jury able to reach a

10   verdict?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  All right.  Thank you, ma'am.  I

13   appreciate that.

14        Good morning, sir.

15        PROSPECTIVE JUROR:  Hello.

16        THE COURT:  Please state your full name for the

17   record.

18        PROSPECTIVE JUROR:  William Young.

19        THE COURT:  Mr. Young, what is your date of birth?

20        PROSPECTIVE JUROR:  June 12, 1949.

21        THE COURT:  Where do you currently reside?

22        PROSPECTIVE JUROR:  Titusville, Florida.

23        THE COURT:  And what do you do for a living?

24        PROSPECTIVE JUROR:  Civil engineer.

25        THE COURT:  Are you married?

80

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Is your spouse employed?

3          PROSPECTIVE JUROR:  She's retired -- a bank trainer.

4          THE COURT:  Do you have any children?

5          PROSPECTIVE JUROR:  Yes, three.

6          THE COURT:  Are they grown or school age?

7          PROSPECTIVE JUROR:  Grown with children.

8          THE COURT:  And what do they do for a living?

9          PROSPECTIVE JUROR:  One's an engineer, one's a

10    banker, and one's a mother.

11         THE COURT:  Do you have any friends or relatives

12    that work in law enforcement?

13         PROSPECTIVE JUROR:  Yes.  My father worked for

14    Brevard County Sheriff's department, part time; my cousin

15    works for the F.B.I. in Washington; my sister worked for the

16    F.B.I. in Washington; my neighbor works for the Titusville

17    Police Department, and I have some other friends and so forth.

18         THE COURT:  And you've heard the names of the

19    potential witnesses.  And obviously, you didn't hear any of

20    their names called, but do you have any concerns that these

21    relationships might in any way interfere with your ability to

22    remain fair and impartial if you were to serve in this case?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Thank you, sir.  I appreciate that.

25    Have you, your friends, or relatives ever been the victim of a

81

1    crime?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Who was the victim?

4           PROSPECTIVE JUROR:  My parents and me.

5           THE COURT:  And what were you the victim of?

6           PROSPECTIVE JUROR:  Home robberies.

7           THE COURT:  How long ago was that?

8           PROSPECTIVE JUROR:  My parents was, like, 30 years

9    ago; I was, like, 22 years ago and five years ago.

10          THE COURT:  Did you come into contact with law

11   enforcement?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Were you treated fairly in your view?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Is there anything about those

16   experiences that you're concerned might interfere with your

17   ability to remain fair and impartial here?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  And finally, sir, have you ever served

20   on a jury before?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  All right.  Thank you, sir.  I

23   appreciate that.

24          Good morning, sir.

25          PROSPECTIVE JUROR:  Good morning.

82

1          THE COURT:  Please state your full name for the

2  record.

3          PROSPECTIVE JUROR:  Eric Layman.

4          THE COURT:  Mr. Layman, what is your date of birth?

5          PROSPECTIVE JUROR:  7/8/78.

6          THE COURT:  Where do you currently reside?

7          PROSPECTIVE JUROR:  Osteen.

8          THE COURT:  And so what do you do for a living?

9          PROSPECTIVE JUROR:  Technician.

10          THE COURT:  And are you married?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Do you have any children?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Do you have any friends or relatives

15  that work in law enforcement?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Are they friends or relatives?

18          PROSPECTIVE JUROR:  I have a friend and a relative.

19          THE COURT:  And what agency or agencies do they work

20  for?

21          PROSPECTIVE JUROR:  The friend is Altamonte Springs,

22  and I have a relative in Virginia State Police.

23          THE COURT:  Do they ever talk to you about what they

24  do?

25          PROSPECTIVE JUROR:  No.

83

1          THE COURT:  Is there anything about those

2     relationships that you're concerned might interfere with your

3     ability to remain fair and impartial here?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Other than a traffic citation, ever been

6     accused of committing a crime?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Have you, your friends, or relatives

9     ever been the victim of a crime?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  And finally, have you ever served on a

12    jury?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  All right.  Thank you, sir, I appreciate

15    that.

16         Good morning, sir.

17         PROSPECTIVE JUROR:  Good morning.

18         THE COURT:  Please state your full name for the

19    record.

20         PROSPECTIVE JUROR:  Louis John.

21         THE COURT:  And, Mr. John, what is your date of

22    birth?

23         PROSPECTIVE JUROR:  6/17/68.

24         THE COURT:  Where do you currently reside?

25         PROSPECTIVE JUROR:  Seminole County.

84

1          THE COURT:  And sir, what do you do for a living?

2          PROSPECTIVE JUROR:  Construction sales.

3          THE COURT:  Are you married?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And is your spouse employed?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  What does your spouse do for a living?

8          PROSPECTIVE JUROR:  Special education teacher.

9          THE COURT:  Do you have any children?

10         PROSPECTIVE JUROR:  Two.

11         THE COURT:  Are they grown or school age?

12         PROSPECTIVE JUROR:  School aged.

13         THE COURT:  Do you have any friends or relatives

14    that work in law enforcement?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Have you, your friends, or relatives

17    ever been the victim of a crime?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Other than a traffic citation, ever been

20    accused of committing a crime?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  All right.  And finally, Mr. John, have

23    you ever served on a jury before?

24         PROSPECTIVE JUROR:  I have.

25         THE COURT:  Do you recall what type of jury that

85

1    was?

2            PROSPECTIVE JUROR:  Criminal.

3            THE COURT:  Criminal.  Do you recall how long ago

4    that was?

5            PROSPECTIVE JUROR:  About six, seven years ago.

6            THE COURT:  All right.  And where was that?

7            PROSPECTIVE JUROR:  Seminole County.

8            THE COURT:  And was that jury able to reach a

9    verdict?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  All right.  Thank you, sir, I appreciate

12   that.

13           Good morning.

14           PROSPECTIVE JUROR:  Good morning.

15           THE COURT:  Please state your full name for the

16   record.

17           PROSPECTIVE JUROR:  Kara Miedona.

18           THE COURT:  Ms. Miedona, what is your date of birth?

19           PROSPECTIVE JUROR:  6/7/74.

20           THE COURT:  And where do you currently reside?

21           PROSPECTIVE JUROR:  Orlando.

22           THE COURT:  And what do you do for a living?

23           PROSPECTIVE JUROR:  I'm a paralegal.

24           THE COURT:  And what type of law firm do you work

25   for?

86

1            PROSPECTIVE JUROR:  In-house; it's commercial real

2      estate.

3            THE COURT:  Are you married?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  And is your spouse employed?

6            PROSPECTIVE JUROR:  He is, he's an attorney.

7            THE COURT:  And what type of attorney is your

8      spouse?

9            PROSPECTIVE JUROR:  Commercial real estate.

10           THE COURT:  Do you have any children?

11           PROSPECTIVE JUROR:  Yes.  Grown student.

12           THE COURT:  So one grown student.  Do you have any

13     friends or relatives that work in law enforcement?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Other than a traffic citation, ever been

16     accused of committing a crime?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  And finally, have you ever served on a

19     jury?

20           PROSPECTIVE JUROR:  I have, criminal case.

21           THE COURT:  Do you recall what type of case that

22     was?

23           PROSPECTIVE JUROR:  It was criminal.

24           THE COURT:  How long ago?

25           PROSPECTIVE JUROR:  Twelve years.

87

1          THE COURT:  And where was that?

2          PROSPECTIVE JUROR:  Orange County.

3          THE COURT:  Was that jury able to reach a verdict?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  All right.  Thank you, ma'am.  I

6     appreciate that.

7          Good morning.

8          PROSPECTIVE JUROR:  Good morning.

9          Please state your full name for the record.

10          PROSPECTIVE JUROR:  Donna Lindquist.

11          THE COURT:  Ms. Lindquist, what is your date of

12     birth?

13          PROSPECTIVE JUROR:  4/29/67.

14          THE COURT:  Where do you currently reside?

15          PROSPECTIVE JUROR:  Orlando.

16          THE COURT:  And what do you do for a living?

17          PROSPECTIVE JUROR:  Office manager.

18          THE COURT:  For what type of company?

19          PROSPECTIVE JUROR:  Moving company.

20          THE COURT:  Are you married?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Do you have any children?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Do you have any friends or relatives

25     that work in law enforcement?

88

1           PROSPECTIVE JUROR:  Yes.  Family.

2           THE COURT:  All right.  And what agency or agencies

3    do they work for?

4           PROSPECTIVE JUROR:  They work in North Carolina,

5    sheriff's department.

6           THE COURT:  Is there anything about those

7    relationships that you're concerned might interfere with your

8    ability to remain fair and impartial in this case?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Other than a traffic citation, ever been

11   accused of committing a crime?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  And finally, ma'am, have you ever served

14   on a jury before?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  All right.  Thank you, ma'am.

17          Good morning, sir.

18          PROSPECTIVE JUROR:  Good morning.

19          THE COURT:  Please state your full name for the

20   record.

21          PROSPECTIVE JUROR:  Tyler Basant.

22          THE COURT:  Mr. Basant, what is your date of birth?

23          PROSPECTIVE JUROR:  February 5, 1999.

24          THE COURT:  And sir, where do you currently reside?

25          PROSPECTIVE JUROR:  Orlando.

89

1          THE COURT:  And what do you do for a living?

2          PROSPECTIVE JUROR:  DEQ download tester.

3          THE COURT:  Are you married?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Do you have any children?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Do you have any friends or relatives

8    that work in law enforcement?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Other than a traffic citation, ever been

11   accused of committing a crime?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  And have you, your friends, or relatives

14   ever been the victim of a crime?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  And who was the victim?

17          PROSPECTIVE JUROR:  My aunt's family.

18          THE COURT:  What were they a victim of?

19          PROSPECTIVE JUROR:  Home robbery.

20          THE COURT:  Do you recall how long ago that was?

21          PROSPECTIVE JUROR:  Last year.

22          THE COURT:  Did you come into contact with law

23   enforcement?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Do you feel your family was treated

90

1   fairly?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Is there anything about that experience

4   that you're concerned might interfere with your ability to

5   remain fair and impartial here?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  All right.  And finally, sir, have you

8   ever served on a jury before?

9           PROSPECTIVE JUROR:  No, sir.

10          THE COURT:  All right.  Thank you.  I appreciate

11  that.

12          Mr. Carter, if you could take that to the pew.

13          Good morning, sir.

14          PROSPECTIVE JUROR:  Good morning.

15          THE COURT:  Please state your full name for the

16  record.

17          PROSPECTIVE JUROR:  Juan Herrera.

18          THE COURT:  And, sir, what is your date of birth?

19          PROSPECTIVE JUROR:  January 4, 1966.

20          THE COURT:  Where do you currently reside?

21          PROSPECTIVE JUROR:  Orlando.

22          THE COURT:  And what do you do for a living?

23          PROSPECTIVE JUROR:  Assistant person for the

24  aerospace industry, aircraft parts.

25          THE COURT:  Are you married?

91

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Do you have any children?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Do you have any friends or relatives

5    that work in law enforcement?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Have you, your friends, or relatives

8    ever been the victim of a crime?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And who was the victim?

11          PROSPECTIVE JUROR:  Myself.

12          THE COURT:  What were you a victim of?

13          PROSPECTIVE JUROR:  Of home robbery and someone

14    broke in my car.

15          THE COURT:  Okay.  So burglary of your home and of

16    your automobile.  Did you come into contact with law

17    enforcement?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Do you feel you were treated fairly?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Is there anything about those

22    experiences that you're concerned might interfere with your

23    ability to remain fair and impartial?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Other than a traffic citation, ever been

92

1   accused of committing a crime?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  And without getting into any detail on

4   that, do you feel you were treated fairly in that process?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Is there anything about that experience

7   that you're concerned might interfere with your ability to

8   remain fair and impartial here?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Finally, have you ever served on a jury?

11          PROSPECTIVE JUROR:  Yes, called, but then dismissed.

12          THE COURT:  So you got called.  Did you end up

13  serving?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Okay.  Thank you, sir.  I appreciate

16  that.  Please hand that microphone to your right.

17          Good morning.

18          PROSPECTIVE JUROR:  Good morning.

19          THE COURT:  Please state your full name for the

20  record.

21          PROSPECTIVE JUROR:  Harry Amesbury.

22          THE COURT:  And Mr. Amesbury, what is your date of

23  birth?

24          PROSPECTIVE JUROR:  22, July, '56.

25          THE COURT:  And where do you reside?

93

1        PROSPECTIVE JUROR:  Oviedo.

2        THE COURT:  And what do you do for a living?

3        PROSPECTIVE JUROR:  Retired project manager.

4        THE COURT:  For what type of company?

5        PROSPECTIVE JUROR:  Tech. companies primarily --

6   Amazon, General Electric, Motorola.

7        THE COURT:  Are you married?

8        PROSPECTIVE JUROR:  No.

9        THE COURT:  Do you have any children?

10       PROSPECTIVE JUROR:  No.

11       THE COURT:  Do you have any friends or relatives

12   that work in law enforcement?

13       PROSPECTIVE JUROR:  No.

14       THE COURT:  Have you, your friends, or relatives

15   ever been the victim of a crime?

16       PROSPECTIVE JUROR:  Oh, I need to back up.  I have a

17   brother who is a district attorney in Oregon.

18       THE COURT:  In Oregon?

19       PROSPECTIVE JUROR:  In Oregon.

20       THE COURT:  Does your brother ever have occasion to

21   talk to you about what he does for a living?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  Is there anything about that

24   relationship that you're concerned --

25       PROSPECTIVE JUROR:  No.

1          THE COURT:  -- might interfere with your ability to

2     make -- in other words, you're not going to be leaning heavily

3     towards the prosecutor because you're related to one?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Okay.  I appreciate that.  Other than a

6     traffic citation, ever been accused of committing a crime?

7          PROSPECTIVE JUROR:  Trespassing.

8          THE COURT:  And do you feel you were treated fairly

9     in that process.

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Is there anything about that experience

12    that you're concerned might interfere with your ability to

13    remain fair and impartial here?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  And finally, sir, have you ever served

16    on a jury before?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And do you recall what type?

19         PROSPECTIVE JUROR:  It was a misdemeanor battery

20    case in Sanford.

21         THE COURT:  A civil misdemeanor -- or criminal

22    misdemeanor, beg your pardon.

23         PROSPECTIVE JUROR:  Right.

24         THE COURT:  Do you recall how long ago that was?

25         PROSPECTIVE JUROR:  About seven years.

95

1          THE COURT:  And where was that?

2          PROSPECTIVE JUROR:  Sanford.

3          THE COURT:  And did that jury reach a verdict?

4          PROSPECTIVE JUROR:  We did.

5          THE COURT:  All right.  Thank you, sir.  I

6    appreciate that.

7          Good morning.

8          PROSPECTIVE JUROR:  Good morning.

9          THE COURT:  Please state your full name for the

10   record.

11         PROSPECTIVE JUROR:  Allen Morseth.

12         THE COURT:  And Mr. Morseth, what is your date of

13   birth?

14         PROSPECTIVE JUROR:  6/24/57.

15         THE COURT:  Where do you currently reside?

16         PROSPECTIVE JUROR:  Winter Park.

17         THE COURT:  And, sir, what do you do for a living?

18         PROSPECTIVE JUROR:  I own a machinery dealership.

19         THE COURT:  Are you married?

20         PROSPECTIVE JUROR:  Nope.

21         THE COURT:  Do you have any children?

22         PROSPECTIVE JUROR:  Yeah.  Two.

23         THE COURT:  Are they grown or school age?

24         PROSPECTIVE JUROR:  Grown.

25         THE COURT:  What do they do for a living?

96

1            PROSPECTIVE JUROR:  Office manager and a technician.

2            THE COURT:  The office manager; what type of

3    business do they work for?

4            PROSPECTIVE JUROR:  Insurance.

5            THE COURT:  Okay.  Do you have any friends or

6    relatives that work in law enforcement?

7            PROSPECTIVE JUROR:  No.

8            THE COURT:  Have you, your friends, or relatives

9    ever been the victim of a crime?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  Other than a traffic citation, ever been

12   accused of committing a crime?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  And finally, have you ever served on a

15   jury before?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  All right.  Thank you, sir.

18           Good morning.

19           PROSPECTIVE JUROR:  Good morning.

20           THE COURT:  Please state your full name for the

21   record.

22           PROSPECTIVE JUROR:  Sonia Edwards.

23           THE COURT:  Ms. Edwards, what is your date of birth?

24           PROSPECTIVE JUROR:  3/10/59.

25           THE COURT:  Where do you currently reside?

97

1            PROSPECTIVE JUROR:  Kissimmee.

2            THE COURT:  What do you do for a living?

3            PROSPECTIVE JUROR:  I am a registered sales

4    associate.

5            THE COURT:  For what type of company?

6            PROSPECTIVE JUROR:  Stock brokerage.

7            THE COURT:  Are you married?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  And is your spouse employed?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  What does your spouse do for a living?

12           PROSPECTIVE JUROR:  He's a realtor.

13           THE COURT:  Do you have any children?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Are they grown or school age?

16           PROSPECTIVE JUROR:  Grown and school age.

17           THE COURT:  The ones that are grown, what do they do

18   for a living?

19           PROSPECTIVE JUROR:  He's a research scientist,

20   public health.

21           THE COURT:  Do you have any friends or relatives

22   that work in law enforcement?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  Have you, your friends, or relatives

25   ever been the victim of a crime?

98

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Other than a traffic citation, ever been

3     accused of committing a crime?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  And, finally, ma'am, have you ever

6     served on a jury before?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Do you recall what type of jury that

9     was?

10         PROSPECTIVE JUROR:  It was against an insurance

11    company.

12         THE COURT:  Sounds like it was civil.

13         PROSPECTIVE JUROR:  Yeah.

14         THE COURT:  Do you recall how long ago that was?

15         PROSPECTIVE JUROR:  Probably about 25 years ago.

16         THE COURT:  And where was that?

17         PROSPECTIVE JUROR:  Bridgeport, Connecticut.

18         THE COURT:  Was that jury able to reach a verdict?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  All right.  Thank you, ma'am.  I

21    appreciate that.

22         Good morning.  Please state your full name for the

23    record.

24         PROSPECTIVE JUROR:  David Collins.

25         THE COURT:  Mr. Collins, what is your date of birth?

99

1          PROSPECTIVE JUROR:  January 4, 1982.

2          THE COURT:  Where do you currently reside?

3          PROSPECTIVE JUROR:  Winter Park.

4          THE COURT:  And, sir, what do you do for a living?

5          PROSPECTIVE JUROR:  Pilot.

6          THE COURT:  And are you married?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Do you have any children?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Do you have any friends or relatives

11  that work in law enforcement?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Have you, your friends, or relatives

14  ever been the victim of a crime?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Other than a traffic citation, ever been

17  accused of committing a crime?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  And finally, Mr. Collins, have you ever

20  served on a jury?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  All right.  Thank you, Mr. Collins.

23  Good morning.

24         PROSPECTIVE JUROR:  Good morning.

25         THE COURT:  Please state your full name for the

100

1    record.

2              PROSPECTIVE JUROR:  Regina Taylor.

3              THE COURT:  And, Ms. Taylor, what is your date of

4    birth?

5              PROSPECTIVE JUROR:  3/29/65.

6              THE COURT:  Where do you currently reside?

7              PROSPECTIVE JUROR:  Winter Garden.

8              THE COURT:  And what do you do for a living?

9              PROSPECTIVE JUROR:  I am currently an unemployed

10   accountant.

11             THE COURT:  Are you married?

12             PROSPECTIVE JUROR:  Divorced.

13             THE COURT:  Do you have any children?

14             PROSPECTIVE JUROR:  Three.

15             THE COURT:  Are they grown or school age?

16             PROSPECTIVE JUROR:  Grown.

17             THE COURT:  And what do they do for a living?

18             PROSPECTIVE JUROR:  One is a letter carrier for the

19   post office, and two are college students.

20             THE COURT:  Do you have any friends or relatives in

21   law enforcement?

22             PROSPECTIVE JUROR:  Ex-husband.

23             THE COURT:  And what agency -- what type of law

24   enforcement did your ex-husband work at?

25             PROSPECTIVE JUROR:  Orlando Police.

1          THE COURT:  Is there anything about that

2     relationship or that former relationship that you're concerned

3     might interfere with your ability to remain fair and impartial

4     in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Have you, your friends, or relatives

7     ever been the victim of a crime?

8          PROSPECTIVE JUROR:  My sister.

9          THE COURT:  And what was your sister a victim of?

10         PROSPECTIVE JUROR:  She was a victim of a hit and

11    run.

12         THE COURT:  How long ago was that?

13         PROSPECTIVE JUROR:  Sixteen years ago.

14         THE COURT:  Did your family come into contact with

15    law enforcement based on your sister's experience?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Do you feel she was treated fairly?

18         PROSPECTIVE JUROR:  Well, she passed away.

19         THE COURT:  I'm sorry to hear that.

20         PROSPECTIVE JUROR:  I would say, yes, we were

21    treated fairly.

22         THE COURT:  Is there anything about that experience

23    that might affect your ability to remain fair and impartial

24    here?

25         PROSPECTIVE JUROR:  No.

102

1          THE COURT:  Other than a traffic citation, ever been

2     accused of committing a crime?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  And finally, have you ever served on a

5     jury before?

6          PROSPECTIVE JUROR:  A civil trial.

7          THE COURT:  A civil trial; how long ago?

8          PROSPECTIVE JUROR:  About 20 years ago.

9          THE COURT:  And where was that?

10         PROSPECTIVE JUROR:  Orange County.

11         THE COURT:  Did that jury reach a verdict?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  All right.  Thank you, ma'am.  I

14     appreciate that.

15         Good morning.

16         PROSPECTIVE JUROR:  Good morning.

17         THE COURT:  Please state your full name for the

18     record.

19         PROSPECTIVE JUROR:  Ai Bosques.

20         THE COURT:  Ms. Bosques, what is your date of birth?

21         PROSPECTIVE JUROR:  6/15/76.

22         THE COURT:  And where do you currently reside?

23         PROSPECTIVE JUROR:  Winter Springs.

24         THE COURT:  And what do you do for a living?

25         PROSPECTIVE JUROR:  CPA.

1          THE COURT:  Are you married?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Is your spouse employed?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  What does your spouse do for a living?

6          PROSPECTIVE JUROR:  Accountant.

7          THE COURT:  Do you have any children?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And are they grown or school age?

10          PROSPECTIVE JUROR:  School age.

11          THE COURT:  Do you have any friends or relatives

12   that work in law enforcement?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Have you, your friends, or relatives

15   ever been the victim of a crime?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And who was the victim?

18          PROSPECTIVE JUROR:  My mother.

19          THE COURT:  What was your mother a victim of?

20          PROSPECTIVE JUROR:  Robbery.

21          THE COURT:  How long ago was that?

22          PROSPECTIVE JUROR:  Over 30 years ago.

23          THE COURT:  Do you have any recollection of that

24   experience?

25          PROSPECTIVE JUROR:  Not so much with law

1    enforcement, no.

2            THE COURT:  Is your feeling that your -- do you feel

3    whether -- have an opinion as to whether or not your family

4    was treated fairly in that situation?

5            PROSPECTIVE JUROR:  I think they were treated

6    fairly.

7            THE COURT:  Is there anything about that experience

8    that you're concerned might interfere with your ability to

9    remain fair and impartial here?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  Other than a traffic citation, have you

12   ever been accused of committing a crime?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  And finally, have you ever served on a

15   jury?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  All right.  Thank you, ma'am.  If you

18   can hand that microphone directly behind you.

19           Good morning.

20           PROSPECTIVE JUROR:  Good morning, sir.

21           THE COURT:  Please state your full name for the

22   record.

23           PROSPECTIVE JUROR:  Charles Pennisi.

24           THE COURT:  And, Mr. Pennisi, what is your date of

25   birth?

105

1          PROSPECTIVE JUROR:  February 17, 1970.

2          THE COURT:  Wow, that's a coincidence.  We have a

3   February 17, 1970, we have a February 15, 1970, and I'm

4   February 18, 1970.  Time to buy a lottery ticket, one of us.

5          All right.  Mr. Pennisi, where do you currently

6   reside?

7          PROSPECTIVE JUROR:  Longwood.

8          THE COURT:  And what do you do for a living?

9          PROSPECTIVE JUROR:  Theme park operations.

10          THE COURT:  Sir, are you married?

11          PROSPECTIVE JUROR:  Divorced.

12          THE COURT:  Do you have any children?

13          PROSPECTIVE JUROR:  Two.

14          THE COURT:  Are they grown or school age?

15          PROSPECTIVE JUROR:  Grown.

16          THE COURT:  What do they do for a living?

17          PROSPECTIVE JUROR:  My daughter is in college; my

18   son is a U.S. Marine reserve, currently in the fire

19   department.

20          THE COURT:  Sir, do you have any friends or

21   relatives that work in law enforcement?

22          PROSPECTIVE JUROR:  No, sir.

23          THE COURT:  Have you, your friends, or relatives

24   ever been the victim of a crime?

25          PROSPECTIVE JUROR:  No.

1          THE COURT:  Other than a traffic citation, ever been

2     accused of committing a crime?

3          PROSPECTIVE JUROR:  No, sir.

4          THE COURT:  And finally, have you ever served on a

5     jury?

6          PROSPECTIVE JUROR:  No, sir.

7          THE COURT:  Thank you, sir.  I appreciate that.

8          Good morning.

9          PROSPECTIVE JUROR:  Good morning.

10         THE COURT:  Please state your full name for the

11    record.

12         PROSPECTIVE JUROR:  Jennifer Boudreau.

13         THE COURT:  Ms. Boudreau, what is your date of

14    birth?

15         PROSPECTIVE JUROR:  July 6, 1972.

16         THE COURT:  And where do you currently reside?

17         PROSPECTIVE JUROR:  Winter Garden.

18         THE COURT:  And what do you do for a living?

19         PROSPECTIVE JUROR:  Substitute teacher.

20         THE COURT:  Are you married?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Do you have any children?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  And let's go back to your spouse.  What

25    does your spouse do for a living?

107

1          PROSPECTIVE JUROR:  Helicopter pilot.

2          THE COURT:  And your children; are they grown or

3   school age?

4          PROSPECTIVE JUROR:  Both.

5          THE COURT:  All right.  The ones that are grown,

6   what do they do for a living?

7          PROSPECTIVE JUROR:  My middle daughter is a college

8   student, works in the theme parks.  And my oldest daughter

9   also works in a theme park.

10          THE COURT:  Have you, your friends, or relatives

11   ever been the victim of a crime?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Other than a traffic citation, ever been

14   accused of committing a crime?

15          PROSPECTIVE JUROR:  No, sir.

16          THE COURT:  All right.  Finally, have you ever

17   served on a jury before?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  All right.  Thank you.  I appreciate

20   that.

21          PROSPECTIVE JUROR:  Thank you.

22          THE COURT:  Thank you.

23          Good morning.

24          PROSPECTIVE JUROR:  Good morning.

25          THE COURT:  Please state your full name for the

108

1    record.

2              PROSPECTIVE JUROR:  Clayton Fore.

3              THE COURT:  And, Mr. Fore, what is your date of

4    birth?

5              PROSPECTIVE JUROR:  10/19/86.

6              THE COURT:  Where do you currently reside?

7              PROSPECTIVE JUROR:  Chuluota.

8              THE COURT:  What do you do for a living?

9              PROSPECTIVE JUROR:  I'm a truck driver.

10             THE COURT:  Are you married?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Is your spouse employed?

13             PROSPECTIVE JUROR:  Yes, a nurse.

14             THE COURT:  Go on ahead?

15             PROSPECTIVE JUROR:  Say it again?

16             THE COURT:  Your wife is a nurse?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Do you have any children?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Are they grown or school age?

21             PROSPECTIVE JUROR:  School age.

22             THE COURT:  Do you have any friends or relatives

23   that work in law enforcement?

24             PROSPECTIVE JUROR:  I do.

25             THE COURT:  What agency or agencies do they work

1    for?

2          PROSPECTIVE JUROR:  Seminole County and Altamonte.

3          THE COURT:  All right.  You didn't hear their names,

4    but I need to ask nonetheless, is there anything about those

5    relationships that you're concerned might interfere with your

6    ability to remain fair and impartial in this case?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Other than a traffic citation, have you

9    ever been accused of committing a crime?

10          PROSPECTIVE JUROR:  Nope.

11          THE COURT:  Finally, have you ever served on a jury

12    before?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  What type of jury?

15          PROSPECTIVE JUROR:  It was a civil traffic incident.

16          THE COURT:  How long ago?

17          PROSPECTIVE JUROR:  About 12 years.

18          THE COURT:  And did that jury reach a verdict?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And where was that?

21          PROSPECTIVE JUROR:  Seminole County.

22          THE COURT:  One more question.  Have you, your

23    friends, or relatives ever been the victim of a crime?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  All right.  Thank you, sir.

110

1    All right.  Those are the vegetables with dinner.

2    So the tough part's over.  I have a few general questions with

3    you.  I'll have a brief discussion with the attorneys, and

4    then we'll begin whittling things down.

5    So as a group, I need to ask, has anyone ever been

6    called to testify as a witness in any courtroom proceeding?

7    If so, raise your hand.

8    All right.  Now leave your hand up if based on that

9    experience, you harbor any negative feelings towards

10   prosecutors, defense attorneys, or attorneys in general, as a

11   result of that experience.

12   All right.  So leave your hand up if you have a

13   negative -- if it was a negative experience.  All right.  None

14   of the hands stayed up.

15   All right.  We have one member of the panel.  Are

16   there any other persons on the panel who English is not your

17   first language?  If so, please raise your hand.  All right.

18   English is not my first language.  So I need to ask.  Is there

19   anyone other than our one juror who has indicated she has

20   trouble understanding me?  Raise your hand if English is not

21   your first language and you have had some problems

22   understanding what I've been saying this morning.  Please

23   raise your hand.  All right.  We only have the one juror who

24   has been accounted for.  Thank you.  I appreciate that.

25   Has anyone served in the military?  Please raise

1    your hand.

2            Thank you for your service, sir.  And that's going

3    to be --

4            Go on ahead and bring him the microphone.  Thank

5    you, Mr. Carter.

6            Is that Mr. Amesbury?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Mr. Amesbury, did you serve as a police

9    officer while you served in the military?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  All right.  Thank you.

12           Mr. Carter, if you can retrieve that microphone.

13           All right.  Does any member have strong feelings for

14   or against the United States Government or, specifically, the

15   Federal Bureau of Investigation, that you're concerned might

16   interfere with your ability to remain fair and impartial in

17   this case?  If so, please raise your hand.  All right.  And we

18   will go over that in a minute, but that is our Juror No. 9,

19   Ms. Naimoli.

20           All right.  I introduced everyone in the courtroom

21   previously.  So I need to ask now, do you know anyone?  Do you

22   know any members of the courtroom staff, the attorneys, or do

23   you think you know me?  If so, please raise your hand.  All

24   right.  None of the jurors have raised their hands.

25           Does anyone have a conflict with the trial dates of

1    today through Wednesday of this week -- and we'll start with

2    the first row -- that I need to be made aware of?  If so,

3    please indicate by raising your hand.  Are there any

4    scheduling professional or personal conflicts with the dates

5    of trial?  Starting with row one.  All right.  No hands go up

6    for row one.  Hold on.  Hold on.  We have Ms. Nicholas.  Hold

7    on.  We've got to get you the microphone.

8              Yes, ma'am?

9              PROSPECTIVE JUROR:  I do babysit my grandson, and

10   that's Wednesdays, Thursdays, and Fridays.

11             THE COURT:  So if you're on this panel and you're on

12   the panel on Wednesday, that's going to create -- is there

13   anyone that can cover for you?

14             PROSPECTIVE JUROR:  I am not quite sure.

15             THE COURT:  All right.  What time do you babysit

16   your nephew?

17             PROSPECTIVE JUROR:  No.  My grandson.

18             THE COURT:  Your grandson.

19             PROSPECTIVE JUROR:  From 8:00 to 7:00.

20             THE COURT:  8:00 a.m. to 7:00 p.m.?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  All right.  Anyone else on the first

23   row?  Yes.  We have Ms. Mosrie.  We can go there.  We can go

24   there.  Keep it with him.

25             THE COURTROOM SECURITY OFFICER:  With him, sir?

113

1          THE COURT:  Yeah.  And we'll go back to Ms. Mosrie.

2          PROSPECTIVE JUROR:  You took my phone, but I think I

3    have a doctor's appointment tomorrow at 8:00.

4          THE COURT:  Is that a doctor's appointment you've

5    been waiting for some time for?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  Is that something that can be

8    rescheduled, or have you been waiting a long time for that

9    appointment?

10          PROSPECTIVE JUROR:  I can reschedule it.

11          THE COURT:  All right.  Thank you, sir.  I

12    appreciate that.

13          We have Ms. Mosrie next.  Yes, ma'am.

14          PROSPECTIVE JUROR:  Well, I'm the caregiver of my

15    mom; she lives with me and she's 93.

16          THE COURT:  Is there anyone else that can substitute

17    in your absence if you were to be on this panel?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  All right.  Caregiver for your mom.  All

20    right.  Thank you.

21          Anyone else on the first row?  All right.  Second

22    row.  All right.  If you can take it on up.

23          That's Ms. Evans.

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Yes, what is your conflict, ma'am?

1      PROSPECTIVE JUROR:  I'm a caregiver for my disabled

2  brother.

3      THE COURT:  Is there anyone that can substitute in

4  your absence?

5      PROSPECTIVE JUROR:  Not really because today we had

6  to get, like, three or four people to, like, take shifts, and

7  I'm still with a question, and I'm waiting for the break so I

8  can call in and check on him.

9      THE COURT:  Okay.  Well, thank you, ma'am, for

10  telling me that.  I appreciate that.

11      Is there anyone on row two?  All right.  If you can

12  hand that over.  That's Mr. Kukor.

13      PROSPECTIVE JUROR:  Yes.

14      THE COURT:  Yes.

15      PROSPECTIVE JUROR:  I have patients scheduled the

16  good amount of the day on Tuesday and Thursday.

17      THE COURT:  So you have them all day long?

18      PROSPECTIVE JUROR:  A fair amount of the day, yes.

19      THE COURT:  All right.  Anyone else on row two?  All

20  right.  And that's Mr. Dalrymple.

21      PROSPECTIVE JUROR:  I have a doctor's appointment at

22  8:30 on Thursday.  I had eye surgery, and I have to have a

23  follow-up.  And also, I am self-employed and I'm small

24  business.  I'm the only one at the business, and I have work

25  scheduled for the week.

115

1          THE COURT:  All right.  Thank you for telling me
2     that.
3          PROSPECTIVE JUROR:  Okay.
4          THE COURT:  That will be taken into consideration.
5          Anyone on row three?
6          Let's start with Ms. Augustin, yes, ma'am?
7          PROSPECTIVE JUROR:  I have a doctor's appointment
8     tomorrow at noon, at noon.
9          THE COURT:  Is that something that can be
10    rescheduled?
11         PROSPECTIVE JUROR:  I can see, but I've been waiting
12    for this appointment.
13         THE COURT:  At noon tomorrow?
14         PROSPECTIVE JUROR:  Yes.
15         THE COURT:  All right.  Thank you.
16         Anyone else on row three?  All right.  If you can
17    hand it down.  They can just pass it down.
18         PROSPECTIVE JUROR:  I have an audit in my department
19    in my company; it's on Wednesday.
20         THE COURT:  Is that something that you have to be
21    there for?
22         PROSPECTIVE JUROR:  Yes, because I'm their manager.
23         THE COURT:  Okay.  So Ms. Nguyen has -- Juror No. 5
24    has an audit scheduled for Wednesday.  When is it scheduled on
25    Wednesday?

1      PROSPECTIVE JUROR:  It's all day, so it starts at

2  9:00 a.m. to 5:00 p.m.

3      THE COURT:  Is there anyone that can substitute for

4  you if you're not available?

5      PROSPECTIVE JUROR:  Um.

6      THE COURT:  Would be tough?

7      PROSPECTIVE JUROR:  Kind of, it's tough.  I'm like

8  the senior one there.  My manager, she's just started so she

9  has no idea what's going on.

10      THE COURT:  I understand.  Thank you.  Thank you for

11  telling me that.  And next to you --

12      Mr. Blair, yes?

13      PROSPECTIVE JUROR:  Yes.  I'm a small business

14  owner.  I have two employees.  And I have work scheduled for

15  this week, but I had to cancel for today because it's rented a

16  piece of equipment that is high reach, and I had to cancel

17  that today, and I'm on hold until we find out what we're doing

18  here.

19      THE COURT:  All right.  Thank you.  I appreciate

20  that.

21      Anyone else on row one?  All right.  With no one

22  else on row one, how about the front pew?

23      Is that Mr. Morseth?

24      PROSPECTIVE JUROR:  Yes.

25      THE COURT:  Yes, Mr. Morseth?

1          PROSPECTIVE JUROR:  Being as I was on call and just

2    got the call yesterday to be here today, I had a major machine

3    delivery slated for today north of Tampa.  And on Wednesday, I

4    have another major move of a big machine in Jacksonville, and

5    I'm the only person that can be around to do that.

6          THE COURT:  Is the machine not getting delivered

7    today in Tampa because of your absence?

8          PROSPECTIVE JUROR:  Well, the machine was delivered.

9    I had to be there to show them how to run it --

10         THE COURT:  Okay.

11         PROSPECTIVE JUROR:  -- when I say "delivery."

12         THE COURT:  All right.  Thank you, sir.  I

13   appreciate that.

14         PROSPECTIVE JUROR:  Okay.

15         THE COURT:  Anyone else on that row?  How about on

16   our back row?  All right.

17         If counsel would be kind enough to approach sidebar.

18     (At the bench.)

19         THE COURT:  All right.  This is going to be tight.

20   So let me just tell you, of the ones who said they heard

21   something about the case, I don't think we need to hear from

22   Ana Roman because she's, essentially, already going -- we can

23   go through that.  I'll keep the ones except for her to learn

24   what they heard about the case.

25         Is there anything specifically you want asked, other

1    than what's been asked?

2         MS. NAIR:  The only other one is Boudreau.  You

3    didn't ask her --

4         THE COURT:  What number?

5         MS. NAIR:  No. 39.

6         THE COURT:  Okay.

7         MS. NAIR:  I think you forgot to ask her about law

8    enforcement.

9         THE COURT:  Okay.  I'll ask that.  Anything else?

10        MR. CHIU:  No, Your Honor.

11        THE COURT:  Okay.  Thank you.

12     (In open court.)

13        THE COURT:  All right.  Let's get the mic to one

14   more person, just one more question.

15        And that's Ms. Boudreau.  I may have neglected to

16   ask you.

17        Go ahead and bring her the microphone.

18        If you can raise your hand so Mr. Carter can see

19   you.  Do you have any friends or relatives that work in law

20   enforcement?

21        PROSPECTIVE JUROR:  No.

22        THE COURT:  All right.  Thank you.  I appreciate

23   that.

24        All right.  So with the exception of Mary Nolan,

25   Ashley Ledford, Allen Morseth, and Harry Amesbury, everyone's

1   going to head on downstairs.  Those are the persons who

2   indicated they had heard something about this case, so we're

3   going to have a brief discussion on that.

4            Everyone else, relax downstairs.  We're almost to

5   the end of the process, and we'll let everyone know who's

6   going to be on this panel.  So with the exception of those

7   persons whose name I just called, please feel free to head on

8   back downstairs with Mr. Carter.  Thank you.

9            THE COURTROOM SECURITY OFFICER:  All rise for the

10  jury.

11     (The jury panel retired from the courtroom at 10:20 a.m.)

12           THE COURT:  All right.  The remaining jurors, feel

13  free to be seated.

14           Darleen, if you can deliver the microphone, please.

15           THE COURTROOM DEPUTY:  Yes, Judge.

16           THE COURT:  Let's start with Ms. Ledford.  We'll get

17  everyone outside of the courtroom.  All right.

18           Persons in the courtroom, feel free to be seated.

19           All right.

20           And, Ms. Ledford, you indicated that you heard --

21  know -- or you think you might have heard something about this

22  case -- what specifically?

23           PROSPECTIVE JUROR:  Well, I'm pretty confident I've

24  seen him on TV.  And then, I --

25           THE COURT:  You've seen the defendant on TV?

1           PROSPECTIVE JUROR:  Well, I think.  I can't remember

2      it.  I'm almost positive, but I can tell you I did hear about

3      it.  I'm in the car all day; I'm a medical rep.  All I do is

4      listen to news.

5           THE COURT:  Right.

6           PROSPECTIVE JUROR:  And I hear everything about --

7           THE COURT:  Do you remember, specifically, did you

8      hear anything other than a news report?

9           PROSPECTIVE JUROR:  Could you clarify, be more

10     specific?

11          THE COURT:  Did you listen -- did you hear anything

12     that led you to a conclusion that something did or didn't

13     happen, or have you heard about any of the specific facts

14     about the case?

15          PROSPECTIVE JUROR:  I mean, other than what -- he

16     was threatened.  Nothing more specific than that, but --

17          THE COURT:  All right.  So if I were to tell you

18     that what you heard on the radio is something that cannot be

19     considered in here, only the evidence presented before you,

20     are you going to have time -- trouble separating that?

21          PROSPECTIVE JUROR:  Absolutely, because I've already

22     formed --

23          THE COURT:  You've already formed an opinion?

24          PROSPECTIVE JUROR:  -- an opinion, yeah,

25     unfortunately.

121

1          THE COURT:  Well, that's okay.

2          PROSPECTIVE JUROR:  I'm being honest.

3          THE COURT:  Yeah, but there's nothing unfortunate

4    about that.  I mean, you can't live your life thinking you

5    might be on a jury in six months, so you didn't do anything

6    wrong.

7          PROSPECTIVE JUROR:  Right.

8          THE COURT:  Thank you for telling me that.  If you

9    could hand the microphone to your left, to Ms. Nolan.

10         Ms. Ledford, if you want to go on ahead and head

11   downstairs, feel free to do so.  Do you remember how to get

12   down there?

13         PROSPECTIVE JUROR:  The elevator.

14         THE COURT:  Yes.  Down to the first floor, and then

15   the jury room is on the left.  All right.  Thank you.

16         (The prospective juror retired from the courtroom

17          at 10:22 a.m.)

18         THE COURT:  All right.  Ma'am, do you remember what

19   you heard, if anything, about the case?

20         PROSPECTIVE JUROR:  Basically just the story itself

21   when it was on the news.  Generally, hearing that a threat was

22   made against a senator.  I don't --

23         THE COURT:  All right.  So would you be surprised to

24   hear from me in telling you that not everything you hear on

25   the radio or see on TV is accurate?

122

1          PROSPECTIVE JUROR:  I would not be surprised, no.

2          THE COURT:  All right.  So having said that, is that

3    going to interfere -- have you already come to an opinion as

4    to what happened here?

5          PROSPECTIVE JUROR:  I don't believe I've come -- I

6    haven't heard enough details about it.  I just heard an

7    overall.

8          THE COURT:  All right.  So here's the big question:

9    If I were to tell you you have to disregard -- as I did

10   previously -- what you heard on the radio or saw on TV and

11   just rely on what's presented in the courtroom, is that going

12   to be a problem?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  All right.  Thank you, ma'am, I

15   appreciate that.  And if you want to give the microphone to

16   Ms. Darleen, or you can hand it to one of the gentlemen, and

17   feel free to head downstairs, ma'am.  Thank you so much.

18             (The prospective juror retired from the courtroom

19              at 10:23 a.m.)

20         THE COURT:  Good morning, sir, again.  And this is

21   Mr. Amesbury.

22         PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  If you could be kind enough to tell me

24   what you heard about this case.

25         PROSPECTIVE JUROR:  I raised my hand because I

123

1    wasn't sure I'd heard about this particular case, but had

2    heard about threats.

3              THE COURT:  Right.

4              PROSPECTIVE JUROR:  A letter involving a white

5    powder as I recall.  It may not even be this case, but --

6              THE COURT:  Yeah.  That is not this.

7              PROSPECTIVE JUROR:  Okay.  Then -- but I -- but out

8    of caution, I just --

9              THE COURT:  Okay.  Well, thank you, I appreciate you

10   telling me that.  So is there anything about that other thing

11   you heard about that you're concerned might interfere with

12   your ability to remain fair and impartial here?

13             PROSPECTIVE JUROR:  No, Your Honor.

14             THE COURT:  All right.  Thank you, sir.  If you can

15   hand the microphone to the gentleman to your right and head on

16   downstairs, I certainly would appreciate that.

17             (The prospective juror retired from the courtroom

18             at 10:23 a.m.)

19             THE COURT:  And last, but certainly not least, is

20   Mr. Morseth.  What do you recall hearing about this case?

21             PROSPECTIVE JUROR:  I do a lot of traveling,

22   listening to talk radio news all the time.  It was just a --

23   one story in one of 100 that I had heard last year.

24             THE COURT:  So do you even know whether or not it's

25   applicable to this?

124

1           PROSPECTIVE JUROR:  No.  I heard about the story,
2      but --
3           THE COURT:  Okay.  And did you come to a conclusion
4      or an --
5           PROSPECTIVE JUROR:  No.
6           THE COURT:  -- opinion as to what happened?
7           PROSPECTIVE JUROR:  No.
8           THE COURT:  Can you disregard what you heard on the
9      radio and only rely on what goes on in this courtroom in
10     making your determination?
11          PROSPECTIVE JUROR:  Yes.
12          THE COURT:  Do you have any doubts about that?
13          PROSPECTIVE JUROR:  No.
14          THE COURT:  All right.  Thank you, sir.  Ms. Darleen
15     is going to grab the microphone from you, and I would invite
16     you to head on downstairs, and we'll see you back here in just
17     a few minutes.
18               (The prospective juror retired from the courtroom
19               at 10:24 a.m.)
20          THE COURT:  All right.  Let's go on ahead and take
21     about ten minutes, and Ms. Darleen will check and see where
22     you're at.
23          Ms. Nair, you obviously want to talk to your client
24     before we move on further.  So as soon as you have a chance to
25     have a discussion with your client, and, Mr. Chiu, when you

125

1    have a chance to deliberate, I'll see you back in ten minutes

2    and we'll start moving forward.  All right.  Court's going to

3    be in recess.

4         (Recess at 10:25 a.m., until 10:43 a.m.)

5              THE COURT:  Okay.  So let's start.  And remain

6    seated while we do this.  Let's just try with the low-hanging

7    fruit here.

8              All right.  Ms. Nair, any challenges for cause?

9    Just give me the number; I don't need a reason.  I'll ask if

10   the Government opposes.  If they do, then I'll ask for a

11   reason.  Go on ahead.

12             MS. NAIR:  4.

13             MR. CHIU:  No objection, Your Honor.

14             THE COURT:  All right.  4 is off the panel.

15             MS. NAIR:  5.

16             MR. CHIU:  No objection.

17             THE COURT:  All right.  5 is off the panel.

18             MS. NAIR:  8.

19             MR. CHIU:  No objection, Your Honor.

20             THE COURT:  Give me a second.  All right.  4, off

21   the panel; 5, off the panel.  All right.  Ussery was treated

22   unfairly by law enforcement.  I get it.  All right.  So 8 is

23   gone.

24             Anyone else?

25             MS. NAIR:  9.

126

1          MR. CHIU:  No objection, Your Honor.

2          THE COURT:  All right.  9 is gone.

3          Any other challenges for cause?

4          MS. NAIR:  14.

5          MR. CHIU:  No objection, Your Honor.

6          THE COURT:  All right.  14 is off the panel.

7          MS. NAIR:  16.

8          THE COURT:  Any objection?

9          MR. CHIU:  No, Your Honor.

10         THE COURT:  16 is off the panel.

11         MS. NAIR:  19.

12         MR. CHIU:  No objection.

13         THE COURT:  19 is off the panel.

14         MS. NAIR:  20.

15         MR. CHIU:  No objection.

16         THE COURT:  20 is off the panel.

17         MS. NAIR:  21.

18         THE COURT:  She's the one that's a caregiver.

19         MR. CHIU:  No.  No objection.

20         THE COURT:  20 is off the panel.

21         MS. NAIR:  Did you say 21 is off the panel as well?

22         THE COURT:  I beg your pardon.  20 is off; 21 is off

23    the panel.

24         MS. NAIR:  20 should be off the panel as well

25    though.

1      THE COURT:  Yeah, 20 and -- 19, 20, and 21.

2      MS. NAIR:  Okay.  Perfect.  22.

3      THE COURT:  She's also the person -- she babysits

4  her grandchild from 8:00 a.m. to 7:00 p.m. on Wednesday.

5      MR. CHIU:  On Wednesday.  Your Honor, I don't

6  necessarily have an objection to that.  I don't want to run

7  out of jurors, but I also --

8      THE COURT:  I don't think we're going to run out,

9  even with that --

10      MR. CHIU:  Okay.

11      THE COURT:  -- but I'll leave it to you.

12      MR. CHIU:  I just don't know that we're going to get

13  to Wednesday, but I don't have an objection to it.

14      THE COURT:  Remember, if you keep her under the

15  premise it will be done by Wednesday and we're not, then we're

16  in a bind.  All right.  So no objection to that; she's off the

17  panel.  Anyone else?

18      MS. NAIR:  23.

19      MR. CHIU:  No objection.

20      THE COURT:  All right.  23 is off the panel.  Anyone

21  else?

22      MS. NAIR:  The Government and I spoke about this

23  before.  I don't really have a for cause challenge, but I

24  don't have an objection for No. 38.  It's more so the

25  Government's --

1              MR. CHIU:  Actually, I think it was 35.  This was

2     Mr. --

3              MS. NAIR:  Or 35, sorry.

4              THE COURT:  Machine dealership work

5     responsibilities.  Does the Government make any challenge for

6     cause on him?  He said he had a machine delivered to Tampa,

7     but he needs to be able to demonstrate it.  Has a delivery

8     going to Jacksonville.

9              MR. CHIU:  On Thursday, I believe it was.

10             THE COURT:  Correct.

11             MR. CHIU:  No, Your Honor, I don't think that rises

12    to a for cause.

13             THE COURT:  We can address this if he survives up as

14    one of the jurors or the alternate.

15             All right.  I've got another one for you.  There's a

16    juror that's asked -- Juror No. 27 has asked to speak to me in

17    private.  I don't think we need to do that because he has

18    issues with Senator Sanders and believes that -- hold on.  Let

19    me make sure I have the right one.  He has significant issues

20    with Senator Sanders and it's not a big fan.  We have

21    objectivity issues with this Juror No. 27.  I can bring him up

22    here and ask him what his problem is.  I've been told that his

23    problem is he thinks Senator Sanders and his wife should be

24    behind bars.  So you probably don't want -- maybe Ms. Nair

25    does, but if that's where the starting point is, I would

1   imagine Mr. Chiu -- I can bring him up and question if you

2   like, but I just don't see the reason, any reason to do that.

3         MR. CHIU:  Your Honor, I'm going to ask that he be

4   stricken for cause.

5         MS. NAIR:  I have no objection to that.

6         THE COURT:  Okay.  So he's off the panel.

7         All right.  So we're going to start with --

8   Ms. Nair, any more challenges for cause?

9         MS. NAIR:  No, Your Honor.

10        THE COURT:  Any from the Government?

11        MR. CHIU:  No, Your Honor.

12        THE COURT:  All right.  So let's start with No. 1,

13  Mr. Berkauzer.  And as usual, the defense gets ten and the

14  Government gets six peremptory challenges.  So let's start

15  with the defense and we'll go back and forth.  Will Ms. Nair

16  be using a peremptory challenge on Berkauzer?

17        PROSPECTIVE JUROR:  No, Your Honor.

18        THE COURT:  Will the Government?

19        MR. CHIU:  No, Your Honor.

20        THE COURT:  All right.  We have our first juror.

21        Starting with the Government.  Bolling.

22        MR. CHIU:  No, Your Honor.

23        THE COURT:  Will the defense?

24        MS. NAIR:  No, Your Honor.

25        THE COURT:  All right.  We have Juror No. 2.

130

1    Starting with the defense this time.  Emma Harris.

2            MS. NAIR:  No, Your Honor.

3            THE COURT:  Government.

4            MR. CHIU:  No, Your Honor.

5            THE COURT:  We have Juror No. 3.  Starting with the

6    Government.  Sandra Sluder.

7            MR. CHIU:  Yes, Your Honor.

8            THE COURT:  Any objections from the defense?  This

9    is Sandra Lynne Sluder.

10           MS. NAIR:  No, Your Honor.

11           THE COURT:  All right.  Government has used one

12   peremptory.  Ms. Sluder is off the panel.

13           Starting with the defense this time.  Gail Sheldon.

14           PROSPECTIVE JUROR:  No, Your Honor.

15           THE COURT:  Government.

16           MR. CHIU:  No, Your Honor.

17           THE COURT:  We have No. 4.

18           Starting with the Government -- or, yeah, the

19   Government this time, Kerry Augustin.

20           MR. CHIU:  No, Your Honor.

21           MS. NAIR:  No, Your Honor.

22           THE COURT:  Remember, by the way, she has an

23   appointment tomorrow at noon.

24           MR. CHIU:  I guess, think she was somewhat equivocal

25   about --

131

1    THE COURT:  Yeah.  She said she -- I thought she
2    said she could reschedule.

3    MS. NAIR:  That's what I heard.  She just had to
4    check.

5    THE COURT:  Okay.  So she remains on the panel.  She
6    is No. 4 --

7    THE COURTROOM DEPUTY:  Five.

8    THE COURT:  One, two, three, four, I can't count.
9    Thank you.  She is No. 5.

10    Starting with the defense, how about Janice Clift?

11    MS. NAIR:  No, Your Honor.

12    MR. CHIU:  No, Your Honor.

13    THE COURT:  All right.  So now we're halfway there.
14    Starting with the Government this time.  Ms. Gonzalez Sanchez.

15    MR. CHIU:  No, Your Honor.

16    MS. NAIR:  No, Your Honor.

17    THE COURT:  All right.  That's No. 7.

18    Starting with the defense this time, Mary Nolan.

19    MS. NAIR:  Yes, Your Honor.

20    THE COURT:  All right.  Any objection to the defense
21    exercising a peremptory on Nolan?

22    MR. CHIU:  No, Your Honor.

23    THE COURT:  All right.  Nolan is off the panel.

24    Mr. Chiu, back to you.  Jonathan Kukor.  He is the
25    acupuncture gentleman who has two days' worth of patients

132

1    scheduled.  Will the Government be exercising a peremptory on

2    Mr. Kukor?

3            MR. CHIU:  No, Your Honor.

4            THE COURT:  How about the defense?

5            MS. NAIR:  Yes, Your Honor.

6            THE COURT:  Any objection from the Government?

7            MR. CHIU:  No, Your Honor.

8            THE COURT:  All right.  Mr. Kukor is off the panel.

9            Starting with Ms. Nair this time.  Angela Liquori,

10   the clerk in state court.

11           MS. NAIR:  Yes, Your Honor.

12           THE COURT:  All right.  Any objection?

13           MR. CHIU:  No, Your Honor.

14           THE COURT:  All right.  That's three that Ms. Nair's

15   used so far.

16           Starting with the Government this time.

17   Joseph Boone.

18           MR. CHIU:  No, Your Honor.

19           THE COURT:  Ms. Nair?

20           MS. NAIR:  No, Your Honor.

21           THE COURT:  All right.  That's No. 8.

22           Starting with the Government this time, we're at

23   No. 24, Krystal Marie Hunter.

24           MR. CHIU:  No, Your Honor.

25           THE COURT:  Ms. Nair?

133

1          MS. NAIR:  Yes, Your Honor.

2          THE COURT:  Any objection from Government?

3          MR. CHIU:  No, Your Honor.

4          THE COURT:  All right.  So that's four used by

5   Ms. Nair.  Starting with Ms. Nair this time,

6   William Robert Young.

7          MS. NAIR:  Yes, Your Honor.

8          THE COURT:  Any objection from the Government?

9          MR. CHIU:  No, Your Honor.

10         THE COURT:  All right.  That's five used by the

11  defense.  Mr. Young is off the panel.

12         Starting with the Government, Eric Charles Layman.

13         MR. CHIU:  No, Your Honor.

14         THE COURT:  Ms. Nair?

15         MS. NAIR:  Yes, Your Honor.

16         THE COURT:  All right.  That's six by the defense.

17  Any objection from the Government as to Mr. Layman?

18         MR. CHIU:  No, Your Honor.

19         THE COURT:  All right.  Layman is off the panel.

20         Starting with the Government this time,

21  Kara Miedona.

22         MR. CHIU:  No, Your Honor.

23         THE COURT:  Ms. Nair?

24         MS. NAIR:  No, Your Honor.

25         THE COURT:  That's fine.  Starting with the defense.

1    Donna Lindquist.

2              MS. NAIR:  No, Your Honor.

3              THE COURT:  Will the Government be using a

4    peremptory on Lindquist?

5              MR. CHIU:  No, Your Honor.

6              THE COURT:  That's 10.  Starting with the Government

7    this time.  Tyler Basant.

8              MR. CHIU:  No, Your Honor.

9              THE COURT:  Ms. Nair?

10             MS. NAIR:  No, Your Honor.

11             THE COURT:  All right.  Starting with Ms. Nair this

12   time.  Ai Bosques, No. 31; she's the CPA.

13             MR. CHIU:  I'm sorry.  Are we starting with the

14   Government or the defense?

15             THE COURT:  We're starting with Ms. Nair.  First

16   name A-i, last name, Bosques.

17             MS. NAIR:  Yes, Your Honor.

18             THE COURT:  Any objection from the Government?

19             MR. CHIU:  No, Your Honor.

20             THE COURT:  All right.  That's seven used by the

21   defense.

22             We'll start with the Government this time.

23   Regina Taylor.

24             MR. CHIU:  No, Your Honor.

25             THE COURT:  Ms. Nair?

135

1          MS. NAIR:  Yes, Your Honor.

2          THE COURT:  Any objection from the Government?

3          MR. CHIU:  No, Your Honor.

4          THE COURT:  All right.  That's eight from the

5    defense, off the panel.

6          Starting with the defense this time.

7    David Matthew Collins.

8          MS. NAIR:  No, Your Honor.

9          THE COURT:  Government?

10         MR. CHIU:  No, Your Honor.

11         THE COURT:  All right.  We have 12.  Does the

12   Government accept this panel?

13         MR. CHIU:  Yes, Your Honor.

14         THE COURT:  Does the defense accept the panel?  Let

15   me read the names so you have a moment to think.  Our panel

16   would be:  Jacob Berkauzer, Catherine Bolling, Emma Harris,

17   Gail Sheldon, Kerry Augustin, Janice Clift,

18   Ms. Sanchez Gonzalez, Joseph Boone, Kara Miedona,

19   Donna Lindquist, Tyler Basant, David Collins.

20         So do you want to use any back strikes at this time,

21   Ms. Nair?

22         MS. NAIR:  Yes, Your Honor.  No. 29.

23         THE COURT:  Number 29 would be Taylor Victor Basant.

24   Any objections from the Government?

25         MS. NAIR:  No.

136

1          THE COURT:  Say again.

2          THE COURTROOM DEPUTY:  Donna Lindquist.

3          THE COURT:  Oh, I beg your pardon.  You said 29?

4          MS. NAIR:  Yes, Your Honor.

5          THE COURT:  Thank you, Darleen.  She meant Donna

6     Lindquist.

7          Any objection from the Government?

8          MR. CHIU:  No, Your Honor.

9          THE COURT:  All right.  So now that's nine

10    peremptories used by the defense.  So we'll start with the

11    defense.

12         Do you want to use your final peremptory on

13    Sonia Edwards?

14         MS. NAIR:  No, Your Honor.

15         THE COURT:  How about the Government?

16         MR. CHIU:  No, Your Honor.

17         THE COURT:  All right.  So we have 12.  Does the

18    Government accept this panel?  We've removed Lindquist and

19    added Sonia Edwards.

20         MR. CHIU:  Yes, Your Honor.

21         THE COURT:  So you accept the panel.

22         Does the defense accept the panel?

23         MS. NAIR:  Yes, Your Honor.

24         THE COURT:  All right.  So erase everything, and now

25    we're going to start with our one peremptory each for an

1   alternate.

2        Starting with the Government, are you going to use

3   your one peremptory on Allan Morseth?  He's the machine

4   dealership guy.  I'll let you -- if you want to address

5   these -- I'm willing to consider a challenge for cause on him.

6        MR. CHIU:  Your Honor, I would move for a challenge

7   for cause.

8        THE COURT:  Ms. Nair, do you have any objection to

9   that?

10        MS. NAIR:  I don't.

11        THE COURT:  All right.  So Morseth is gone.

12        So the next pertinent question for the Government is

13   Mr. Amesbury.  Will you be using a challenge on Mr. Amesbury?

14   He would be alternate No. 1.  I'd like two alternates.

15        MR. CHIU:  No, Your Honor.

16        THE COURT:  All right.  So, Ms. Nair, will you be

17   using your one alternate on Amesbury?

18        MS. NAIR:  Yes, Your Honor.

19        THE COURT:  All right.  Any objection from the

20   Government?

21        MR. CHIU:  No, Your Honor.

22        THE COURT:  All right.  Amesbury is gone.

23        So starting with the defense this time.

24   Juan Herrera; will the defense be using a peremptory on

25   Herrera?

138

1          MS. NAIR:  No, Your Honor.

2          THE COURT:  Will the Government?

3          MR. CHIU:  Yes, Your Honor.

4          THE COURT:  Okay.  So I'm going to do you two a

5    courtesy.  If you guys can agree on which of the two of the

6    remaining three are going to remain, then we can go from

7    there.  Otherwise, it will be Pennisi and Boudreau.  Do you

8    guys want an opportunity to confer?  All right.

9          MS. NAIR:  We've agreed to remove Pennisi and have

10   Boudreau and Fore remaining.

11         THE COURT:  All right.  So no Pennisi; we'll keep

12   Boudreau and Fore.  All right.  Sounds good.

13         All right.  So from the Government's perspective,

14   how much time do you need for opening statement?

15         MR. CHIU:  Five minutes, Your Honor.

16         THE COURT:  All right.  How about from the defense

17   perspective?  I'm guessing you'll need more than five minutes.

18         MS. NAIR:  I would ask for ten.

19         THE COURT:  All right.  So why don't we do this?

20   I'll give you 15 each, just to make sure you have all the time

21   you need.  I'll give a two-minute warning.

22         Will the Government be prepared -- we can go for an

23   early lunch, but if you can start -- do you have a witness you

24   can be ready to call, assuming we get through opening

25   statement?

139

1          MR. CHIU:  I do, Your Honor.

2          THE COURT:  Okay.  So let's use our time wisely,

3     then.  Let's bring the jury back up.  We'll just have them all

4     seated.  If everyone who's a member of the public in the

5     courtroom would be kind enough to sit together so the jury can

6     have as much room.  So everyone come on forward and sit with

7     the gentlemen to my right and your left so we can have the

8     jury occupy the rest of the pews.  Thank you.  I appreciate

9     that.

10          Have you told Mr. Carter to bring them up?

11          THE COURTROOM DEPUTY:  Yes, Judge.  He should be

12     entering any moment.

13          THE COURT:  And I always give them a longer lunch on

14     the first day -- an hour and a half because some of them might

15     not be familiar with downtown, and they might be trying to get

16     their equilibrium after such a busy day.  So it's going to be

17     a little longer of a lunch today.

18          THE COURTROOM SECURITY OFFICER:  All rise for the

19     jury.

20      (The jury entered the courtroom at 11:02 a.m.)

21          THE COURT:  All right.  Ladies and gentlemen, if you

22     can be seated anywhere you can find space in the pews.  As

23     soon as everyone's seated, we'll call out the names of the 14

24     people serving on this panel.  Thank you.

25          Please be seated, everyone.  All right.  Ladies and

1    gentlemen of the jury, thank you again for your time and

2    service here.  I want to commend the attorneys.  They're very

3    thoughtful in making their selections and weighing heavily all

4    of the information you relate to the Court in terms of your

5    availability and responsibilities outside of this courtroom.

6    So when you hear your name called -- we're going to start with

7    the back row to my far right or the one in the corner.  There

8    will be seven in the back, seven in the front.  You'll see

9    pads and pens in each of the chairs.  Our first juror is

10   Mr. Jacob Berkauzer.

11            If you want to come on forward and be seated in the

12   jury box.  Mr. Carter will guide you there.

13            Seated next to him is Ms. Catherine Bolling.  Seated

14   to Ms. Bolling is Ms. Emma Harris.  Seated next to Ms. Harris

15   is Ms. Gail Sheldon.  Seated next to Ms. Gail Sheldon is

16   Kerry Augustin.  Next we have Janice Clift.  And then the last

17   person on the back row is Ms. Maribelys Sanchez Gonzales.

18            All right.  Seated on the front row, we have

19   Joseph Boone.  Next to Mr. Boone we have Kara Miedona.  Next

20   to Ms. Miedona we have Tyler Basant.  Next to Mr. Basant we

21   have David Collins.  Next to Mr. Collins we have

22   Sonia Edwards.  Next to Ms. Edwards we have Jennifer Boudreau,

23   and last, but certainly not least, next to Ms. Boudreau we

24   have Clayton Fore.

25            Again, for those of you that weren't selected, I do

1  thank for your honorable service.  It's important to have you

2  participate in this process.  And without you, we certainly

3  could not have arrived at the smaller number.  At this time

4  I'm going to invite you to head on back downstairs.  You'll

5  simply check out with our jury coordinator.  There are no more

6  trials today and you'll be excused.  Again, thank you for your

7  service.  Have a very good day.

8          And the jury in the box can remain seated, please.

9  Thank you.

10     (The jury retired from the courtroom at 11:06 a.m.)

11     THE COURT:  All right.  While they're exiting,

12  remain seated while Ms. Darleen places you under oath as our

13  jury.

14          (Jury sworn.)

15     THE COURT:  All right.  I'm going to read you what's

16  called a set of preliminary jury instructions.  They're sort

17  of a schematic on how the trial is going to proceed.  You

18  don't need to take notes or memorize anything.  Whenever I

19  read you instructions on the law, I will provide hard copies

20  for you to consider during deliberations.

21          All right.  Now that the prospective jurors have

22  departed, I'd invite everyone else in the courtroom to remain

23  seated.

24          Again, we're going to use your time wisely, and the

25  attorneys will be here before you arrive, after you depart, to

1    make sure that every preparation is smooth and we're not

2    wasting any of your time.

3          A couple of tips for you.  If you want to bring

4    something to drink into the courtroom, you're welcome to do

5    so.  Non-alcoholic, of course.  And please make sure anything

6    you bring has some sort of lid on it so we can limit spillage.

7    I don't know who controls the temperature in the courtroom.  I

8    don't think I'm ever going to know the answer to that

9    question, but I can tell -- suffice it to say, sometimes it's

10   cold, sometimes it's warm.  So if you want to bring a coat, a

11   jacket, or even a blanket, feel free to do so.  And again, if

12   at any time you need anything, let Mr. Carter know, and he

13   will let me know.

14         Behind the door to my left is your jury deliberation

15   room.  You have two private restrooms in there, and you also

16   have coffee and water available to you.  You'll be coming in

17   and out of the courtroom through the hallway behind me which

18   is a judicial hallway.  It's double security.  So you'll have

19   your own private elevator and your own hallway you're brought

20   up, in and out of from here on out.  So if you have any

21   questions or concerns, Mr. Carter is your point of contact,

22   and we'll do everything we can to use your time wisely and to

23   be sensitive to whatever needs you have.

24         Members of the jury, now that you have been sworn, I

25   need to explain some basic principles about a criminal trial

1    and your duty as jurors.  These are preliminary instructions.

2    At the end of the trial, I will give you more detailed

3    instructions.  It will be your duty to decide what happened so

4    you can determine whether the defendant is guilty or not

5    guilty of the crimes charged in the indictment.  At the end of

6    trial, I will explain the law that you must follow to reach

7    your verdict.  You must follow the law as I explain it, even

8    if you do not agree with the law.

9          You must decide the case solely on the evidence

10   presented here in the courtroom.  Evidence can come in many

11   forms.  It can be testimony about what someone saw, heard, or

12   smelled; it can be an exhibit admitted into evidence; it can

13   be someone's opinion.

14         Some evidence may prove a fact indirectly.  Let's

15   say a witness saw wet grass outside and people walking into

16   the courtroom carrying wet umbrellas.  This may be indirect

17   evidence that it rained, even though the witness did not

18   personally see it rain.  Indirect evidence like this is also

19   called "circumstantial evidence," simply a chain of events

20   that likely proves a fact.  As far as the law is concerned, it

21   makes no difference whether evidence is direct or indirect,

22   you may choose to believe or disbelieve either kind and should

23   give every piece of evidence whatever weight you think it

24   deserves.  Certain things are not evidence and must not be

25   considered.  I will list them for you now:

1              The statements and the arguments of the lawyers.  In

2       their opening statements and closing arguments, the lawyers

3       will discuss the case, but their remarks are not evidence.

4              Questions and objections of the lawyers.  The

5       lawyers' questions are not evidence, only the witness's

6       answers are evidence.  You should not think that something is

7       true simply because a lawyer's question suggests that it is.

8       For example, if a lawyer asks the question, quote, You saw the

9       defendant hit his sister, didn't you, end quote, that question

10      is no evidence whatsoever of what the witness saw or what the

11      defendant did, unless the witness agrees with it.

12             There are rules of evidence that control what can be

13      received into evidence.  When a lawyer asks a question or

14      offers an exhibit and a lawyer on the other side thinks it is

15      not permitted by the rules of evidence, that lawyer may

16      object.  If I overrule the objection, then the question may be

17      answered or the exhibit received.  If I sustain the objection,

18      then the question cannot be answered and the exhibit cannot be

19      received.  Whenever I sustain an objection to a question, you

20      must ignore the question and not try to guess what the answer

21      would have been.

22             Sometimes I may order that evidence be stricken and

23      that you disregard or ignore that evidence.  That means that

24      when you are deciding the case, you must not consider that

25      evidence.

1      Some evidence is admitted for a limited purpose

2  only.  When I instruct you that an item of evidence has been

3  admitted for a limited purpose, you must consider it only for

4  that purpose and for no other.

5      In reaching your verdict, you may have to decide

6  what testimony to believe and what testimony not to believe.

7  You may believe everything a witness says or part of it or

8  none of it.

9      In considering the testimony of any witness, you may

10  take the following into account:  The opportunity and ability

11  of the witness to see or hear or know the things testified to;

12  the witness's memory; the witness's manner while testifying;

13  the witness's interest in the outcome of the case; and any

14  bias or prejudice; whether other evidence contradicted the

15  witness's testimony, the reasonableness of the witness's

16  testimony in light of all of the evidence; and any other

17  factors that bear on believability.  I will give you

18  additional guidelines for determining the credibility of

19  witnesses at the end of the case.

20      As you know, this is a criminal case.  There are

21  three basic rules about a criminal case that you must keep in

22  mind.  First, the defendant is presumed innocent until proven

23  guilty.  The indictment against the defendant brought by the

24  Government is only an accusation, nothing more.  It is not

25  proof of guilt or anything else.  The defendant, therefore,

1   starts out with a clean slate.

2          Second the burden of proof is on the Government
3   until the very end of the case.

4          The defendant has no burden to prove his innocence
5   or to present any evidence or to testify.  Since the defendant
6   has the right to remain silent and may choose whether to
7   testify, you cannot legally put any weight on a defendant's
8   decision not to testify.  It is not evidence.

9          Third the Government must prove the defendant's
10  guilt beyond a reasonable doubt.  I will give you further
11  instructions on this point later, but bear in mind that the
12  level of proof required is high.

13         Our law requires jurors to follow certain
14  instructions regarding their personal conduct in order to help
15  assure a just and fair trial.  I will now give you these
16  instructions:

17         One, do not talk, either among yourselves or with
18  anyone else, about anything related to the case.  You may tell
19  people with whom you live and your employer that you are a
20  juror, and you may give them information about when you will
21  be required to be in court, but you may not discuss with them
22  or anyone else anything related to the case.

23         Two, do not at any time during the trial request,
24  accept, agree to accept, or discuss with any person any type
25  of payment or benefit in return for supplying any information

1   about the trial.

2        Three, you must promptly tell me about any incident

3   you know of involving an attempt by any person to improperly

4   influence you or any other member of the jury.

5        Four, do not visit or view the premises or place

6   where the crimes -- where the charged crimes were allegedly

7   committed or any other premises or place involved in the case.

8   And you must not use the Internet, Internet maps, Google

9   Earth, or any other program or device to search for a view of

10  any location discussed in the testimony.

11       Five, do not read, watch or listen to any accounts

12  or discussions related to the case which may be reported by

13  newspapers, television, radio, the Internet, or any other news

14  media.

15       Six, do not attempt to research any fact, issue, or

16  law related to this case, whether by discussions with others,

17  by library or Internet research, or by any other means or

18  source.  In this age of instant electronic communication or

19  research, I want to emphasizes that in addition to not talking

20  face to face with anyone about the case, you must not

21  communicate with anyone about the case by any other means,

22  including by telephone, text messages, e-mail, Internet chat,

23  chat rooms, blogs, or social networking websites.  You must

24  not provide any information about the case to anyone by any

25  means whatsoever.  And that includes posting information about

1    the case or what you are doing in the case on any device,

2    Internet site, including blogs, chat rooms, social websites,

3    or any other means.  You must also not use the Internet or

4    Internet search engines or otherwise search for any

5    information about the case or the law that applies to the case

6    or the people involved in the case, including the defendant,

7    the witnesses, the lawyers, or the judge.

8            It is important that you understand why these rules

9    exist and why they are so important.  Our law does not permit

10   jurors to talk with anyone else about the case or to permit

11   anyone to talk to them about the case because only the jurors

12   are authorized to render a verdict.  Only you have been found

13   to be fair, and only you have promised to be fair.  No one

14   else is so qualified.  Our law also does not permit jurors to

15   talk among themselves about the case until the Court tells

16   them to begin their deliberations because premature

17   discussions can lead to a premature final decision.

18           Our law also does not permit you to visit a place

19   discussed in the testimony.  First, you cannot be sure the

20   place is in the same condition as it was on the day in

21   question.  And second, even if it were in the same condition,

22   once you go to a place discussed in the testimony to evaluate

23   the evidence in light of what you see, you become a witness

24   and not a juror.  As a witness, you may now have a mistaken

25   view of the scene that neither party may have a chance to

149

1    correct.  That is not fair.

2          Finally, our law requires that you not read or

3    listen to any news accounts of the case and that you not

4    attempt to research any fact, issue, or law related to the

5    case.  Your decision must be based solely on the testimony and

6    other evidence presented in the courtroom.

7          Also, the law often uses words and phrases in

8    special ways, so it is important that any definitions you hear

9    come only from me and not from any other source.  It would not

10   be fair to the parties for you to base your decision on some

11   reporter's view or opinion or upon other information you

12   acquire outside of the courtroom.

13         These rules are designed to help guarantee a fair

14   trial, and our law accordingly sets forth serious consequences

15   if the rules are not followed.  I trust that you understand

16   and appreciate the importance of following these rules, and in

17   accord with your oath and promise, I know you will do so.

18         Moving on now, if you wish to take notes, you may do

19   so, but please remember that if you do take notes, keep them

20   to yourself until you and your fellow jurors go to the jury

21   room to decide the case.  And do not let note-taking distract

22   you so that you do not hear other answers by witnesses.

23         When you leave the courtroom, your notes should be

24   left facedown in your chairs in the jury box.  Whether or not

25   you take notes, you should rely on your own memory of what was

1  said.  Notes are only to assist your memory; they are not

2  entitled to greater weight than your memory or impression of

3  the testimony.

4          The trial will now begin.  First, the Government

5  will make an opening statement, which is simply an outline to

6  help you understand the evidence as it comes in.

7          Next, the defendant may -- the defendant's attorney

8  may, but does not have to, make an opening statement.  Opening

9  statements are neither evidence nor argument.  Following the

10  opening statements, witnesses will be called to testify under

11  oath.  They will be examined and cross-examined by the

12  attorneys.  Documents and other exhibits may also be produced

13  as evidence.  After the evidence has been presented, the

14  attorneys will have an opportunity to make their final

15  argument.  Following the arguments by the attorneys, the Court

16  will instruct you on the law applicable to this case.  After

17  those instructions have been given, you will then retire to

18  the jury room to consider your verdict.

19          Mr. Chiu, is the Government ready to make an opening

20  statement?

21          MR. CHIU:  Yes, Your Honor.

22          THE COURT:  Feel free to proceed.

23          MR. CHIU:  Thank you, Your Honor.

24          May it please the Court, Counsel, Members of the

25  jury.  This case is an example of what happens when political

1  hostility crosses the line.  And we're here today because on

2  September 29th of last year, the defendant left three voice

3  mail messages on the office line of Senator Bernard Sanders --

4  you probably know him as Bernie Sanders -- and those three

5  voice mail messages contained threats to kill the senator.

6  And I take no pleasure in repeating the language in them, and

7  some of it may -- you may find offensive or crude, but in

8  order to tell the story, we're going to have to.

9        So the evidence will show that the defendant called

10  Senator Sanders' main line at 4:43 p.m., approximately, on a

11  Saturday afternoon, September 29th.  And he left these voice

12  mail messages, and on Monday morning, Senator Sanders' staff

13  came in and listened to them.  And what they heard was, the

14  first message included -- they're -- and all three of them are

15  short.  The first one included this:  "Bernie, you Jew

16  bastard.  You had your chance.  Now we're going to behead you

17  ISIS style, videotaped for the world to see."

18        The next message which came in about 30 minutes

19  after that included this quote: "Bernie, you fucking Jew

20  bastard.  How is that knife going to feel cutting your head

21  off, boy?"

22        And a minute after that, the defendant called again

23  and left that third voice mail.  And that included the

24  following quote:  "You pussy ass fucking Bernie Sanders

25  cocksucker.  Leave your name and address, and we'll get back

1   to you.  You motherfucker, listen you Jew fucking cocksucker,

2   you're dead."

3          And after hearing these messages, Greta Hasler, who

4   is Senator Sanders' staff assistant, passed these on to her

5   boss who then moved those on to law enforcement.

6          Now, the evidence is going to come in quickly.  This

7   case is going to move fairly fast.  You're going to see phone

8   records that show that these calls came from the defendant's

9   phone, and you're going to see phone records that show that,

10  not only did they call -- they came from his number, but also,

11  specifically, that they came from his phone.  You'll hear the

12  answering machine -- you'll hear the voice mail messages, and

13  you'll hear that that's his voice on the messages.

14         You'll hear that each time he called, he had to

15  listen to an answering machine message that states clearly

16  that this is Senator Bernie Sanders' office, and if you'd like

17  to leave a message for the senator, you can do so after the

18  beep.

19         And he called not once, not twice, but three times

20  and listened to that.  And at the conclusion of the trial, I'm

21  going to ask you to return the only verdict and come to the

22  only conclusion the evidence supports -- that the defendant

23  made these calls, that the defendant intended to threaten

24  Senator Bernie Sanders, and that the defendant's guilty.

25  Thank you.

1          THE COURT:  All right.  Thank you, Mr. Chiu.

2          Ms. Nair, would you like to make an opening

3    statement at this time?

4          MS. NAIR:  Yes, Your Honor.

5          THE COURT:  Feel free to proceed.

6          MS. NAIR:  Thank you.

7          May it please the Court, Counsel.  The evidence that

8    you will hear throughout this trial is that Mr. Pratersch was

9    a man who drank a lot, who had injuries that he sustained

10   after working for almost four decades, who took multiple

11   medications, and for 18 to 20 hours every day, he remained

12   isolated in his home, sitting in a chair, unable to sleep in a

13   bed, in front of a TV.

14         You will hear that Mr. Pratersch, after he would

15   take his medicine, would drink about a half of a fifth of

16   alcohol -- of vodka a day.  And that, typically, he would make

17   phone calls to his brothers or his sister-in-law, and that

18   after he made those phone calls, they would talk about things

19   during these calls, and the next day or the next week, he

20   would talk to that same family member and would not recall

21   even having the conversation, would sometimes fall asleep

22   during the phone call.

23         You will hear the evidence and the language that the

24   Government has presented to you was a call -- a series of

25   calls that Mr. Pratersch made, and that the first time he was

1  confronted with this information was approximately one month

2  later by agents who produced transcripts in front of him --

3  and that Mr. Pratersch did not remember making the calls or

4  even the language that he used in those calls.  You will hear

5  that Mr. Pratersch has no political affiliation.  He doesn't

6  vote.  He's not affiliated with any of the extremist groups.

7  You will hear this information come out in trial, that he

8  can't even discern why he would have made a phone call to

9  Senator Bernie Sanders.

10        What you will hear, though, is that he was

11  embarrassed when he saw the language on paper.  And you will

12  hear that he didn't even hear his voice on the voice calls

13  until approximately five to six months after the calls were

14  made.

15        What you will hear throughout this trial is that

16  Mr. Pratersch had no intention on making these phone calls or

17  threatening anyone.  And although you see two crimes that are

18  charged in front of you by the Government, you will hear that

19  these are just from the same incident.  It's not two separate

20  crimes.  It's the same facts concerning, and the Government

21  chose to charge it two separate ways.

22        But when you hear all of the evidence in this trial,

23  which will be short, you will understand that Mr. Pratersch

24  had no intention on calling and threatening anybody and

25  definitely not during the person's official duties.  And that

1    is the elements that you will have to discern whether or not

2    Mr. Pratersch is guilty of.  And I charge you that when you

3    hear all of the evidence, not guilty will be the clear verdict

4    for both of the offenses that the Government has charged and

5    that this is not a politically motivated crime.  Thank you.

6             THE COURT:  Thank you, Ms. Nair.

7             Mr. Chiu, are you ready to call your first witness?

8             MR. CHIU:  I am, Your Honor.  And before we do that,

9    I believe the parties have agreed on the admission of exhibits

10   beforehand.

11            THE COURT:  So you just want to name them and move

12   them in?

13            MR. CHIU:  If I may, Your Honor?

14            THE COURT:  Yes, you may.

15            MR. CHIU:  My understanding is that the parties have

16   agreed to the admission of Government's Exhibits 1, 2, 3 --

17   the admission of -- the conditional admission of Government's

18   4, 5, and 6 as demonstrative evidence, those being

19   transcripts.  The admission of 7, 8, and 9.

20            THE COURT:  All right.  Ms. Nair, are you in

21   agreement with this?  So it's essentially, 1 through 9 are

22   being moved into evidence with the understanding that 4, 5,

23   and 6 are demonstrative.  He's indicating that that's

24   stipulated to by the parties.

25            MS. NAIR:  That is correct, Your Honor.

1        THE COURT:  All right.  So what's previously marked

2   as Government's 1 through 9 -- acknowledging that 4, 5, and 6

3   are demonstrative -- will be admitted without objection from

4   the defense, and you may publish at the appropriate time.

5        (Government's Exhibit Nos. 1 through 9 were

6           admitted into evidence.)

7        THE COURT:  Are you ready to call your first

8   witness?

9        MR. CHIU:  Yes, Your Honor.  The United States calls

10  Greta Hasler.

11       THE COURTROOM DEPUTY:  Please come forward and be

12  sworn.  Right this way, ma'am.

13                        **GRETA HASLER**,

14  called by Government, was duly sworn by the courtroom deputy,

15  and in answers to questions propounded, testified as follows:

16       THE COURTROOM DEPUTY:  Have a seat there, please.

17       THE COURT:  Good morning, ma'am.  Once seated,

18  please make yourself comfortable with the chair's proximity to

19  the microphone and then state your full name into the

20  microphone and please spell your last name.

21       PROSPECTIVE JUROR:  My full name is Greta Johanna

22  Hasler.  My last name is spelled H-a-s-l-e-r.

23       THE COURT:  Thank you, Ms. Hasler.  Your witness,

24  Mr. Chiu.

25       MR. CHIU:  Thank you, Your Honor.

1           DIRECT EXAMINATION

2     BY MR. CHIU:

3     Q    Good morning, ma'am.  Ms. Hasler, are you employed?

4     A    Yes.

5     Q    Who are you employed with?

6     A    Senator Bernard Sanders.

7     Q    And what do you do for Senator Bernard Sanders?

8     A    I'm a staff assistant.

9     Q    What does being a staff assistant involve?

10    A    So I answer the phones at the front desk for half of the

11    day.  I share my office responsibilities with another staff

12    assistant, and he answers the phone for the other half of the

13    days, which includes taking legislative comments for the

14    senator as well as speaking with constituents when they may

15    have an issue with a federal agency.  Our office is a

16    constituent services office, so in taking whatever they need

17    help with and opening it as a case so that we can assist them.

18    Q    How long have you worked for that office?

19    A    I started on April 1st, 2018.

20    Q    Now, who is technically your employer?  Like, who sends

21    you your paychecks?

22    A    The United States Senate.

23    Q    But you're assigned to Senator Bernard Sanders?

24    A    Correct.

25    Q    And where do you work out of?

1    A    His Burlington, Vermont, senate office.

2    Q    When you say "Senator Bernard Sanders," is this

3    individual a member of the United States Senate?

4    A    Yes.

5    Q    Now, I'm going to take you back to on or about

6    September 29, 2018.  Were you working with that same office

7    then?

8    A    Yes.

9    Q    Do you recall receiving some voice mails that contained

10   some threats to Senator Sanders?

11   A    Yes.

12   Q    Can you tell us about what happened, please?

13   A    Sure.  So I came in on Monday, October 1st.  The interns

14   in our office listen to the voice mails every day and send us

15   an e-mail with the contents of all of the voice mails, which

16   my staff assistant partner Liam and I review, whichever one of

17   us is not on the front desk phones.

18        There was flagged -- three voice mails were flagged

19   in the initial e-mail from the interns as being threatening.

20   So I dialed into the phone system and listened to them and

21   transcribed them as well as I could.

22   Q    And these messages were left on what telephone line?

23   A    Our main Burlington, Vermont, office number.

24   Q    And what is that number?

25   A    It's (802) 862-0697.

1   Q    And when someone calls that line and no one picks up,

2   what does that -- you know, what is on the other end of the

3   line?

4          MS. NAIR:  Objection, Your Honor, hearsay.

5          THE COURT:  All right.  I'm going to overrule the

6   objection.  I don't think he's asking for hearsay.  I think

7   he's asking what generally is on the other side of the line.

8   But if it starts coming out, jump in.  So it's overruled for

9   now.  It's premature.  Go on ahead and ask your question.  And

10  please tailor it specifically to what you're trying to elicit.

11  BY MR. CHIU:

12  Q    Let me put it this way.  What does the answering machine

13  message say?

14         MS. NAIR:  Objection, Your Honor, hearsay.

15         THE COURT:  Okay.  So what is the response to that?

16  Out-of-court statement used in court for the truth of the

17  matter asserted, that's the objection.  What's the response to

18  the objection?

19         MR. CHIU:  Your Honor, I'm not seeking to admit

20  anything for the truth of the matter asserted, simply for what

21  is the content of the answering machine message.  There's no

22  matter asserted in that.  It's --

23         THE COURT:  All right.  What's the defense's

24  response to that?

25         MS. NAIR:  He's seeking to -- may we approach

1  sidebar?

2          THE COURT:  Sure.

3       (At the bench.)

4          MS. NAIR:  Mr. Chiu is seeking to introduce it to

5  say what Mr. Pratersch heard and specifically in that when you

6  listen to the voice message it says that you're leaving a

7  message for Bernard Sanders.  That is for the truth of the

8  matter asserted because it goes to the specific issue of

9  whether or not Mr. Pratersch heard information and then left a

10  message for Senator Sanders.  Additionally, the other

11  information is relevancy because what he heard is not a matter

12  of whether or not he made a threat, and so it doesn't go to

13  prove or establish or disprove or establish any of the

14  elements of the offense.

15          THE COURT:  What's your response?

16          MR. CHIU:  I think we're looking at the wrong matter

17  asserted.  The matter asserted is what's actually said in the

18  answering machine message, mainly, you have reached the office

19  of United States Senator Bernie Sanders.

20          THE COURT:  So you're trying to establish when

21  someone calls the office what they heard.  I guess her problem

22  is that you're connecting it to him.

23          MR. CHIU:  Well, Your Honor, the testimony is that

24  that's what the person -- a person calling hears, and it's

25  relevant because my understanding is that the defense is --

1   one of the defenses is going to be that the defendant didn't

2   intend to threaten the official in the course of their

3   official business.

4          THE COURT:  So if anyone calls the office, that's

5   what they hear if no one picks up personally?

6          MR. CHIU:  Yes, Your Honor.

7          MS. NAIR:  May I respond briefly?

8          THE COURT:  Sure.

9          MS. NAIR:  So there's no way to establish whether

10  that's accurate or not.  The information that she's going to

11  testify to is something she was interviewed about in January

12  and if you call that same line today it is a different

13  message.  So we don't know the exact message that was heard or

14  was an individual calling in would have heard.  So it's

15  hearsay on top of hearsay.

16         THE COURT:  Well, I'm going to overrule on hearsay.

17  But now she's objecting to predicate.  How do you know the

18  message she's testifying to was the one that was playing at

19  the time he called?

20         MR. CHIU:  I can lay that predicate.

21         THE COURT:  You'll have to lay that predicate.

22  Overruled as to hearsay but sustained as to predicate at this

23  time.

24         MR. CHIU:  Thank you, Your Honor.

25      (In open court.)

1        THE COURT:  All right.  Thank you.

2        Mr. Chiu, feel free to proceed.

3   BY MR. CHIU:

4   Q    Ma'am, at the time of -- let's go back to September 29th.

5   Back in that time period, do you know what the answering

6   machine from the office line said if somebody didn't pick up

7   at the office?

8   A    Not verbatim, no.

9   Q    Okay.  What is it -- what did it generally say?

10  A    It generally --

11       MS. NAIR:  Objection, Your Honor.  I restate my

12  objections.

13       THE COURT:  Okay.  You can state your objections.

14       MS. NAIR:  I object for predicate, relevancy, and

15  hearsay.

16       THE COURT:  Okay.  I'm going to give you leeway on

17  cross-examination, but the objection is going to be overruled.

18  She can answer your question.

19  BY MR. CHIU:

20  Q    What did that answering machine message state?

21  A    Generally, it stated our office hours, that if you were

22  calling during office hours all of the lines were full, but if

23  you were calling outside of office hours you could leave a

24  message for Senator Bernard Sanders.  If you were requesting

25  assistance, you were to leave your contact information and

1    someone would call you back.

2    Q    And did that message identify that line as the line for

3    the office of Senator Bernard Sanders?

4    A    Yes.

5    Q    Is it Bernie Sanders or Bernard Sanders that's usually --

6    A    His full name is Bernard, but it's typically Bernie.

7    Q    Okay.  So let's go back to September -- I guess it would

8    be October 1, 2018, when you came into the office.  You

9    mentioned you heard three calls?

10   A    Yes, three voice mails.

11   Q    Three voice mails.

12        MR. CHIU:  Can we play Government's Exhibit 1,

13   please?

14   BY MR. CHIU:

15   Q    Have you recently re listened to any of these voice

16   mails?

17   A    Yes.

18       (The above referenced exhibit was published.)

19   BY MR. CHIU:

20   Q    Is what you heard as Government's Exhibit 1, is that a

21   fair and accurate depiction of what you heard that Monday

22   morning?

23   A    Yes.

24        MR. CHIU:  If we could play Government's Exhibit 2,

25   please.

1        (The above referenced exhibit was published.)

2    BY MR. CHIU:

3    Q    Government's Exhibit 2, is that also a fair and accurate

4    depiction of what you heard?

5    A    Yes.

6               MR. CHIU:   And if we can play Government's

7    Exhibit 3, please.

8        (The above referenced exhibit was published.)

9    BY MR. CHIU:

10   Q    Now, Government's Exhibit 3, was that also one of the

11   calls you heard that morning?

12   A    Yes.

13   Q    After hearing these voice mail messages, what did you do?

14   A    As I was listening to them, I typed them and e-mailed

15   them to my state director David Weinstein.

16   Q    Now, do you listen to every voice mail that comes in?

17   A    No.   I read a transcript of every voice mail that's sent

18   to us by the interns.

19   Q    Now, your office in Burlington, Vermont, can you tell us

20   about what are the operations of that senate office?

21   A    So we take legislative comments, just like the DC office,

22   and share them with the senator, but we also are a constituent

23   services office.  So we have a number of caseworkers who

24   specialize in specific federal agency casework, and we, you

25   know, help constituents who may be having issues with the

1    I.R.S. or Social Security or the Veterans Administration.  So

2    my colleague Liam, the other staff assistant, and I hear

3    constituents as far as what problems they're facing with

4    federal agencies and take that information and assign it to a

5    caseworker.  That's the core function of the office.

6    Q    Who works out of that office?

7    A    The senator, our state director David, a number of

8    caseworkers, as I said, and then a number of outreach

9    representatives who take meetings throughout the state on

10   specific legislative areas, as well as two staff assistants,

11   myself and Liam, and senior press advisor Dan McLean, and four

12   interns.

13   Q    And how often does Senator Sanders work out of the

14   Burlington, Vermont, office?

15   A    Generally when the Senate is in session, the senator is

16   in the Burlington, Vermont, office Mondays and Fridays.  His

17   home is in Vermont.  So he's in Vermont on the weekends and

18   then he flies back to DC on generally Monday afternoon and

19   flies back to Vermont, generally, Thursday night to be in the

20   Burlington office on Fridays.

21   Q    And when senate is not in session?

22   A    He's in the Burlington office generally all week.

23   Q    Now, when you received these voice mail messages, did you

24   receive any -- did the system show any kind of identifying

25   information for the caller?

1   A    Yes.

2   Q    What did it show?

3   A    It showed -- the caller ID was KISSIM, K-I-S-S-I-M,

4   believe and then the full phone number.

5   Q    Okay.  And did you write that down?

6   A    I did, yes.

7   Q    And did you pass that on?

8   A    Yes.

9        MR. CHIU:  May I have one moment, Your Honor?

10       THE COURT:  You may.

11       MR. CHIU:  I have no further questions.  Thank you.

12       THE COURT:  Ms. Nair, cross-examination.

13       MS. NAIR:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15  BY MS. NAIR:

16  Q    Ms. Hasler, when is senate in session?

17  A    When is the senate in session?  I can't say specifically

18  the weeks that it's in session.

19  Q    Do you know the months it's in session?

20  A    It's in session for most of the year.  There's a few

21  weeks that are recess weeks, but I don't know them off the top

22  of my head.

23  Q    How is the senate session determined?  Who determines

24  when it's in session versus when it's not in session?

25  A    I don't know.

1   Q    So you come in on October 1st and the interns give you a

2   message?

3   A    The interns sent us an e-mail with all of the voice mail

4   messages from the weekend, up until Monday morning.

5   Q    So you're not the first person to hear the voice message?

6   A    Correct.

7   Q    It would be your interns?

8   A    Correct.

9   Q    And after the interns listen to it, do they send you all

10  of the messages or just some messages?

11  A    All of them.

12  Q    You said that there were three that were flagged --

13  A    Correct.

14  Q    -- as possibly being threatening?

15  A    Correct.

16  Q    Did they separate those three out from the other calls

17  that were received?

18  A    So all of the calls are typed up as individual calls.

19  The three that were threatening were highlighted in red font,

20  and I don't believe the intern typed them up verbatim.  It

21  just said, three threatening messages.

22  Q    The third message that you heard where it said, you're

23  dead, your effing dead, do you recall that message?

24  A    Yes.  It said, "You're fucking dead."

25  Q    Okay.  There was no one saying, I'm going to kill you, in

1    that message, correct?

2    A    I don't recall specifically.

3         MS. NAIR:  May I approach the witness, Your Honor?

4         THE COURT:  You may.

5    BY MS. NAIR:

6    Q    Now that you have in front of you what's previously

7    marked as Government's Exhibit 6, that is the third call,

8    correct?

9    A    Yes.  It says, "Transcript of Exhibit 3."

10   Q    Okay.  But the tab next to it is a six?

11   A    Correct.

12   Q    Okay.  So that was the third call that was transcribed or

13   was heard on that voice line, correct?

14   A    Yes.

15   Q    Inside of that call, it does not say, I'm going to kill

16   you.

17   A    Correct.

18   Q    It just says, "You're dead"?

19   A    It says, "You're dead, you're fucking dead."

20   Q    Is that the part that you view to be threatening?

21   A    In this particular message?

22   Q    Yes.

23   A    Yes.

24   Q    When the voice mails were sent to you, did you take them

25   collectively as a threat?

1   A    Yes.

2   Q    Now, these messages were left within a short time frame

3   on Saturday, September 29th, correct?

4   A    That is my understanding, yes.

5   Q    You testified earlier that when you call into the system,

6   you receive a message, the person calling in would receive a

7   message, correct?

8   A    Yes.

9   Q    And that would generally tell you that you have the

10  ability to leave a message?

11  A    Yes.

12  Q    And you said you don't know what it says verbatim,

13  correct?

14  A    Correct.

15  Q    But that message system has changed over time?

16  A    Not to my knowledge.

17  Q    Have you listened to the message today?

18  A    The voice mails?

19  Q    When you call in.

20  A    No.

21  Q    So do you know if the message, the answering system, says

22  today what it said in September?

23  A    I believe it does, yes.

24  Q    Okay.  If it were different, would that surprise you?

25  A    Yes.

1         MS. NAIR:  Okay.  May I retrieve?

2         THE COURT:  You may.

3         MS. NAIR:  Thank you.

4   BY MS. NAIR:

5   Q    Do you have any control over the message that is left for

6   an individual calling in?

7   A    No.

8   Q    So that is not your voice on the machine when you call

9   in?

10  A    No.

11  Q    Do you know whose voice it is?

12  A    No.

13  Q    Do you know when the person changes out the messages?

14  A    What do you -- can you rephrase the question?

15  Q    Do you know when the person who is on the messaging

16  system changes out the messages?

17  A    No.

18  Q    Okay.  So when you were asked the question about what it

19  generally says, how do you have information on what it

20  generally says?

21  A    Because I've listened to it.

22  Q    When was the last time you listened to it?

23  A    In January.

24  Q    Prior to January, when was the last time you listened to

25  it?

1   A    I can't say for sure.

2   Q    What made you listen to it in January?

3   A    An agent called our office and asked me what it said when

4   somebody called in.

5   Q    Prior to -- is this around January 30th?

6   A    Correct.

7   Q    Prior to January 30th, would there have ever been an

8   instance where you would have needed to know what that

9   information said?

10  A    I'm not sure.

11  Q    Do you call into that office?

12  A    I have, yes.

13  Q    Okay.  And do you reach the voice messaging system?

14  A    I have, yes.

15  Q    When you listened to the voice messaging system, do you

16  leave a message?

17  A    I don't believe I've ever left a message, no.

18  Q    Do you listen to it all the way through?

19  A    Yes, you have to.

20  Q    But you don't leave a message?

21  A    No.

22  Q    So you listen to it all the way through and then you hang

23  up?

24  A    Yes.

25  Q    And you don't know when the last time you did that was?

1    A     In January.

2    Q     Prior to January, do you know when the last time you did

3    that?

4    A     No.

5    Q     Okay.  So then you can't say with any degree of certainty

6    whether the message that was left in January that you heard

7    was a message that was heard in September?

8    A     Can you rephrase the question?

9    Q     Yes.  You have no idea whether when Mr. Pratersch called

10   in in September, if he heard the exact same message that you

11   heard in January.

12   A     To my knowledge, it did not change between September and

13   January.

14   Q     Who would have given you that information?

15   A     Likely my state director David.

16   Q     You're saying "likely."  Did someone tell you that it did

17   not change between September and January?

18   A     Nobody told me that it did not change.

19   Q     Did anyone tell you that it did change?

20   A     No.

21   Q     Did you ask that specific question?

22   A     No.

23   Q     So you don't know today whether or not it changed?

24   A     To my knowledge, it did not change.

25   Q     And you don't know whether or not it changed from January

1    to today?

2    A    To my knowledge, it has not changed at all since I began

3    working there.

4    Q    Just for clarity, you stated that it says, if you're

5    calling to leave a message for the senator, leave your name,

6    and if you're calling during office hours, leave your name,

7    mailing address, and message, correct?

8    A    I can't say for sure.  Is it possible for me to look at

9    that?

10   Q    If you recall what your testimony was earlier or not,

11   that's fine.

12   A    My -- are you asking about my conversation on

13   January 30th?

14   Q    I'm asking you about your testimony today, ma'am.

15   A    Okay.  Can you repeat the question?

16   Q    Your testimony today was when you call the number, you

17   receive a message saying, if you would like to leave a message

18   for the senator, leave your name, and we'll get back to you.

19   A    No.  The voice mail asks if you would like assistance to

20   leave your name and contact information, and we'll get back to

21   you.  We don't return calls for people that are just leaving a

22   message for the senator, leaving a legislative comment.  So

23   it's likely a separation between if you're leaving a message

24   or if you're requesting assistance.

25   Q    So you're saying that there are two separate ways that

1  you can leave a message on that message machine, on the voice

2  mail?

3  A    I'm saying that the recording that you hear when you're

4  leaving a message differentiates between whether you're

5  calling with a comment for the senator or whether you're

6  requesting assistance from our office.

7  Q    I understand.  Now, you said that you don't -- or do you

8  know whether the session was in -- whether the senate was in

9  session on September 29th?

10  A    I don't recall specifically.  That was a weekend day

11  though.

12  Q    So are sessions -- are the senate in session during

13  weekends?

14  A    No.

15  Q    Do you know if the senate was in session on October 1st?

16  A    I don't recall.

17  Q    Do you know whether Mr. Sanders was working on

18  September 29th?

19  A    I don't know.

20  Q    You would have the ability to know his schedule, correct?

21  A    I do have access to his schedule, yes.

22  Q    Do you know if Mr. Sanders had any speaking engagements

23  on September 29th?

24  A    I don't recall.

25  Q    Do you know if Mr. Sanders had any speaking engagements

1    on October 1st?

2    A    I don't recall.

3    Q    On October 1st, was Mr. Sanders in the office?

4    A    I don't recall.

5    Q    You recalled receiving the voice mails from your interns

6    and then taking those voice messages to your superior,

7    Mr. Weinstein, correct?

8    A    I e-mailed them to David Weinstein, yes.

9    Q    Was Mr. Weinstein in the office on that day?

10   A    Yes.

11   Q    Did you all have any conversation about it outside of the

12   e-mail?

13   A    I don't recall.

14   Q    Would you pass on these communications to Mr. Sanders, or

15   would someone else pass that on?

16   A    I don't know.

17   Q    You don't know if you would do that?

18   A    I personally did not.

19   Q    Would you?  Is that a part of your job duties?

20   A    No.

21        MS. NAIR:  I have nothing further for this witness,

22   Your Honor.  Thank you.

23        THE COURT:  Thank you.  Redirect.

24        MR. CHIU:  Thank you, Your Honor.

25   ////

<u>REDIRECT EXAMINATION</u>

1

<u>BY MR. CHIU:</u>

2

Q    You mentioned on cross that you've called into the office

3

before and heard the answering machine message; is that

4

correct?

5

A    Yes.

6

Q    And had you done that prior to, you know, September 29,

7

2018?

8

A    Likely, yes.

9

Q    And after?

10

A    Yes.

11

Q    And have you done this on multiple occasions?

12

A    Yes.

13

Q    Every time, to the extent you've heard that answering

14

machine message, has it identified the office that's -- or the

15

phone line as belonging to the office of Senator Bernie

16

Sanders?

17

A    Yes.

18

Q    And has it afforded the caller an opportunity to leave a

19

message for the senator?

20

A    Yes.

21

Q    These calls, did you take the content of these calls

22

seriously when you first heard this?

23

A    Yes.

24

Q    You mentioned you have to listen to the message all the

25

1  way through to leave a message.  Can you, like, press a button

2  or something to kind of cut the message short?

3  A    No, not to my knowledge.

4           MR. CHIU:  I have no further questions thank you.

5           THE COURT:  Mr. Chiu, can this witness be accused?

6           MR. CHIU:  Yes, Your Honor.

7           THE COURT:  Will she be subject to recall?

8           MR. CHIU:  Not from the Government.

9           THE COURT:  Ms. Nair.

10           MS. NAIR:  She can be excused.

11           THE COURT:  Thank you.  Have a nice day.

12           All right.  Ladies and gentlemen of the jury, at

13  this time, we're going to go on ahead and recess for lunch.

14  I'm going to invite you to be -- to report where you started

15  this morning at 1:30.  I'm giving you extra time today because

16  some of you may not be entirely familiar with downtown

17  Orlando.  So if you would be kind enough to leave the pads and

18  pens facedown in your chairs.  If you would be kind enough to

19  report to our jury coordinator at 1:30.  As soon as everyone's

20  here and accounted for, we'll continue marching forward.

21  Thank you all.  Have a good lunch.

22           THE COURTROOM SECURITY OFFICER:  All rise for the

23  jury.

24      (The jury retired from the courtroom at 11:55 a.m.)

25           THE COURT:  All right.  Please be seated.  Is there

178

1   anything further at this time from the United States?

2          MR. CHIU:  Not from the United States, Your Honor.

3          THE COURT:  Anything further from the defense?

4          MS. NAIR:  No, Your Honor.  Thank you.

5          THE COURT:  All right.  I'll see you at 1:30.

6   Court's in recess.

7       (Recess at 11:56 a.m., until 1:33 p.m.)

8          THE COURT:  Is the Government ready to proceed?

9          MR. CHIU:  Yes, Your Honor.

10         THE COURT:  Ms. Nair, are you ready?

11         MS. NAIR:  Yes, Your Honor.

12         THE COURT:  And, Ms. Nair, assuming that Mr. Chiu

13  closes today, are you ready to start calling witnesses today?

14         MS. NAIR:  Yes, Your Honor.

15         THE COURT:  All right.  Thank you, Ms. Nair.

16         Let's bring the jury in.

17         THE COURTROOM SECURITY OFFICER:  All rise for the

18  jury.

19      (The jury entered the courtroom at 1:35 p.m.)

20         THE COURT:  Welcome back, ladies and gentlemen.

21  Feel free to be seated in your chairs once you're there.

22         All right.  Please be seated in the courtroom.

23         Ladies and gentlemen of the jury, whenever you

24  depart from the courtroom for an extended break, meaning, you

25  have the option of leaving the courthouse, I'm going to ask

179

1    the same general question based on the instructions.

2              Are there any matters of concern to report to the

3    Court?  If so, please indicate by raising your hand at this

4    time.

5              That's my asking whether or not anyone's spoken to

6    you about the case or attempted to speak to you about the case

7    or you've been put in any kind of uncomfortable situation you

8    want to report to the court.  So if there are any issues at

9    this time, please raise your hand.

10             All the jurors answer in the negative.

11             Mr. Chiu, are you ready to call your next witness?

12             MR. CHIU:  Yes, Your Honor.

13             THE COURT:  All right.  Feel free to do so.

14             MR. CHIU:  United States calls Kenneth LeCesne to

15   the stand.

16                        **KENNETH LECESNE**,

17   called by Government, was duly sworn by the courtroom deputy,

18   and in answers to questions propounded, testified as follows:

19             THE COURT:  All right.  Good afternoon, sir, once

20   seated, please make yourself comfortable with the chair's

21   proximity to the microphone, and please state your full name

22   into that microphone, spelling your last name.

23             THE WITNESS:  Yes, sir.  Kenneth P. LeCesne.  That's

24   K-e-n-n-e-t-h, middle initial P, L-e-C-e-s-n-e.

25             THE COURT:  Your witness.

1      MR. CHIU:  Thank you, Your Honor.

2                  DIRECT EXAMINATION

3  BY MR. CHIU:

4  Q    Mr. LeCesne, who are you employed with?

5  A    I work for T-Mobile cellular telephone company in the

6  offices in Richardson, Texas.

7  Q    What do you do for T-Mobile?

8  A    My official title is records custodian/testifier.

9  Q    How long have you been with T-Mobile?

10 A    Since August of 2011.

11 Q    What is your -- what are your job duties at T-Mobile?

12 A    When I'm assigned to a specific trial, I usually travel

13 and I attend court, and I authenticate and certify the records

14 that are involved -- the T-Mobile records that are involved in

15 trial.

16 Q    And do you have any previous experience or employment

17 prior to being at T-Mobile?

18 A    Yes, sir.

19 Q    What is that?

20 A    I actually retired twice.  I retired from the Dallas

21 police department after 28 years of service, back in 2005.  I

22 then went to a large IT company, and I was the security

23 director for Perosis Corporation (phonetic spelling) until

24 2011.

25 Q    Now, in your capacity at T-Mobile, are you familiar with

1   T-Mobile records?

2   A    Yes, sir.

3   Q    Are you familiar with, sort of, what they mean and how

4   they're kept?

5   A    Yes, sir.

6           MR. CHIU:  If I can pull up Government's Exhibit 7,

7   which has already been admitted.

8       (The above referenced exhibit was published.)

9   BY MR. CHIU:

10  Q    Mr. LeCesne, are you familiar with Government's

11  Exhibit 7?

12  A    Yes, sir.

13  Q    If I can just draw your attention to -- let's go down to

14  lines 45 through 47.  Now, let me first ask you -- each of

15  those rows in this document, what does that represent?

16  A    These are call detail records.  They're phone logs of

17  specific phone calls during a certain time period that were

18  requested, I believe by the F.B.I., in response to a search

19  warrant or court order.

20  Q    Now, just help us out as we look through some of these

21  columns.  What's in that very first column, column A?

22  A    The very first column is the date of a specific phone

23  call or text message, either sent or received by the T-Mobile

24  phone number.

25  Q    Okay.  And how about column B?

1   A    Column B is the time the specific text message or phone

2   call was actually made or received by the T-Mobile customer.

3   Q    And that time that's listed in column B in particular,

4   let's take a look at lines 45, 46, and 47.  What unit of time

5   is that?

6   A    It is Universal Coordinated Time, UTC time.

7   Q    Okay.  And do you know, on September 29, 2018, what was

8   the corresponding time between UTC time and time on the East

9   Coast of the United States?

10  A    You'd have to do a conversion.  You'd have to subtract

11  four hours from the time stamp on the records to get the time

12  that the phone call/text message was actually received or made

13  by the T-Mobile telephone number.

14  Q    Okay.  So if I were -- let's just take line 45, for

15  example.  I believe the UTC time reads 21:12:03?

16  A    Okay.

17  Q    Is that correct?

18  A    Yes.

19  Q    What would the corresponding Eastern Daylight Time be?

20  A    It would be -- you would have to subtract four hours, so

21  it would be 7:12 and 3 seconds, p.m.

22  Q    Now, if I were to look at column C, what would column C

23  be?

24  A    That would be the duration in seconds of the event.

25  Q    When you say, "duration in seconds of the event," what do

1  you mean?

2  A    It would be a phone call or text message sent or received

3  by the T-Mobile number.

4  Q    And how do you tell whether it's phone call or text

5  message?

6  A    Well, with text message, if you look up to line 37 -- a

7  text message, the duration will always be 60 seconds and it

8  will be SMS terminating SMS, in MSC SMSC; that is a text

9  message.  All text messages, the duration is 60 seconds.

10 Q    Okay.  And then, what's in line F?

11 A    Line F is the phone number that was connected to the

12 target number, to the T-Mobile number.

13 Q    I'm sorry.  Is line F the T-Mobile number or the

14 destination number?

15 A    Well, let's go up to the top so we can look at the -- go

16 up to the top.  That is the calling number.

17 Q    What does that mean?

18 A    That is the number that made the call.  On an incoming

19 call, that is the number that called the T-Mobile number.

20 Q    Okay.  And what's the column next to that?

21 A    That is the dialed number; that is the number that was

22 dialed by the caller.

23 Q    Okay.  And if we can go all the way over to -- where

24 would I find -- well, let me ask you this:  Where would I find

25 the IMEI number?

1  A    The IMEI number is the column.  It's the one, two, three,

2  four, five, six, seven, eight, nine, ten, eleventh column.  It

3  has IMEI at the top of the document.

4  Q    And what does IMEI mean?

5  A    That is the international mobile equipment identifier;

6  that is the serial number of the cell phone that's associated

7  with the -- that (407) 344-9507 phone number.

8  Q    Now, an IMEI number, is that a unique number, or can

9  different cell phones share the same IMEI number?

10 A    The IMEI number is the number that is put on that

11 particular device at the factory where the device is made.

12 Q    And is that unique to a specific device?

13 A    That's correct, that device and only that device.

14 Q    Now, that number itself, are all of those numbers the

15 identifying numbers, or are there any numbers that aren't

16 necessarily part of the identification?

17 A    The last number is always zero in our records.  To get

18 the actual number that is actually associated with that

19 device, you would have to go to the actual subscriber records,

20 and it will have the phone number.  But it always shows up as

21 zero, the last number on our records on these call detail

22 records.

23 Q    Is that last number part of what identifies the device?

24 A    No, sir.  That is -- that takes the place of the last

25 number on the actual subscriber information; that would be the

1  number of the device itself.

2  Q    Let me ask you a different way.  If I had only the first

3  14 digits, would that still identify a unique device?

4  A    Yes.

5  Q    Where can I find on this document, if anywhere, the

6  location of the cell tower that the call would have come off

7  of?

8  A    You'd have to scroll over, and you will have a first

9  tower latitude and a first tower longitude; that is the exact

10  location of the tower that handled the call on the first part

11  of the call, and it would also give you the city, the state,

12  and the ZIP code.

13  Q    And then what's this column that says, "First Tower

14  Address"?

15  A    That is the physical address of the tower.  That's the

16  closest physical address of where the tower is.  The exact

17  location would be the latitude and longitude.

18       MR. CHIU:  May I have one moment, Your Honor?

19       THE COURT:  You may.

20       MR. CHIU:  I have no further questions, Your Honor.

21  Thank you.

22       THE COURT:  Ms. Nair, cross-examination?

23       MS. NAIR:  Yes, Your Honor.  Thank you.

24

25  ////

CROSS-EXAMINATION

BY MS. NAIR:

Q    I apologize.  I was getting the correct spelling of your name.

A    Everybody does it.

Q    Or correct pronunciation of your name.  "LeCesne," is it?

A    "LeCesne."

Q    Mr. LeCesne, how long have you worked for T-Mobile?

A    Since August of 2011.

Q    So you're familiar with these phone records inside and out?

A    Yes, ma'am.

Q    You testified earlier that it provides you the date --

A    That's correct.

Q    -- on the records?

A    Yes, ma'am.

Q    It provides you the time?

A    Yes, ma'am.

Q    The time is in UTC, however?

A    That's correct.

Q    And so you testified that you have to subtract four hours from the time frame that is listed on the records to get Eastern Standard Time?

A    That's correct.

Q    And does that matter for the entire year, or does it

1    change, depending on daylight savings?

2    A    It depends on whether it's daylight savings or it's

3    Eastern standard time.

4    Q    Okay.  So in September, it was in daylight savings?

5    A    That's correct.

6    Q    And that's why you subtract four hours?

7    A    That's correct.

8    Q    You testified that you at line 45, when it says 21:12:03,

9    that's 7:00 p.m.?

10   A    You have to subtract four hours from that time.  That

11   time stamp on the record is UTC.

12   Q    Yes.

13   A    To get Eastern standard daylight, you subtract four hours

14   from it.

15   Q    And 21 hours in military time is what in just regular

16   time?

17   A    9:00 p.m.

18   Q    It's 9:00 p.m.

19   A    21:00 hours, yes.

20   Q    Okay.  So when you testified that you subtract 4, you

21   don't get 7, you get 5 from 9?

22   A    I don't understand your question.

23   Q    You were asked earlier to subtract 4 from 21.  You said

24   it was 7, but then you just testified that it's 9:00 p.m.  So

25   if you really subtract 4 from 9 you get 5:00 p.m.?

585 of 284 PageID 585

1  A    The time stamp on the records is 21 -- I'm sorry, 21:12.

2  Is that the one we're looking at?

3  Q    That's correct.

4  A    That is 9:12 p.m. in Eastern daylight time.

5  Q    Okay.  So it's 9:12 -- at 21, it equals 9:00?

6  A    21:00, it's 9:00.

7  Q    Okay.

8  A    It's a 24-hour clock, military time.

9  Q    I understand.  Subtracting 4 from 9 gives you 5:00 p.m.,

10 correct?

11 A    Yes.

12 Q    Okay.  Earlier, you testified that it gave you 7:00 p.m.

13 That was just a misstatement.  Is that correct?

14 A    Yes.

15 Q    Okay.  I just want to make sure we're clear on the time

16 frame.  So we're really talking about 4 and 5 o'clock in the

17 afternoon.  Is that correct?

18 A    That's correct.

19 Q    Okay.  Above you also testified that it gives you the

20 duration of the time --

21 A    That's correct.

22 Q    -- in column C?

23 A    That's correct.

24 Q    And then if it's a text message, it's automatically going

25 to give you 60 seconds?

1   A    That's correct.

2   Q    But any other time frame that's a call is going to give

3   you from the moment that the phone picks up to the termination

4   of the call.  Is that correct?

5   A    That's correct.

6   Q    So that doesn't mean that someone is actually speaking

7   that entire time.  Is that accurate?

8   A    Ma'am, the duration is the duration of the event.

9   Q    Okay.

10  A    The event starts when the person answers the phone, if

11  you called them.  It ends when either party hangs up.

12  Q    Now if it's a voice mail, that still qualifies as within

13  that time frame, correct?

14  A    All text messages will be 60 seconds.  The voice calls

15  will have the total amount of time in seconds.

16  Q    I understand.  If someone were to call a phone and a

17  voice message machine were to pick up, that time duration

18  includes the time that you're listening to the voice message

19  because it has picked up.  Is that correct?

20  A    That's correct, yes, ma'am.

21  Q    Okay.  So if a voice message that you listen to is 30

22  seconds, then the start of the call for each of those would be

23  30 seconds, plus whatever time someone would leave a message?

24  A    Yes.  Or if they hang up.

25  Q    Or if they hang up?

1   A    Yes.

2   Q    You also have up there in column E the direction,

3   meaning, whether it's outgoing or incoming?

4   A    That's correct.

5   Q    Whether someone actually made a call or whether they

6   received a call, correct?

7   A    Incoming is when they received it; outgoing is when they

8   made it, the T-Mobile customer.

9   Q    And then in column F was the calling number, and you

10   stated that that would be the T-Mobile number?

11   A    The calling number is the number that made the call.

12   Q    So that could then be either outgoing or incoming, just

13   whoever made the call?

14   A    The direction is listed, either incoming or outgoing.

15   Q    Okay.

16   A    If it's incoming, it's a call made to the T-Mobile

17   number; if it's outgoing, it's a call from the T-Mobile number

18   to another phone number.

19   Q    I understand.  With the records that we have in front of

20   us, it doesn't distinguish whether it is a smart phone or

21   whether it is a flip phone.  Is there any way for us to tell?

22   A    The only phone that will be identified is the target

23   number that is the T-Mobile phone that was requested in the

24   legal demand to be searched for this time period.

25   Q    Okay.  Can you tell on this document whether it is a

1   smart phone?

2   A    I would have to look at the subscriber information.

3   Q    Is the subscriber information in this document?

4   A    It's a different document, subscriber information.

5   Q    Okay.  So you can't tell from the face of this whether

6   it's a smart phone or not?

7   A    No, ma'am.

8   Q    Okay.  In the next column, column G, you said that,

9   "dialed number," means the number that was the direction, the

10  receiving number.  Is that correct?

11  A    That's the number dialed by the caller.

12  Q    Okay.  You say "dialed."  Do you have a smart phone?

13  A    I have a Note 8; it's smarter than me, that's for sure.

14  Q    You have a smart phone?

15  A    Yes, ma'am.

16  Q    Okay.  Thank you.

17          You say "dialed number," meaning that it's not in

18  its literal sense that someone actually has to dial in the

19  number.  Is that correct?

20  A    The dialed number is the number dialed by the caller.

21  Q    Does an individual actually have to punch in the numbers?

22  A    Sometimes people have certain numbers on their phones

23  coded.  It may be 1, 2, 3 for the certain number.  If the 1,

24  2, 3 is there, well then that's the number that was dialed by

25  the caller.

1  Q    Are there also contacts that are saved in individual's

2  phones?

3  A    Yes.

4  Q    And so someone could just push the contact, and then it

5  would dial out that number?

6  A    That's correct.

7  Q    There's also devices on the smart phone, such as Siri,

8  Alexa -- you're familiar with the sort?

9  A    I don't use that type stuff on my smart phone.

10 Q    Okay.  Are you familiar with them?

11 A    I've heard the terms, but I don't use it.

12 Q    Okay.  But you're familiar?

13 A    I don't use it though.  Yes, ma'am, I've heard the terms,

14 but I don't use that.

15 Q    You can ask Siri or Alexa -- if you know the answer to

16 this question -- you can ask Siri or Alexa to dial a number

17 for you as well?

18        MR. CHIU:  Objection, Your Honor, the witness has

19 expressed that he's not knowledgeable about this.

20        THE COURT:  Well he said he didn't use it.  So the

21 question is:  Are you familiar with those, Alexa and Siri?

22 Are you familiar with them?

23        THE WITNESS:  I'm familiar with the terms.

24        THE COURT:  Do you know how they work?

25        THE WITNESS:  No.  I don't use that.

1          THE COURT:  All right.  So you don't know how they

2    work?

3          THE WITNESS:  That's right.

4          THE COURT:  Okay.  Go on ahead.  The objection is

5    sustained, but there was a little bit of ambiguity there.

6    Feel free to proceed, Ms. Nair.

7    BY MS. NAIR:

8    Q    It boils down to, you don't actually have to physically

9    dial a number for a number -- for a call to be made.  Is that

10   correct?

11   A    That's correct.

12   Q    Okay.  And so it is actually just the call -- or excuse

13   me -- the number that actually is receiving the call is always

14   going to be in that column.  Is that correct?  The dialed

15   number?

16   A    Unless there's a code that's being used that you referred

17   to when the person has a --

18   Q    The 1, 2, 3?

19   A    Right, yeah.

20   Q    But not for contacts?

21   A    No, ma'am.

22   Q    And not when -- let me back up.  No.  I'll move on.

23          MS. NAIR:  Can I have one moment, Your Honor?

24          THE COURT:  You may.

25          MS. NAIR:  Thank you.

1    BY MS. NAIR:

2    Q    Last question.  On these records you can't tell if

3    someone were to dial the number, versus if they were saved in

4    a contact?

5    A    It depends on what the column has in, "dialed number."

6    Q    Correct, the dialed number.

7    A    Right.

8    Q    I know you talked about the 1, 2, 3 code, correct?

9    A    Yes.

10   Q    Okay.  But if it's a contact number saved in your phone

11   and you push the button, it will still show "dialed number,"

12   versus if you actually type in the numbers?

13   A    I would imagine so.

14   Q    There's no way to differentiate between those?

15   A    No, ma'am.  The only thing I can tell you is when I use

16   my phone.  I have a Samsung phone.

17   Q    Yes.

18   A    I'm on the T-Mobile network.

19   Q    Yes.

20   A    When I dial my wife, I look for her name, A Mama.  When I

21   call my children, I look for their names.

22   Q    Yes.

23   A    I don't dial their numbers.  It's automatically in my

24   phone.

25   Q    And it will still show under the dialed number as their

1    phone number?

2    A    Yes.

3                MS. NAIR:  Thank you.

4                THE COURT:  Anything further, Ms. Nair?

5                MS. NAIR:  No, Your Honor.

6                THE COURT:  All right.  Thank you, Ms. Nair.

7                Redirect examination?

8                MR. CHIU:  No, Your Honor.

9                THE COURT:  May this witness be excused?

10               MR. CHIU:  Yes, Your Honor.

11               THE COURT:  Will he be subject to recall?

12               MR. CHIU:  Not from the United States.

13               THE COURT:  Ms. Nair, will he be subject to recall

14   from the defense?

15               MS. NAIR:  No, sir.

16               THE COURT:  All right.  Thank you, sir, you have a

17   nice day.

18               THE WITNESS:  Thank you, sir.

19               THE COURT:  You can leave everything up there they

20   brought you and we'll clean up after you.

21               THE WITNESS:  Yeah.

22               THE COURT:  I would invite the Government to call

23   their next witness.

24               MR. CHIU:  The United States calls Omar Figueroa to

25   the stand.

1    THE COURTROOM DEPUTY:  Please come forward and be

2    sworn.

3                           **OMAR FIGUEROA,**

4    called by Government, was duly sworn by the courtroom deputy,

5    and in answers to questions propounded, testified as follows:

6                    THE COURTROOM DEPUTY:  Have a seat there, please.

7                    THE COURT:  All right.  Good afternoon, Special

8    Agent Figueroa.  Please be seated.  And once you're

9    comfortable with the chair's proximity to the microphone,

10   please state your full name, spelling your last name.

11                   THE WITNESS:  My name is Omar Figueroa, last name

12   F-i-g-u-e-r-o-a.

13                   THE COURT:  Your witness.

14                   MR. CHIU:  Thank you, Your Honor.

15                          DIRECT EXAMINATION

16   BY MR. CHIU:

17   Q    Sir, are you employed?

18   A    I am.

19   Q    Who do you work for?

20   A    I'm a special agent with the F.B.I.

21   Q    How long have you been an F.B.I. special agent?

22   A    Ten years.

23   Q    What's your current assignment?

24   A    I'm assigned to the Joint Terrorism Task Force.

25   Q    And has that been your assignment during your time with

OMAR FIGUEROA - Direct Examination by Mr. Chiu                    197

1    the F.B.I.?

2    A    No.

3    Q    What are some of the other assignments you've had?

4    A    I've been -- I've investigated drug offenses.  I was

5    assigned to San Juan division and then Tampa division.  I

6    worked OCDETF cases, Hobbs Act, carjackings, international

7    terrorism, to name a few.

8    Q    And do you have any prior law enforcement experience

9    prior to the F.B.I.?

10   A    I do.

11   Q    And what did you -- what is that?

12   A    I spent seven years as a deputy US Marshal.

13   Q    Okay.  And any prior law enforcement experience before

14   that?

15   A    I did.  Correct.

16   Q    Which is what?

17   A    I was law enforcement, security forces in the Air Force.

18   Q    Now, I'm going to take you back to February 20, 2019.

19   Did you have any involvement in the case involving the

20   defendant that day?

21   A    Yes, sir.

22   Q    What was your involvement?

23   A    February 20, 2019, we, early on in the morning,

24   approximately, 0600 hours, we executed an arrest warrant.

25   Q    For who?

1   A    For Mr. Robert Francis Pratersch.

2   Q    And how did you end up there?  Like, how did you end up

3   at Mr. Pratersch's house?

4   A    Sure.  There was an operational plan drafted in the

5   F.B.I. --

6   Q    Let me back up.  How did you end up targeting

7   Mr. Pratersch for an arrest?

8   A    Mr. Pratersch was a subject of a threat investigation

9   against Senator Bernard Sanders.

10  Q    Well, let me go ahead.  Let's go back to

11  February 20, 2019.  What did you do?

12  A    February 20, 2019, we went to Mr. Pratersch's house.  We

13  did a knock announce and we arrested Mr. Pratersch.

14  Q    At that time did you have any discussion with

15  Mr. Pratersch?

16  A    When we arrested Mr. Pratersch, I had a brief

17  conversation with him.

18  Q    Okay.  What did you ask the -- and when we're referring

19  to Mr. Pratersch, is that person in the courtroom today?

20  A    Yes, he is.

21  Q    And could you point to him and describe what he's

22  wearing?

23  A    Sure.  He's sitting next to the defense counsel.  He's

24  wearing a tie, a gray shirt, and a suit.

25          MR. CHIU:  Your Honor, may the record reflect that

1    the witness has identified the defendant?

2          THE COURT:  The record will so reflect.

3    BY MR. CHIU:

4    Q    Now, did you ask the defendant if he -- about cell phones

5    or anything like that?

6    A    I did.  After we had Mr. Pratersch handcuffed, we asked

7    if, number one, if he was okay, meaning physically, did he

8    need anything.  Second, we asked whether or not there was

9    anybody else in the home.  After the home was cleared and

10   Mr. Pratersch was in handcuffs, we brought him back inside his

11   home, so he could change for adequate clothing to come to the

12   courthouse, and in doing so, we asked Mr. Pratersch about cell

13   phones, if he had any cell phones in the home and which he

14   answered in the positive manner, and he consented for us to

15   take the cell phones with us.

16   Q    So did he provide you the phones or did he show you?

17   What happened?

18   A    Sure.  He showed us where the phones were at.  The phones

19   were on top of some piece of furniture that he had in his

20   trailer.

21   Q    And how many phones were there?

22   A    There were a total of five phones.

23   Q    I'm going to show you --

24         MR. CHIU:  If I may approach, Your Honor?

25         THE COURT:  You may.

1    BY MR. CHIU:

2    Q    -- Government's Exhibit 8.  If you can take a look at

3    Government's Exhibit 8 and tell us what that is.

4    A    This is the cell phone we obtained from Mr. Pratersch's

5    home.

6            MR. CHIU:  Okay.  If we can go ahead and pull up

7    Government's Exhibit 9, please?

8            (The above referenced exhibit was published.)

9    BY MR. CHIU:

10   Q    What is Government's Exhibit 9?

11   A    That is a consent to search for the phone before me from

12   Exhibit 8.

13   Q    And who is that signed by?

14   A    It's written by myself; it's signed by myself and Task

15   Force Agent Nester Mercado.

16   Q    And who else?

17   A    And Mr. Robert Francis Pratersch.

18   Q    Now, what does that consent form say?

19   A    The consent form states that we have a -- that he's

20   giving us, Mr. Pratersch is giving us consent to search the

21   content of the cell phone before me.

22   Q    What does it say in particular?

23   A    It says, "I have been asked by special agents of the

24   F.B.I. to permit a complete search of" -- and then the

25   description of the cell phone.

1   Q    What is the description of the cell phone?

2   A    Cellular phone:  Black phone with aqua trim around phone.

3   Then the number (407) 344-9507.  The letters, Z as in Zulu, T

4   as in tango, E as in echo, engraved on the back of phone.

5   Carrier is Consumer Cellular.  And then it has the initials

6   for Mr. Robert Pratersch.

7   Q    And is that the phone that you're holding there as

8   Government's Exhibit 8?

9   A    Yes.

10  Q    On that phone, Government's Exhibit 8, is there an IMEI

11  number?

12  A    Yes, sir.

13  Q    And where is that located?

14  A    It's inside the phone.

15  Q    What do you mean "inside the phone"?

16  A    Well, you have to pop open the phone to get the IMEI

17  number.

18  Q    Can you do that?

19  A    Yes.

20  Q    And can you show us, can you show the jury where that

21  IMEI of the phone would be listed?

22  A    Sure.  I just removed the cover of the phone, the battery

23  of the phone, and the IMEI number is located in the middle,

24  and then, just above the bar code.

25            MR. CHIU:  Now, if we can turn to Government's

1   Exhibit 7?

2       (The above referenced exhibit was published.)

3   BY MR. CHIU:

4   Q    And before I move on -- that consent form we just looked

5   at, did the defendant have an opportunity to read what was

6   written on the consent form?

7   A    Yes.

8   Q    Including the phone number?

9   A    Yes, sir.

10  Q    And he agreed to that?

11  A    He did.

12  Q    All right.  Have you had a chance to look at Government's

13  Exhibit 7?

14  A    I have.

15          MR. CHIU:  In particular, if we could go down to

16  lines, I think, 45.  Let's start with line 45.  I think it's

17  the one above that.

18      (The above referenced exhibit was published.)

19  BY MR. CHIU:

20  Q    Now, well let me ask you this.  Were you able to --

21          MS. NAIR:  Judge, I apologize.  May we approach?

22          THE COURT:  Sure.

23      (At the bench.)

24          MS. NAIR:  I just want to point out that Juror No. 4

25  keeps falling asleep.

1          THE COURT:  We will watch carefully.

2          MS. NAIR:  Yes.

3          THE COURT:  All right.  Thank you.

4          MS. NAIR:  Yes.  All right.  Thank you.

5      (In open court.)

6          THE COURT:  I know it's post lunch, and if anyone is

7    having trouble staying awake, I would invite you to stand up

8    any time you feel yourself dozing off.  It's happened before.

9    This isn't sometimes the most exciting stuff, but we need to

10   make sure that you're awake and aware of what's going on.  I

11   appreciate that.

12         All right.  Thank you.  Feel free to proceed.

13         MR. CHIU:  Thank you.

14   BY MR. CHIU:

15   Q    Let me take a step back.  Did you review these phone

16   records to try and locate the actual calls that correspond

17   with the voice mail messages reflected in Government's

18   Exhibits 1 through 3?

19   A    Yes, sir.

20   Q    Okay.  And where are those calls?

21   A    Lines 45, 46, and 47.

22   Q    Okay.  So let's take a look at 45.  Now, what time did

23   that call occur?

24   A    It occurred at 20:43:15 UTC, which is at 4:43 and

25   15 seconds Eastern time, 4:43 p.m.

1   Q    How did you identify this as one of the calls from the

2   exhibits?

3   A    The calls from the exhibit has Mr. Pratersch's number and

4   the outgoing number which it's dialing to,

5   Senator Bernie Sanders.

6   Q    That's the number that -- that's this (802) number?

7   A    That is the (802) 862-0697.

8   Q    And is there a -- did you find the IMEI number on these

9   records?

10  A    I did.

11  Q    Did you compare them to the IMEI number on the back of

12  the Government's Exhibit 8?

13  A    I did.

14  Q    And do they match?

15  A    They match.  With --

16  Q    Or I should say, do the first 14 digits match?

17  A    The first 14 digits match.

18  Q    Okay.  And were you able to identify a cellular tower --

19  well, let me back up.  45, 46, and 47, did those calls all go

20  to the same location?

21  A    Yes, sir.

22  Q    And what's that?

23  A    It went to the called Senator Bernie Sanders number.

24  Q    And do they all have the same IMEI number?

25  A    They did.

1   Q    Were you able to determine where these calls were made

2   from?

3   A    Yes.

4   Q    How?

5   A    So there is a specific address -- keep going to the

6   right -- in which, obviously, they have longitude and

7   latitude, but the address on column V, as in Victor, states

8   5349 East Irlo Bronson Highway --

9   Q    Okay.

10  A    -- which is located in St. Cloud, Osceola County, Middle

11  District, Florida.

12  Q    And where is that in proximity to the defendant's

13  residence?

14  A    Less than 1.6 miles.

15  Q    At the time you encountered the defendant, did he live

16  with anybody?

17  A    Not to my knowledge.

18  Q    Was there anybody else at the house?

19  A    There was nobody else in the house when we went to arrest

20  him.

21  Q    During your encounter with the defendant, did you have

22  any opportunity to listen to his voice?

23  A    I did.

24  Q    About how long did you have to hear his voice?

25  A    Well, after the arrest we transported him from St. Cloud

1   to here, to downtown Orlando, and that trip took approximately

2   30 minutes, and we had small chat along the way.

3   Q    About the case or just chat, just small talk?

4   A    Small talk.  I typically like to explain the process

5   that's going to go on before them so they're not surprised.

6   It eases everything up.

7   Q    So during that period of time, did you get the

8   opportunity to be familiar with the defendant's voice?

9   A    Yes.

10  Q    Have you had a chance to review Government's Exhibits 1,

11  2, and 3?

12  A    Yes, sir.

13  Q    And have you had the opportunity to compare the voice on

14  those messages with your recollection of the defendant's

15  voice?

16  A    Yes, sir.

17  Q    Were you able to determine -- do you know whose voice is

18  on those voice mail messages?

19  A    The voice on the voice mail messages reflect that of

20  Mr. Robert Francis Pratersch.

21  Q    That's the individual you just identified as the

22  defendant?

23  A    That's correct.

24          MR. CHIU:  I have no further questions.  Thank you.

25          THE COURT:  Ms. Nair, cross-examination?

1          MS. NAIR:  Yes, Your Honor.  Thank you.

2                    CROSS-EXAMINATION

3    BY MS. NAIR:

4    Q    Mr. Figueroa, you said you got involved in this case in

5    February of 2019?

6    A    Yes, ma'am, approximately.

7    Q    Okay.  But that wasn't the beginning of this case.  Is

8    that correct?

9    A    That's correct.

10   Q    That's not the first time an law enforcement officer had

11   went to visit with Mr. Pratersch.  Is that correct?

12             MR. CHIU:  Objection, hearsay.

13             THE COURT:  Overruled.  He can answer that question.

14             The question was:  That wasn't the first time an

15   officer went to visit Mr. Pratersch, is it?

16             THE WITNESS:  That's correct, ma'am.

17   BY MS. NAIR:

18   Q    Someone went to visit Mr. Pratersch in October of 2018.

19   Is that correct?

20   A    I believe someone went to talk to Mr. Pratersch.

21   Correct.

22   Q    To interview him?

23   A    I believe so, yes, ma'am.

24   Q    When you met with Mr. Pratersch in February, you said you

25   talked about phones.  Is that correct?  Whether he had any

1    phones?

2    A    That is correct.

3    Q    You also talked about the voice messages that were left

4    on the machine?

5    A    I talked about the phones, not the voice messages.

6    Q    So you didn't show him any transcripts?

7    A    No, ma'am.

8    Q    You didn't let him listen to any of the voice mails?

9    A    No, ma'am.

10   Q    But you arrested him for the voice messages?

11   A    I arrested him because he had an arrest warrant.

12   Q    For the voice messages?

13   A    It was an arrest warrant based on the investigation for

14   the messages.

15   Q    Okay.  Thank you.  You said that you typically talk about

16   the process when you're transporting an individual to court?

17   A    Yes, ma'am.

18   Q    You don't know exactly what you would have talked about

19   with Mr. Pratersch on that day?  You don't know verbatim what

20   you talked with Mr. Pratersch on that day?

21   A    Not verbatim.  I just tell them that -- where the

22   courtroom is -- where the courthouse is located.  That if he

23   needed to make a call that -- to -- he was released, that we

24   would facilitate that one way or the other so he wouldn't be

25   stranded here, downtown.

1   Q     Is that something you do out of habit?

2   A     Yes.

3   Q     So you always do it whenever you're talking to someone

4   and transporting them?

5   A     Typically when I transport, we do that out of habit.

6   That's correct.

7   Q     Okay.  You said that when you met with Mr. Pratersch, you

8   said that he was the subject of a threat.  Is that correct?

9   A     He was the subject of an investigation.

10  Q     Okay.  Did you have information about the voice messages

11  prior to meeting with Mr. Pratersch?

12  A     Prior to his arrest?

13  Q     Yes.

14  A     Some, some information in reference to voice messages.

15  Q     You hadn't had the opportunity to listen to the voice

16  messages prior to that?

17  A     I can't recall if I listened to them before or not,

18  honestly.

19  Q     Do you know if someone gave you the transcript of them

20  before?

21  A     I believe I perused through the case with a comrade

22  and --

23  Q     You -- oh, sorry.  Go ahead.

24  A     And I was able to see the e-transcripts.

25  Q     So when you're saying, perused through the case, you're

1    talking about reviewing reports that someone else wrote?

2    A    Yes.

3    Q    Okay.  So you -- that's how you had knowledge someone

4    else met with Mr. Pratersch before?

5    A    Yes, that's correct.

6    Q    Okay.  And on February 20th, Mr. Pratersch gave you

7    consent to search through the phone voluntarily?

8    A    Yes, ma'am.

9    Q    You didn't force him to give you that permission?

10   A    I did not force him.

11   Q    You didn't threaten him to give you permission?

12   A    Absolutely not, ma'am.

13   Q    And you didn't make him any promises that if he allowed

14   you to look into the phone, that you would reward him in some

15   way?

16   A    Absolutely not.

17   Q    So basically, you just asked and he said sure?

18   A    We respectfully asked, and he said that he was providing

19   us consent for his phone.

20              MS. NAIR:  Thank you.

21              THE COURT:  Redirect?

22              MR. CHIU:  Nothing further, Your Honor.

23              THE COURT:  All right.  May this witness be excused?

24              MR. CHIU:  Well --

25              THE COURT:  Oh, he's going to be sitting with you?

1          MR. CHIU:  Yes, Your Honor.

2          THE COURT:  Got you.

3          All right.  Feel free to be seated at counsel table.

4          And I would invite the Government to call their next

5     witness.

6          MR. CHIU:  May I have just one moment, Your Honor?

7          THE COURT:  You may have a moment.

8          MR. CHIU:  Your Honor, the United States would rest.

9          THE COURT:  All right.  Ladies and gentlemen of the

10    jury, that concludes the United States presentation of the

11    case.  We have to handle a legal matter before we continue

12    marching forward.  So I certainly thank you for your patience

13    here.  We're ahead of schedule.  If you'd be kind enough to

14    leave your pads and pens facedown on your chair's, we're going

15    to have a bit of a break that you can spend in your jury

16    deliberation room.  I think our marshal's in there making

17    coffee for you in case anyone's interested.  So we'll see you

18    in about 15 minutes, but thank you for your patience.  Leave

19    your pads and pens facedown.  We'll see you soon.

20          Darleen, if you want to take them in there.

21          THE COURTROOM DEPUTY:  Yes, Judge.  Right this way.

22       (The jury retired from the courtroom at 2:14 p.m.)

23          THE COURT:  All right.  Please be seated.

24          Will there be any legal arguments from the defense

25    at this time?

212

1          MS. NAIR:  Yes, Your Honor.  At this time, we make a

2    motion to issue a judgment for verdict of acquittal as to

3    Count 1 of the superseding indictment, whether the Court uses

4    the Government's jury instruction or the defense's proposed

5    jury instruction, the Government has failed to establish or

6    present any evidence that Mr. Bernard Sanders was engaged in

7    the performance of official duties during the time that the

8    threat was made.  The information that was -- the only

9    information that was presented to the Court was through the

10   testimony of his legal staff assistant, Ms. Hardy, and

11   Ms. Hardy testified that she was not sure if Mr. Sanders

12   was -- if Senate was in session.  She's not sure if

13   Mr. Sanders was in the office on the Friday before, the

14   Saturday of, or the Monday after, and she was not certain when

15   session -- when Senate was in session at all throughout that

16   year.

17          The Government, by virtue of failing to present any

18   evidence that Mr. Sanders was engaged in the performance of

19   his official duties, or that Mr. Pratersch had any reason to

20   retaliate against Mr. Sanders on account of the performance of

21   his official duties is reason enough alone to grant a verdict

22   for judgment of acquittal.

23          The information that has been presented is that a

24   threat of some sort was made and that Mr. Pratersch is the

25   individual who made the threat.  However, it goes beyond that

1    in order to establish a verdict of guilt for Mr. Pratersch for

2    Count 1.  And so we, in addition to our motion to dismiss

3    Count 1 because of the multiplicity argument that we

4    previously made in a motion filed yesterday, we also are

5    establishing that the Government has failed to meet its burden

6    by not producing any evidence to that element.

7              THE COURT:  All right.  Mr. Chiu, response?

8              MR. CHIU:  Thank you, Your Honor.

9              Your Honor, 18 U.S.C., Section 115, criminalizes

10   making a threat to assault or kill a federal official with

11   intent to impede, intimidate, or interfere with such official

12   while engaged in the performance of official duties.

13             Now, what the defense is essentially asking the

14   Court to do without really any -- without any precedent to

15   back it up, is to simply -- is to take that "while engaged in

16   the performance of official duties" and use it, not to modify

17   the intimidation -- the intent to intimidate, but rather

18   taking it back to the earlier part of the phrase and using

19   that to modify the actual threat itself.

20             There's a textual canon that comes into play here.

21   It's the Last-Antecedent Canon or the rule of the last

22   antecedent, which is most prominently featured in

23   *Barnhart v. Thomas*.  It's 540 U.S. 20, 27 to 28.  But

24   basically, it says that a limiting clause or phrase should

25   ordinarily be read as modifying only the phrase that it

1    immediately follows.  So, at best, this "while engaged in the

2    performance of official duties" goes towards the intent to

3    impede, intimidate, or interfere.

4         Now, what the evidence has shown is that the

5    defendant called Senator Sanders' office, his senate office,

6    left a voice mail on his senate phone, which was

7    understandably and expectedly then listened to when business

8    resumed on Monday.

9         So the jury can clearly infer that the intent of the

10   caller, the defendant, was to impede, intimidate, or interfere

11   with Senator Sanders while engaged in the performance of

12   official duties.

13        There's another side to this too, is that what the

14   defendant is also asking the Court to do is, essentially, read

15   Section 115 as an anti-obstruction statute, that is that --

16   the defense is asking the Court to read that statute to say

17   that you -- it only criminalizes obstruction of currently

18   occurring official activity.  And there's no -- there's no

19   precedent for that.  In fact, that goes against United

20   States --

21        THE COURT:  Just cutting to the chase, I need some

22   legal authority to agree with the defense's position because I

23   think maybe the unintended consequence of this is you just

24   take all of the teeth out of the statute.  Essentially, you're

25   saying that if you want to wait -- if you want to avoid this

1   statute, all you have to do is wait until the senate is not in

2   session and threaten the senator over an upcoming vote or

3   something that happened previously.  I think a senator is a

4   senator all the time.  And I don't think, unless there's some

5   very specific limitation to this federal statute, that it only

6   applies when the senate's in session, that paragraph A is

7   applicable.

8           Moving on to paragraph B, with the intent to

9   retaliate against such an official on the account of

10  performance of his official duties.  I don't think he just

11  acts -- assuming the jury agrees, I think one can certainly

12  find that this wasn't just a call to an anonymous or a random

13  person.  He uses the word "Bernie" or refers to this

14  particular senator specifically, and while he doesn't say,

15  This is in retaliation specifically for your vote on blah,

16  blah, blah, I think the statute's applicable here and the

17  evidence is clear --

18          MS. NAIR:  Your Honor.

19          THE COURT:  I would like to hear from you again if

20  you want to argue this further.

21          MS. NAIR:  Thank you.  I actually -- I'm going to

22  pull it up, but the case law that I have that is on the issue

23  is for federal judges, specifically, or law enforcement.  The

24  most analogous case, as I'm pulling it up, is with a federal

25  judge who made a ruling against a defendant who acted pro se.

1    And when the person acted pro se, he then later threatened the

2    federal judge.  That was in retaliation for something that the

3    judge did while he was performing his official duties.

4         The issue that we have in this specific statute is

5    that it has to be while engaged in the performance of your

6    official duties.  You cannot turn off the fact that you are a

7    United States federal district court judge; you are that so

8    long as you shall live.

9         I cannot turn off the fact that I am an attorney.

10   I'm an attorney no matter if I leave this courthouse and go

11   home and I'm interacting in my daily affairs.  I cannot turn

12   off my title of being an attorney, the same way that

13   Senator Bernie -- Bernard Sanders cannot turn off the fact

14   that he is a United States senator.

15        This statute protects the officials while they're

16   engaged in their official capacity in their official duties,

17   and that is the purpose of the statute, to protect those

18   individuals just while they are doing their official duties.

19   Anything beyond that goes to what the Government has set forth

20   in 875(c), which is just any individual being threatened.  But

21   I would like to put on the record the case law that --

22        I understand the Court's ruling.

23        THE COURT:  No.  But I think you need to preserve

24   your issue if you want appellate review, so --

25        MS. NAIR:  Yes.  I would like to supplement with the

1    actual case law that -- because my computer is taking a little

2    while to --

3                THE COURT:  Do you have it in a hard copy document

4    where you can just give me the citation?

5                MS. NAIR:  I don't.  The one that I have is at my

6    desk, so I don't have it here with me and that is my fault,

7    but as soon as I find the citation --

8                THE COURT:  Let's do this then, because I do want to

9    give you an opportunity.  I've made my ruling, and you want an

10   opportunity to make a proffer for the record so you can

11   adequately preserve the issue for appellate review.

12               MS. NAIR:  Correct.

13               THE COURT:  So let's take a ten-minute break.  You

14   can get it up on your computer before we bring them in here.

15   I'll let you wrap up your argument and cite your case law.

16               MS. NAIR:  Thank you.

17               THE COURT:  All right.  Thank you.  Court's in

18   recess.

19       (Recess at 2:23 p.m., until 2:52 p.m.)

20               THE COURT:  Ms. Nair, are you ready to complete your

21   argument?

22               MS. NAIR:  Yes, Your Honor.  So I provided two

23   copies of different cases to the Court and to the Government.

24   The *United States v. McLean,* 891 F.3d 1308, at

25   1310 through 1311.  The purpose for providing this to the

1    Court is it explains in great detail what an immigration judge

2    is, stating that it's a quasi-judicial officer.  And then it

3    lays out the functions in 1310, saying, "She handles certain

4    proceedings involving litigants and attorneys, hears evidence

5    and arguments, makes findings of facts, issues rulings on

6    matters of law, and renders decisions which are applicable to

7    the BIA under relatively traditional standards of judicial

8    review.

9           It goes further at 1311 in the last paragraph to say

10   that, because an immigration judge is a judicial officer of

11   the United States and therefore a United States judge under

12   Section 115(c)(3)" they affirm the conviction.  So it lays out

13   the duties that an immigration judge has.  Again, an

14   immigration judge can't turn his or her hat on and off once

15   they take the bench.  They're always an immigration judge.

16          Then go further to *United States v. Berki*, which is

17   where I think has the most closely held law for this Court to

18   consider, which is at 936 F.2d 529, at 532, it states, the

19   Court found that the statute was not enacted to protect

20   against obstruction of justice, but to protect federal

21   officers in carrying out their duties.

22          And that was interpreting Section 11 -- 111.

23          It then goes further to say, since the language in

24   18 United States Code Section 111 is almost identical to that

25   of the code section in issue here -- which is 115 -- we follow

1  the same reasoning as the Court.  The statute was not enacted

2  to prevent obstructions of justice, but solely to give

3  sufficient protection to the judges enforcing an unpopular

4  law.

5       It does not give them protection just based solely

6  on their status as a federal official, but it gives them

7  protection for the official duties that they carry out.  And

8  that is the purpose of Section 115.  When you take away the

9  official duties, you have nothing more than a Section 875(c).

10  There's an extra additional element that must be proven in

11  Section 115, and the Government here has simply not met its

12  burden because they have produced no evidence that Mr. Sanders

13  was engaged in the performance of his duties when the

14  perceived threats were made.  Without that additional element,

15  it cannot survive a motion for judgment of acquittal.  Thank

16  you.

17       THE COURT:  All right.  It is noted and preserved

18  for the record, and I understand your argument.  I'm going to

19  take a little more time to absorb these cases, and if I change

20  my mind, I'll let you know.

21       All right.  So at this time, the motion for judgment

22  of acquittal will be tabled.  Once I review these documents,

23  then I'll issue my final decision, probably tomorrow morning

24  before we get started.

25       So that being the case, Ms. Nair, if you would be

220

1    kind enough to stand with your client at counsel table.

2         Do you remember our discussion yesterday where I

3    informed you that when the Government rested, I was going to

4    need to hear from you on whether or not you were going to

5    become a witness in your own defense?  Do you recall that

6    conversation?

7         THE DEFENDANT:  Yes.

8         THE COURT:  All right.  Have you had enough time to

9    talk to Ms. Nair about whether or not you will become a

10   witness in your own defense?

11        THE DEFENDANT:  I will.

12        THE COURT:  All right.  You will.  Okay.  Thank you,

13   sir.  Feel free to be seated.

14        Ms. Nair, are you prepared to call your first

15   witness?

16        MS. NAIR:  Yes, Your Honor.

17        THE COURT:  And who are you calling?

18        MS. NAIR:  The first person I will be calling is

19   John Pratersch.

20        THE COURT:  All right.  Do you want to have someone

21   on your team bring him into the courtroom so he's ready to go?

22        MS. NAIR:  Yes, Your Honor.  Thank you.

23        THE COURT:  All right.  Let's bring the jury in.

24        MR. CHIU:  Your Honor, I don't know if it makes

25   sense.  I think I'm anticipating some -- an objection here,

1   coming up.  Do we want to address that before the jury comes

2   in or do we --

3           THE COURT:  What objection?

4           MR. CHIU:  Based on what this witness may testify

5   to.

6           THE COURT:  I mean, do you know what she's going to

7   ask him and what he's going to say, or are you just

8   anticipating?

9           MR. CHIU:  I'm anticipating it.

10          THE COURT:  You might want to make it a

11  contemporaneous objection.

12          MR. CHIU:  Yes, Your Honor.

13          THE COURT:  We can approach sidebar if we need to.

14  And you might want to confer with Ms. Nair.  Maybe you can

15  tell her what your concerns are, and she might not be going

16  down that road, for all you know.

17          THE COURTROOM SECURITY OFFICER:  All rise for the

18  jury.

19      (The jury entered the courtroom at 2:58 p.m.)

20          THE COURT:  Welcome back, ladies and gentlemen.

21  Sorry for the extensive delay, but we're ready to continue

22  marching forward.  Feel free to be seated in your chairs once

23  you get there.  As soon as everyone's seated, we'll continue

24  moving forward.

25          All right.  Please be seated in the courtroom.

1          Ms. Nair, are you ready to call your first witness?

2          MS. NAIR:  Yes, Your Honor.

3          THE COURT:  All right.  Feel free.

4          MS. NAIR:  Thank you, Your Honor.  I will call

5     John Pratersch.

6          THE COURTROOM DEPUTY:  Please come forward and be

7     sworn.  Raise your right hand.

8                         **JOHN PRATERSCH,**

9      called by Defense, was duly sworn by the courtroom deputy,

10    and in answers to questions propounded, testified as follows:

11         THE COURTROOM DEPUTY:  Have a seat there, please.

12         THE COURT:  Good afternoon, Mr. Pratersch.  Once

13    seated, please make yourself comfortable with the chair's

14    proximity to the microphone, then please state your full name

15    into that microphone, spelling your last name.

16         THE WITNESS:  Yes, sir.  My name is

17    John Michael Pratersch.

18         THE COURT:  And please spell your last name.

19         THE WITNESS:  P-r-a-t-e-r-s-c-h.

20         THE COURT:  Ms. Nair, your witness.

21         MS. NAIR:  Thank you, Your Honor.

22                      <u>DIRECT EXAMINATION</u>

23    BY MS. NAIR:

24    Q    Mr. Pratersch, what is your relationship to

25    Mr. Robert Pratersch?

1    A    I'm his brother.

2    Q    Are you his older brother or younger brother?

3    A    Older.

4    Q    So you've known Mr. Robert Pratersch his entire life?

5    A    Yes.

6    Q    And where do you reside, what city and state?

7    A    Orlando, Florida.

8    Q    How far is that from where Mr. Robert Pratersch lives?

9    A    About 25 miles.

10   Q    Are you employed?

11   A    Yes, I am.

12   Q    Where are you employed?

13   A    State of Florida, the State Attorney's office.

14   Q    How long have you been employed for the State Attorney's

15   office?

16   A    Twenty-four years.

17   Q    Have you had an occasion or occasions to witness your

18   brother's demeanor in the community?

19   A    Yes.

20   Q    Did you meet with agents previously about a case -- facts

21   of a case that occurred on September 29, 2018?

22   A    It was, it was by telephone.

23   Q    You were contacted by telephone?

24   A    By my phone at my workplace.

25   Q    Okay.  And were you asked questions about your brother?

1    A    Yes.

2    Q    When is the last time that you had actually physically

3    been in contact with your brother Robert Pratersch?

4    A    The last time would be at Thanksgiving at my nephew's

5    house.

6    Q    Was there a time before that you had actual interaction

7    with your brother?

8    A    I believe, yes, it was at my nephew's wedding in December

9    of 2017.

10   Q    What is your relationship like with your brother

11   currently?

12   A    Well we're kind of distanced from each other.  I mean,

13   it's -- it's really nothing personal.  It's just he's -- he

14   lives a good distance away, and, you know, he can't really get

15   out that much due to financial and, you know, his physical

16   abilities, and I don't really go out there because, you know,

17   I work full-time and busy during the weekends, so we don't

18   really get to see each other much.

19   Q    Do you have or know of an opinion about your brother's

20   drinking?

21             MR. CHIU:  Objection, Your Honor.

22             THE COURT:  And the basis for the objection?

23             MR. CHIU:  Relevance, personal knowledge.

24             THE COURT:  All right.  What's the response?  I

25   don't even understand the question.  Does he have an opinion

1   about his brother's drinking?

2          MS. NAIR:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MS. NAIR:  The relevance is to the voluntary

5   intoxication, and it also goes to habit as to what his brother

6   does, so it is relevant under the Federal Rules of Evidence.

7   And it also -- I'm not sure, the personal knowledge question.

8   I'm asking him if he has personal knowledge.

9          THE COURT:  All right.  So here's -- the predicate

10  for this is that he's not been in contact with his brother

11  since Thanksgiving, gave no year; interacted with his brother

12  at nephew's wedding in December of 2017; has a distant

13  relationship with his brother and doesn't see him much.

14         There's no predicate for this opinion.

15         MS. NAIR:  May I go further with the predicate?

16         THE COURT:  You may.

17  BY MS. NAIR:

18  Q    Over the years have you had an occasion to interact with

19  your brother?

20  A    Yes.

21  Q    Okay.  So how old is your brother?

22  A    Fifty-eight.

23  Q    Okay.  So when we're talking about a span of time, you've

24  known your brother for 58 years, at least?

25  A    Yes.

1   Q    And you said that your relationship is distant with your

2   brother?

3   A    Yes.

4   Q    Is that within the last couple of years?

5   A    Yes.

6   Q    So prior to that, you've had a long-standing relationship

7   with your brother?

8   A    Yes.

9   Q    You've had an opportunity to observe your brother in his

10  demeanor -- and his demeanor in the community?

11  A    I have at certain times.  I was in the active duty Army

12  for 13 years, so I wasn't here during that time frame.

13  Q    But after that point, you've had an occasion in your

14  adult life to be around your brother?

15  A    Yes, because he -- where I resided before where I live

16  now, he lived in a little trailer on the property for, I

17  think, two and a half to three years.

18  Q    And when I say, physical contact, I'm talking about

19  in-person contact, but have you had an opportunity to speak

20  with your brother over the phone in the last couple of years?

21  A    Yes.

22  Q    Do you know the difference between when your brother has

23  alcohol in his system versus when he's sober?

24  A    Yes, absolutely.

25              MS. NAIR:  If Your Honor is satisfied with that

1   predicate before I ask the next question.  I'm not sure.  I

2   was inquiring from the Government if they needed more.

3           THE COURT:  What's the next question?  Go on ahead

4   and ask it.

5   BY MS. NAIR:

6   Q    Have you formed an opinion about your brother, or do you

7   know of the general opinion about your brother's drinking?

8           MR. CHIU:  Your Honor, I again I would object on

9   predicate grounds, but also, I don't understand what the

10  question is asking.  So I don't know if it's asking for a 701

11  lay opinion, but I'm not sure on what.

12          THE COURT:  All right.  Why don't you both approach

13  for sidebar?

14     (At the bench.)

15          THE COURT:  Are you trying to ask him if his

16  brother -- if he knows whether or not his brother has a

17  drinking problem or is an alcoholic?

18          MS. NAIR:  If he has a reputation for drinking.  And

19  it is hearsay, but it's an exception under 803(21).

20          THE COURT:  I just don't think you can lay the

21  predicate here.  I mean, they obviously have a weird

22  relationship or an estranged relationship.  I mean, he's doing

23  everything he can to try to thwart your ability to lay the

24  predicate on him.  But I understand what you're trying to say.

25  I mean, I would imagine your client's planning on testifying

1    he has a big drinking problem.

2            MS. NAIR:  That is correct, but there's --

3            THE COURT:  You need someone who's had more

4    interaction with him.  He's away for 13 years in the Army.

5    He's described the last couple of years as being distant and

6    having two contacts over the last two years.  I just don't

7    think you can get there with this guy.

8            MS. NAIR:  Okay.  I can ask him another question.

9            THE COURT:  Okay.  Objection is sustained.

10       (In open court.)

11           THE COURT:  All right.  Feel free to proceed.

12           MS. NAIR:  Thank you.

13           Can we play Government's Exhibit 1?

14       (The above referenced exhibit was published.)

15           MS. NAIR:  Can you stop it?

16   BY MS. NAIR:

17   Q    Did you have an opportunity to listen to that?

18   A    No.  This is the first time.  Oh, just now?

19   Q    Yes.

20   A    Yes.  Yes.  Yeah.

21   Q    Do you have an opinion of whether your brother is sober

22   or under the influence of alcohol?

23           MR. CHIU:  Objection, Your Honor.

24           THE COURT:  Response to the objection?

25           MS. NAIR:  I'm not sure.  He didn't state the

1    objection.

2         MR. CHIU:  Lack of predicate, improper opinion

3    testimony.

4         MS. NAIR:  The response to that is, Your Honor,

5    is --

6         THE COURT:  All right.  I'll let you ask this

7    question, but the reputation stuff -- you're asking him does

8    his brother sound drunk?

9         MS. NAIR:  Well, I'm asking.  I apologize, Your

10   Honor, he testified that he knows the difference between when

11   his brother is --

12        THE COURT:  Right, but that's what you're asking,

13   right?

14        MS. NAIR:  Yes.

15        THE COURT:  All right.  You can ask that question

16   and we're moving on.

17        MS. NAIR:  Thank you.

18        THE COURT:  But, ultimately, the jury is going to

19   make that determination.

20        MS. NAIR:  I understand.

21        THE COURT:  It's the jury's decision in how to apply

22   that.

23        MS. NAIR:  I understand.

24        THE COURT:  All right.

25        So the question to you, sir, is whether or not --

1   does your brother sound drunk in that call?

2          THE WITNESS:  He sounds intoxicated, yes.

3          THE COURT:  Okay.

4          MS. NAIR:  Thank you.  I have no further questions

5   for this witness.

6          THE COURT:  Cross-examination.

7          MR. CHIU:  Yes, Your Honor.

8                    CROSS-EXAMINATION

9   BY MR. CHIU:

10  Q    Good afternoon, sir.

11  A    Good afternoon.

12  Q    On the September 29, 2018, were you with your brother

13  that day?

14  A    No.

15  Q    Did you see your brother, or do you have any idea how

16  much your brother -- or whether your brother was drinking or

17  had something to drink that day?

18  A    No.

19         MR. CHIU:  No further questions.  Thank you.

20         THE COURT:  Redirect?

21         MS. NAIR:  No, Your Honor.

22         THE COURT:  Ms. Nair, may this witness be excused?

23         MS. NAIR:  Yes, Your Honor.

24         THE COURT:  Will he be subject to recall?

25         MS. NAIR:  He may.

231

1          THE COURT:  All right.  Thank you, sir.  You're

2     still going to be subject to your subpoena.  You may be

3     hearing from one of the attorneys, so I'd ask that you not

4     speak to anyone about your testimony here today, but I wish

5     you a good afternoon.

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.  Ms. Nair, are you ready to

8     call your next witness?

9          MS. NAIR:  Yes, Your Honor.  At this time we would

10    call Kathy Pratersch.

11         THE COURTROOM DEPUTY:  Please come forward and be

12    sworn.  Raise your right hand.

13                    **KATHY GENUNG-PRATERSCH,**

14     called by Defense, was duly sworn by the courtroom deputy,

15    and in answers to questions propounded, testified as follows:

16         THE COURTROOM DEPUTY:  Have a seat there, please.

17         THE COURT:  Good afternoon, ma'am.  Once seated,

18    please make yourself comfortable with the chair's proximity to

19    the microphone and state your full name into that microphone.

20    Please spell your last name.

21         THE WITNESS:  Kathy Genung-Pratersch, G-e-n-u-n-g,

22    hyphen, P-r-a-t-e-r-s-c-h.

23         THE COURT:  Thank you, ma'am.

24         Ms. Nair, your witness.

25         MS. NAIR:  Thank you.

1                        DIRECT EXAMINATION

2       BY MS. NAIR:

3       Q    Ms. Genung-Pratersch, what is your relationship to

4       Mr. Robert Pratersch?

5       A    I'm his sister-in-law.

6       Q    And who --

7       A    I'm married to his brother, John.

8       Q    How long have you been married to John?

9       A    Coming, 29 years in December.

10      Q    Have you known Mr. Robert Pratersch the entire time that

11      you've been married to his brother?

12      A    Yes.

13      Q    What is your relationship if -- what is your relationship

14      like with Mr. Pratersch, Robert Pratersch?

15      A    It's good.  We're close.  We have not seen each other a

16      lot in the last few years, just because of the distance.

17      Q    When you say you haven't seen him, have you had any -- do

18      you communicate with him?

19      A    Yes, on the phone or texting.

20      Q    How often do you communicate with him over the phone?

21      A    I would say at least twice a month.  There's been some

22      months that we haven't.  It's hard.  I mean, I always try to

23      check up on him.

24      Q    Do you at least communicate with him via text?

25      A    Now, I do -- that I have a cell phone.

1   Q    In September of 2018 -- or in 2018, period, were you

2   communicating with Mr. Robert Pratersch?

3   A    I think I had spoke to him at least once in that month.

4   Q    Okay.  In September of 2018?

5   A    In September.

6   Q    Okay.  But previous to that, you've talked to him

7   throughout the months of 2018?

8   A    Right.  Not, you know, every day, but, you know, off and

9   on.

10  Q    Okay.  When you speak with Mr. Pratersch, are you able to

11  tell when he is intoxicated, versus when he's sober?

12  A    Definitely.

13  Q    Okay.  And how are you able to tell when he's

14  intoxicated, versus when he's sober?

15  A    When he calls sober, he will talk about car repair and

16  just as we're talking now.  When he is drunk, then he will be

17  very slow, hesitant, negative mostly, down.

18  Q    Now, when you speak with Mr. Pratersch, do you have --

19  you said you talk to him at least twice a month, once to twice

20  a month?

21  A    Mm-hm.

22  Q    Is that correct?

23  A    Yes.

24  Q    Have there ever been instances where you've had a

25  conversation with Mr. Pratersch and then have another

1   conversation and he doesn't recall the conversation?

2   A    Yes.  If he's been drinking and -- a lot of times he will

3   not remember what he tells me.

4            MR. CHIU:  Objection, Your Honor, hearsay.

5            THE COURT:  The objection is hearsay.  It's

6   self-serving hearsay, so let's avoid that.  But what you're

7   asking is whether or not he has -- you've got to be very

8   specific here.  I'm going to give you a little bit of license

9   to lead, but I know what you're asking.  She cannot tell what

10  he told her.

11           MS. NAIR:  Correct.

12           THE COURT:  So I'm going to sustain the objection as

13  to hearsay and offer you an opportunity, Ms. Nair, to

14  rephrase.

15  BY MS. NAIR:

16  Q    Have there ever been opportunities where you've spoken

17  with Mr. Pratersch while he was intoxicated and then spoke

18  with him in the future very shortly thereafter?

19  A    Yes.

20  Q    During the times that you speak with Mr. Pratersch in the

21  subsequent conversation, would you have to remind

22  Mr. Pratersch of communications that you previously had with

23  him?

24           MR. CHIU:  Objection, Your Honor.  This gets at the

25  same issue.

1           THE COURT:  This is not hearsay.  I understand where

2    you're coming from.  Hearsay is an out-of-court statement used

3    in court for the truth of the matter asserted.  There is no

4    statement here, and your objection is noted with regard to her

5    repeating any statements.  But this is a very general

6    application, kind of a macro view of the communication without

7    getting in the specifics.

8           So for that reason, the objection is overruled.  She

9    can answer that question.

10   BY MS. NAIR:

11   Q    Do you need the question repeated, or do you remember the

12   question?

13   A    If you could repeat it.

14   Q    Okay.  In subsequent conversations, after speaking with

15   Mr. Pratersch, have you had to remind Mr. Robert Pratersch of

16   a prior communication?

17   A    Yes.

18   Q    Okay.  Were you previously interviewed in regards to

19   communications that took place on September 29, 2018?

20   A    Yes.  I did not have a date when it happened.

21   Q    But someone communicated with you about voice messages?

22   A    They did not tell me it was a voice message.

23   Q    Okay.  So you haven't had an opportunity to listen to the

24   voice message?

25   A    No.

1    Q    Okay.

2             MS. NAIR:  Can we play what's been marked as

3    Government's Exhibit 3?

4         (The above referenced exhibit was published.)

5             MS. NAIR:  You can stop it.

6    BY MS. NAIR:

7    Q    After listening to that, do you have an opinion as to

8    whether or not Mr. Robert Pratersch was intoxicated or not?

9    A    He definitely was.

10   Q    Definitely was what?

11   A    Intoxicated.

12            MS. NAIR:  Thank you.

13            THE COURT:  All right.  Is there cross-examination,

14   Mr. Chiu?

15            MR. CHIU:  Just briefly, Your Honor.

16                    CROSS-EXAMINATION

17   BY MR. CHIU:

18   Q    Ms. Pratersch, you did not have an occasion to speak with

19   the defendant on September 29, 2018.  Is that correct?

20   A    Correct.

21   Q    You don't know what he had to drink or how much?

22   A    No.

23   Q    You don't know for a fact if he had anything to drink at

24   all, do you?

25   A    Just from past, knowing him and being around him when

1   he's been intoxicated.

2   Q    Well, you didn't see him drink anything --

3   A    No.

4   Q    -- on September 29, 2018, correct?

5   A    No, I did not.

6              MR. CHIU:  No further questions, Your Honor.

7              THE COURT:  Redirect examination.

8              MS. NAIR:  Very briefly.

9                    REDIRECT EXAMINATION

10  BY MS. NAIR:

11  Q    Although you did not see him drinking anything on

12  September 29, 2018, is it your opinion based on past

13  experience with Mr. Robert Pratersch that he was intoxicated?

14  A    Yes.

15  Q    And do you have an opinion as to --

16             MS. NAIR:  Nothing further.  Thank you.

17             THE COURT:  Ms. Nair, may this witness be excused?

18             MS. NAIR:  Yes, Your Honor.

19             THE COURT:  Will she be subject to recall?

20             MS. NAIR:  No, Your Honor.

21             THE COURT:  All right.  Will she be subject to

22  Government recall?

23             MR. CHIU:  No, Your Honor.

24             THE COURT:  All right.  Thank you, Ms. Pratersch.

25  You have a nice day.

1          THE WITNESS:  Thank you.

2          THE COURT:  Ms. Nair, I'd invite you to call your

3    next witness.

4          MS. NAIR:  Defense calls Steven Pratersch.

5          THE COURTROOM DEPUTY:  Please come forward to be

6    sworn.  Raise your right hand.

7                         **STEVEN PRATERSCH,**

8     called by Defense, was duly sworn by the courtroom deputy,

9    and in answers to questions propounded, testified as follows:

10         THE COURTROOM DEPUTY:  Have a seat there, please.

11         THE COURT:  All right.  Good afternoon, sir.  Please

12   make yourself comfortable with the chair's proximity to the

13   microphone.  Once seated, please state your full name into

14   that microphone, spelling your last name.

15         THE WITNESS:  Okay.  Steven R. Pratersch,

16   P-r-a-t-e-r-s-c-h.

17         MS. NAIR:  May I proceed?

18         THE COURT:  You may.  Thank you, Ms. Nair.

19         MS. NAIR:  Thank you.

20                    DIRECT EXAMINATION

21   BY MS. NAIR:

22   Q    Mr. Pratersch, what is your relationship, if any, to

23   Robert Pratersch?

24   A    I'm his older brother.

25   Q    So is it fair to say you've known Mr. Robert Pratersch

1    his entire life?

2    A    Yes.

3    Q    And where do you currently reside?

4    A    In Montgomery, Alabama.

5    Q    So you live quite a distance from Mr. Pratersch; is that

6    fair?

7    A    Yes.

8    Q    Do you have any interactions with Mr. Pratersch?

9    A    Telephone calls.

10   Q    It's you calling Mr. Robert Pratersch or

11   Mr. Robert Pratersch calling you?

12   A    Both.

13   Q    Okay.  And how often do you communicate with

14   Mr. Robert Pratersch?

15   A    About twice a month, maybe three.

16   Q    Have you had occasion to come to Florida in the past?

17   A    I do, yes.

18   Q    When you come to Florida, where do you -- where do you

19   stay at?

20   A    Sometimes with my other brother and, occasionally, with

21   Bob, and I've stayed with our mother also before.

22   Q    So you've had an occasion or multiple occasions to stay

23   at Robert Pratersch's home?

24   A    Yes.

25   Q    And can you tell us what type of home this is?

1    A    The environment?

2    Q    Yes.

3    A    Well, okay.  Right now he lives in a mobile home, and

4    it's always kept up.  It's clean, orderly.  There's not much

5    in there as -- furniture-wise.  I mean, he's by himself.

6    Q    How big is it?  How many bedrooms and baths?

7    A    Right now, it's a two-bedroom and two bath.

8    Q    So is it a large trailer?

9    A    No.  It's a single wide.  I think it's 65 by 14, I think.

10   Q    So when you stay with Robert Pratersch, is it fair to say

11   you're in close proximity with him?

12   A    Yes.

13   Q    Have you had occasions to witness your brother's behavior

14   on prior -- on prior occasions?

15   A    Yes.

16   Q    Have you had times to witness his behavior?

17   A    Right.

18   Q    What, if any, opinion have you formed about your

19   brother's drinking habits?

20   A    That is --

21        MR. CHIU:  Objection, Your Honor.

22        THE COURT:  All right.  There's an objection.  Is it

23   predicate?

24        MR. CHIU:  It is predicate.

25        THE COURT:  All right.  What's the basis -- what's

1    the response to the predicate opinion?

2          MS. NAIR:  Mr. Pratersch has testified that he has

3    known his brother his entire life, that he has occasions to

4    visit his brother.  When he visits Florida, he stays in close

5    proximity with his brother, and he is able to observe his

6    behaviors while he is with his brother.

7          THE COURT:  Mr. Pratersch, how often do you visit

8    and stay with your brother?

9          THE WITNESS:  Usually once a year, maybe once every

10   year and a half.

11         THE COURT:  All right.  Thank you, sir.  That

12   objection is going to be sustained.  You can't -- the

13   predicate hasn't been laid with this witness.

14         MS. NAIR:  That's fine.

15   BY MS. NAIR:

16   Q    Do you have -- you said you talk to your brother two to

17   three times a month?

18   A    Yes.

19   Q    Okay.  When you're talking with your brother, are you

20   able to identify when he's drinking, versus when he is sober?

21   A    Yes.

22   Q    How are you able to identify when he is drinking alcohol,

23   versus when he is sober?

24   A    Okay.  His tone, his speech, mannerisms do dictate that,

25   yes.

1   Q    And have you observed this solely over the phone, or have

2   there been other instances where you've observed this?

3   A    When I'm here, yes, I can observe that too, whether he's

4   been drinking or not.  And over the phone, it's the same

5   thing; it's just the mannerism and tone.

6   Q    So it's the same, versus when you're here, versus when

7   you're over the phone with your brother?

8   A    Yes.

9   Q    Okay.  Is there any other way that you are able to tell

10  when he is intoxicated?

11  A    Over the phone, no, not necessarily.  It's just a manner

12  of speech that you can tell by -- over the phone.

13  Q    What about in person?

14  A    Yeah.  There's a little bit more there because your

15  physical appearance, physical behavior; there's some

16  differences there when somebody is intoxicated or not.

17  Q    Do you have occasions where you'll talk to your brother

18  and then -- while he's drinking -- and then, subsequently,

19  talk to him very close after you've talked with him while he

20  was intoxicated?

21  A    Yes.

22  Q    Are there times when you will have to remind your brother

23  of a previous conversation you've had?

24  A    Yes.

25  Q    Does that happen often?

1  A    Okay.  Often is how many times a year or how many times

2  did I talk to him?  I --

3  Q    I apologize.  Let me restate the question.  Does the part

4  where you have to remind your brother of a previous

5  conversation --

6  A    Oh, okay.  Well, okay.  There's times when I remind him,

7  and there's times when I don't, but the times that I don't are

8  times when I know we talked about things, but I just leave it

9  alone.  I don't remind him.  But there has been -- I want to

10 say about -- well, at least half the time when I talk to him,

11 I would just mention something.

12 Q    And have to remind him?

13 A    Yeah.

14 Q    Okay.  Now, you stated you've known him for his entire

15 life since -- and I guess he's 58 years old.  Is that correct?

16 A    Mm-hm.

17 Q    Has it always been where you were able to have

18 conversations and he was been -- he has been drinking his

19 entire life?

20 A    Well, no, not entire life.  You know, because I left home

21 a little early, joined the military, spent most of my time

22 away from this area.  And so when he started drinking, I

23 couldn't say for sure.  I just know that over time, there had

24 been a period in his life when there was a little bit of

25 escalation in that.  So within the last 20 years at least,

1  maybe 30 years, there was, I guess, just an increase in, you

2  know, the times of where I could tell he was drinking a little

3  more, or at least more often.

4  Q    Have you had an occasion to listen to the audios -- or

5  has anyone contacted you about any potential phone calls or

6  voice messages that were made?

7  A    Other than you did the other day.  No.

8         MS. NAIR:  Can you play what's been marked as

9  Government's Exhibit 2?

10     (The above referenced exhibit was published.)

11         MS. NAIR:  You can stop it.

12  BY MS. NAIR:

13  Q    Do you have an opinion of whether or not your brother was

14  intoxicated or sober in that voice message?

15  A    That was definitely a intoxicated voice message to me

16  and -- because I've heard, not that particular, you know, in

17  that way, but I've heard other conversations we've had about

18  just regular things with that type of, you know, inflection,

19  mannerism, yes.

20  Q    So your opinion is that he was intoxicated in that voice?

21  A    That or maybe on medications or both.  You know,

22  there's -- it just sounds, it sounds very familiar, as far as

23  the, you know, the attitude and voice because he can get --

24  yeah.

25  Q    He can get what?  I'm sorry.  You didn't finish that

1    statement.

2    A    Well, it's just that, you know, Bob can kind of go on

3    with, you know, with his conversation about things when

4    he's -- when he's been drinking, and doesn't really remember

5    any of that, actually, because, like I said, you know, before,

6    if we talk about it later, he doesn't remember.

7            MS. NAIR:  Okay.  Thank you.

8            THE COURT:  Mr. Chiu, cross-examination.

9            MR. CHIU:  Thank you, Your Honor.

10                   CROSS-EXAMINATION

11   BY MR. CHIU:

12   Q    Good afternoon, sir.  On September 29, 2018, you were not

13   with the defendant, correct?

14   A    Correct.

15   Q    Now, you didn't have an occasion to speak to him that

16   day, right?

17   A    Not that I know of.

18   Q    So you don't know, necessarily, if the defendant did have

19   anything to drink that day, correct?

20   A    I don't.

21   Q    You don't know if he was -- and if he did, you don't know

22   how much, correct?

23   A    No.  But I can tell you this:  That in the past, every

24   day, Bob --

25   Q    Well, let me stop you there --

1        MS. NAIR:  Objection, Your Honor.  He's not allowing

2   the witness to answer.

3        THE COURT:  He was going into a narrative.  He

4   answered the question, and then he started, Well -- I can tell

5   you this.  That was non-responsive.

6        You can go on ahead.

7        MR. CHIU:  I have no further questions.  Thank you.

8        THE COURT:  Redirect.

9                    REDIRECT EXAMINATION

10  BY MS. NAIR:

11  Q    Even though you weren't with your brother,

12  Mr. Robert Pratersch, on September 29th, is there any doubt in

13  your mind that, after listening to that --

14  A    Mm-hm?

15  Q    -- voice message that your brother was under the

16  influence of something?

17  A    No, there's no doubt.

18  Q    And is that based on your prior communications with your

19  brother?

20  A    Correct.

21  Q    If your brother had been sober, how would you be able to

22  tell the difference?

23  A    Well, he's got a more distinctive way of talking when

24  he's sober than when he's drunk.  There's no slurring.

25  There's no hesitation.  There's no, you know, raised voices

1  where there's an -- more of an alarm to his sound of his

2  voice.  There's nothing like that.  I hear all that here.

3          MS. NAIR:  Thank you.

4          THE COURT:  Ms. Nair, may this witness be excused?

5          MS. NAIR:  Yes, Your Honor.

6          THE COURT:  Will he be subject to recall?

7          MS. NAIR:  No, Your Honor.

8          THE COURT:  Mr. Chiu, will he be subject to recall

9  from the United States?

10          MR. CHIU:  No, Your Honor.

11          THE COURT:  All right.  Thank you, sir.  You have a

12  nice day.

13          THE WITNESS:  Okay.

14          THE COURT:  All right.  Ms. Nair, are you ready to

15  call your next witness?

16          MS. NAIR:  Your Honor, may we have a ten-minute

17  break?

18          THE COURT:  Yes, you may.

19          Ladies and gentlemen of the jury, just to give you

20  an idea where we're at in terms of time, I feel comfortable

21  giving you a thumbnail of the rest of the day.  I do believe

22  there is a strong chance that both sides are going to finish

23  with their presentation today.  As soon as they're finished,

24  we'll end the day.  I have some legal matters to take up with

25  the attorneys.

1          When you come in tomorrow morning, we will begin

2    with final argument, I'll instruct you on the law, and you'll

3    get to deliberate tomorrow.  Before you leave, make sure you

4    fill out menus for tomorrow.  In order to make sure that we

5    use our time wisely, we're just going to provide lunch

6    tomorrow.  The menus will be provided before you leave by a

7    jury coordinator.  So when you arrive here tomorrow, it's

8    everything I indicated.  After closings, you'll be having

9    lunch while you're deliberating, and then we'll wait for your

10   decision.

11         So that's sort of the schedule for the rest of the

12   day today and tomorrow.  So I think we're going to finish

13   early today, but we have a lot to take care of in order to

14   make sure we can hit the ground running tomorrow.  So for now,

15   if you can leave those pads and pens facedown on your chairs.

16   And if ever you don't want to be in that little room for a

17   break, if you tell Mr. Carter, he'll take you downstairs for a

18   break.  All right.  So we'll see you in about 15 minutes.

19   Thank you.

20         THE COURTROOM DEPUTY:  All rise for the jury.

21     (The jury retired from the courtroom at 3:31 p.m.)

22         THE COURT:  All right.  Please be seated, everyone.

23   Just one final loose matter on the motion for judgment of

24   acquittal; that is going to be denied.  But Ms. Nair has had

25   an opportunity to preserve her issue for the record.

249

1          So are you planning on calling your client after the

2     break?

3          MS. NAIR:  Yes, Your Honor.

4          THE COURT:  All right.  So let's take 15, and then

5     we'll continue with the end of the presentation.

6          By the way, Mr. Chiu, are you still considering

7     whether or not you're going to be calling in a witness in

8     rebuttal?

9          MR. CHIU:  I'm considering that.  That will really

10    depend on how things go with the next witness, Your Honor.

11         THE COURT:  All right.  Sounds good.  I'll see you

12    in 15 minutes.  Thank you.

13         MR. CHIU:  Thank you.

14       (Recess at 3:32 p.m., until 3:49 p.m.)

15         THE COURT:  Mr. Carter.  If you would be kind enough

16    to bring the jury back in.

17         THE COURTROOM SECURITY OFFICER:  Yes, sir.

18         All rise for the jury.

19       (The jury entered the courtroom at 3:50 p.m.)

20         THE COURT:  All right.  Welcome back, ladies and

21    gentlemen.  Feel free to be seated.  Once you're at your

22    chairs, we'll continue moving forward.

23         Please be seated in the courtroom.

24         Ms. Nair, are you ready to call your next witness?

25         MS. NAIR:  Yes, Your Honor.  The defense calls

1    Robert Pratersch.

2            THE COURTROOM DEPUTY:  Please come forward and be

3    sworn.

4            THE COURT:  Mr. Pratersch, you can raise your right

5    hand right there at the table.

6                          **ROBERT PRATERSCH**,

7     called by Defense, was duly sworn by the courtroom deputy,

8    and in answers to questions propounded, testified as follows:

9            THE COURTROOM DEPUTY:  Have a seat there, please.

10           THE COURT:  And once seated, as you've heard me say

11   previously, please make yourself comfortable with your

12   proximity to the microphone, then just state your full name.

13   You do not have to spell it.

14           THE DEFENDANT:  Yes, sir.  Robert Francis Pratersch.

15           THE COURT:  Your witness, Ms. Nair.

16                      <u>DIRECT EXAMINATION</u>

17   <u>BY MS. NAIR:</u>

18   Q    Mr. Pratersch, did you intend to threaten Mr. Sanders?

19   A    No, ma'am.

20   Q    Do you remember calling Mr. Sanders?

21   A    I do not.

22   Q    Were you interviewed about voice messages left on

23   Mr. Sanders' office line?

24   A    Yes.

25   Q    When you were interviewed, were you given a transcript of

1    the calls?

2    A    Yes.

3    Q    What was your reaction to looking at the language?

4    A    My reaction was that I -- I didn't call this man.  Why

5    would they be coming to me about this?  And I told the agent,

6    I said, this is a horrible language.

7              And at that time, I didn't know, I didn't understand

8    why they were there.  I mean, I -- and then I seen that it was

9    my phone number, and they -- and they -- and it had to be me.

10   Q    Are you currently employed, Mr. Pratersch?

11   A    No.  I'm on Social Security disability after 35 years of

12   working.

13   Q    You say, disability.  Why are you on disability?

14   A    Combination of the diabetes, damaged nerves in my feet,

15   three accidents to my knees, unable to squat and kneel down

16   anymore, and I have a degenerative joint disease in my lower

17   spine.

18   Q    Are you currently taking any medications for your medical

19   issues?

20   A    Yes.  I take about 11, 11 to 12.

21   Q    Eleven to 12 what?

22   A    Medications.

23   Q    Oh, medications, okay.  Do you take those daily?

24   A    Yes.

25   Q    And do you know what your medications are for?

1   A    Five of them are for hypertension; one's for diabetes;

2   there's two for cholesterol; one's Nitroglycerin pills that I

3   don't take very often; and a Vitamin D once a week.  And

4   there's one more that I can't think of.

5   Q    Do you take any medications for your degenerative joint

6   disease?

7   A    No.  There's nothing they can do about that.  It's

8   irreversible.  I take Ibuprofen three, four in the morning,

9   three, four in the afternoon.

10  Q    Do you drink alcohol, Mr. Pratersch?

11  A    I was.  I'm a recovering alcoholic now.

12  Q    When you say you were drinking alcohol, can you tell us

13  about that?

14  A    I drank for 40 years.  Started when I was a teenager, and

15  I was a working alcoholic, I guess you could call it.  But I

16  always went to work and drank with my friends.  And I was

17  married for ten years, and between my alcohol and her

18  problems, only lasted ten years.  And then -- then I moved

19  next to my brother for three years.  Drinking continued.  Then

20  I moved out to East Lake Fish Camp where I met three friends

21  that turned out to be really good friends, and then the fourth

22  one came at the end of my 18 years there and the drinking

23  continued.  But in the last eight years, I lost five -- well,

24  four -- four friends and one relative.  And the last friend

25  was Joe -- lived down the street from me, and that's why I

1    moved from the Fish Camp to St. Cloud.  And when he died, I

2    just -- I don't know.  I felt very, very alone.  By then I

3    wasn't going to Orlando like I used to, and once Joe died, I

4    think I just got into more of depression and I started

5    drinking more, but I started drinking heavier, and --

6    Q    Can I stop -- I don't mean to stop you, but I just want

7    to get some clarity.  You said before you were a working

8    alcoholic.  Is that correct?

9    A    Right.

10   Q    And when you were a working alcoholic, what type of

11   alcohol did you drink?

12   A    Beer.

13   Q    Beer.  Okay.  Now, you said after your friend died --

14   that was a couple of years ago?

15   A    Three.

16   Q    Three years ago.  Is that correct?

17   A    Right.

18   Q    Okay.  After your friend died, you said you began

19   drinking heavier?

20   A    Yes.  And I just withdrew and spent most of my time in

21   the house because Joe was the last person, the last good

22   friend.  You don't have a lot of them in this world, and when

23   he was gone, I just -- and I was so far from family that I --

24   you know, he was my family --

25   Q    Okay.  And --

1  A    -- him and his wife, and then I just -- and just

2  continued to drink heavy, and I withdrew and became a recluse

3  is what I became.

4  Q    When you --

5  A    And then two -- two years ago I switched to vodka and

6  then that -- it was just -- and it turned into drinking with

7  friends once upon a time to drinking to forget, to -- to -- to

8  go somewhere else because I felt very depressed and alone at

9  that point.

10  Q    Okay.

11  A    And that just -- and that turned into day after day after

12  day after day.  Only time I would slow down when -- because I

13  have, along with my knees and back and the feet, I have stage

14  three kidney failure.  My pancreas is scar tissue'd from

15  pancreatis attacks.  And my liver was not doing so well, and I

16  was just kind of like on a suicide run --

17  Q    Okay.  Mr. Pratersch, I apologize.  I just want to

18  clarify.  You said you switched to drinking vodka.  Is that

19  correct?

20  A    Yes.

21  Q    And that was in the last two years?  Is that what you

22  said?

23  A    Yes.

24  Q    You were testifying just a moment ago about short periods

25  of time that you would stop drinking?

1   A    Only because if I didn't, I'd be in the hospital for a

2   while.  You can't drink in the hospital because that was my

3   life, turned into my life.  You know what I mean?  I -- I'd

4   get up in the mornings.  I'd have my two cats, my fish I'd

5   take care of -- I'd take care of the -- I'd feed the squirrels

6   and the birds outside.  I -- I functioned, but in the

7   afternoon, everything comes crashing down on my soul and in my

8   mind.  And then I started drinking vodka, and then I'd power

9   drink it because it's the best, quickest results.  And half a

10  fifth in a couple of hours is not out of the question.

11  Q    Okay.  So on a typical day in the last two years, you

12  would drink at home.  Is that correct?

13  A    Right.  Right.  Yeah, I never went -- I don't go nowhere.

14  Q    Who would you drink with?

15  A    By myself.

16  Q    Would you drink while you were taking your medicine?

17  A    Yes.

18  Q    Where would you spend your day?

19  A    Spent my days at home.  I'd do what I had to do in the

20  morning.  I'd want to do things.  There's things around there

21  I'd want to do, I got to do, but it overpowers, you know, my

22  mind, and -- and again, come afternoon, and then it all shifts

23  from I want to do this, need to do this.  I did what I have to

24  do to get by, and now I'm just waiting for that time to get

25  here --

1    Q    Okay.  What --

2    A    -- because I know it would only take a short period of

3    time where I don't have to think about it or live it and it is

4    gone again for another eight hours, ten hours, whatever it

5    might be.

6    Q    When you were inside of your home, did you have a place

7    where you would typically drink at?

8    A    In a recliner.  I don't -- I gave my love seat and the

9    couch to Goodwill because I can't lay down no more for about

10   ten years.  I don't even have a bed because my back's that

11   bad.  So I have a recliner, and I have two tables.  I put my

12   water, my drink, what have you, and the TV.

13   Q    How often or how long would you spend in that chair?

14   A    There was days I'd spend 20 hours a day.

15   Q    Where did you get your alcohol from, your vodka?

16   A    At the corner liquor store.

17   Q    I want to turn your attention to September 29, 2018.  Do

18   you remember that day?

19   A    No.

20   Q    Were you in the hospital on that day?

21   A    In the hospital?

22   Q    Yes.

23   A    No.

24   Q    So if you weren't in the hospital, you said that you

25   would be drinking at home?

1   A    Right.

2   Q    So do you believe that you were drinking on

3   September 29, 2018?

4   A    I believe I was, yes.

5   Q    Would you have been -- what would you have been drinking

6   on that day?

7   A    Vodka.

8   Q    And you said you take your medicines every day.  Would

9   you have taken your medicine on that day as well?

10  A    Yes.

11  Q    Is there anything else that would have prevented you from

12  drinking vodka or taking medicine, short of you being in the

13  hospital?

14  A    At that time -- I can't think of anything.

15  Q    Now, you said that officers came to your home and showed

16  you a transcript.  Did you -- was that in October?

17  A    I don't know what date it was.  I don't keep -- I

18  can't -- you know it's kind of a cloudy.  You know, I don't --

19  I can't keep track of dates unless they're wrote down

20  somewhere.

21  Q    And why can't you keep track of dates unless they're

22  written down?

23  A    I assume, from alcoholism.

24  Q    But you do recall at some point somebody coming and

25  talking to you about --

1    A    Yes, I remember them coming there.  I remember

2    everything.  It was in the -- I don't believe it was quite

3    noon, but as far as the date, I don't have the date.  I

4    mean --

5    Q    I understand.  So it was around noon that they came?

6    A    It was.  It was before noon, I believe.

7    Q    What time do you start drinking on a daily basis?

8    A    Usually 3:00, maybe 2:00.  It's not -- it's not a -- I

9    don't have an exact time.

10   Q    But around noon, you wouldn't have been drinking.  Is

11   that fair?

12   A    I've been drinking at noon before.

13   Q    Okay.

14   A    But I can't -- and I've done that, years past, and that's

15   why my pancreas is all tore up from the long-term drinking.  I

16   forget what they call it.

17   Q    You testified that you probably -- you saw your phone

18   number in the transcript, correct?

19   A    Yes.

20   Q    Did you remember at that time making the phone call?

21   A    No.

22   Q    Did the officers who came to your home -- did they play

23   the audio for you at that time?

24   A    No.

25   Q    So did you know for certain that you made the phone call

1    at that time that they came in October?

2    A    I don't believe that I did.  I couldn't explain why or

3    how.  It wasn't real to me until I heard them first time, less

4    than a month ago, a month ago.

5    Q    You heard what?

6    A    The actual recording.  All it's been to me was -- was,

7    well, somebody called from your phone number and here's what

8    they said.  And I hadn't heard it until about a month ago.

9    Q    Do you vote, Mr. Pratersch?

10   A    I do not.

11   Q    Are you officially associated with any political party?

12   A    No.

13   Q    Are you a member of any extreme group?

14   A    No.

15   Q    Are you a member of any hate group?

16   A    No.

17   Q    Do you go to meetings where individuals have an occasion

18   to speak about hate?

19   A    No.

20   Q    Have you ever voted?

21   A    I never had the opportunity to vote because when I was

22   17, me and another kid stole a car battery when our battery

23   went dead at night on Orange Blossom Trail and somebody seen

24   it happen, and I end up as a -- being tried as an adult and

25   convicted of a felony, and I still carry that around today.

1          I never voted because I never had the chance.

2   Didn't have the chance to go into the service.  Both my

3   brothers, 20 years, 21 and a half, and my -- and my father

4   also, he did -- he joined the Army in the Korean War.  He did

5   his three years.  He got out.  He reenlisted into the

6   Air Force, but before he could finish his training, he -- he

7   got multiple sclerosis -- diagnosed with it and that ended his

8   career.

9   Q    Mr. Pratersch, now, after hearing the audio of yourself,

10  do you remember calling Mr. Sanders?

11  A    I do not.

12  Q    How do you feel about what you said?

13  A    To me it was -- it was horrible.  I couldn't believe that

14  I would say anything like that to anybody, especially somebody

15  I don't know.  It's not Christian.  It's not something a

16  southern man would do.  And I think -- and a hundred times a

17  day, how did this happen?  Why did this happen?  Why did I

18  call this man's office?  I feel horrible that these people in

19  his office had to listen to it.  I feel horrible everybody in

20  this courtroom had to -- had to listen to it.

21  Q    Do you have a -- or did you have a smart phone -- or let

22  me take a step back.

23          Can you open the book that's in front of you and

24  turn to what's been marked as Government's Exhibit 8?

25          MS. NAIR:  May I approach the witness, Your Honor?

1          THE COURT:  Sure.

2          THE WITNESS:  Yes.

3   BY MS. NAIR:

4   Q    Those items that you have in front of you are the phone

5   that you had on that day, correct?

6   A    Yes.

7   Q    Is that what you would call a smart phone?

8   A    Well, that's what I would call a smart phone; I don't

9   know if it is or not.

10  Q    It does smart things?

11  A    Yes.

12  Q    Okay.  Mr. Pratersch, do you text individuals?

13  A    I most, like, the person I text most is my sister-in-law

14  in Alabama, and the reason that I -- and it's every day

15  because when I started that, my brother and sister-in-law down

16  here didn't have a smart phone or iPhone -- I'm not sure what

17  the difference is -- but she did.  She's home every day, and I

18  set it up that if I text you, just, you know, "Good morning"

19  "Good afternoon" every day, and if you don't hear from me in

20  two days to try to call me.  And if you can't --

21  Q    Can I pause there for just a second?  When you text

22  someone, do you actually type in the numbers or do you -- or

23  the letters, or do you push and talk to text?  How do you

24  text?

25  A    Both.

1   Q    You can do both.  And could you do both with that phone?

2   A    I think I could.  I can't remember exactly because this

3   phone's been inactive for months.

4   Q    How long have you learned -- or how long have you known

5   how to push and talk to someone or text someone?

6   A    I don't know exactly how long.  A couple of years I'm

7   guessing.  I don't know.

8   Q    Okay.  But you have done it then, at least for a couple

9   of years, pushed and text someone -- or talked and text

10  someone?  Excuse me.

11  A    I believe so.

12  Q    Did Mr. Sanders do anything personally to you?

13  A    No.

14  Q    Do you know about Mr. Sanders' political positions?

15  A    All I know about Mr. Sanders is that he was running for

16  president a few years ago.

17  Q    Okay.

18  A    I don't follow politics.  I don't watch it.  I don't want

19  to even see it.  I don't -- I watch the local news just for

20  the headlines in case there's something out of the ordinary.

21          MS. NAIR:  Okay.  Thank you.

22          THE COURT:  Cross-examination.

23          MR. CHIU:  Thank you, Your Honor.

24

25  ////

1                        CROSS-EXAMINATION

2    BY MR. CHIU:

3    Q    Good afternoon, sir.  Now, you testified earlier that --

4    or just now that you don't really follow politics, right?

5    A    Right.

6    Q    But you know who Bernie Sanders is, correct?

7    A    Yes.

8    Q    And you knew he -- you said you saw him on the news.  Is

9    that right?

10   A    I saw him.  How could you not see any of these people in

11   election cycle?  They're on -- they're on every channel half

12   the time.

13   Q    Now, and you know he was a -- you knew that he was a

14   Democrat, right?

15   A    Yes.

16   Q    And somewhat of a liberal Democrat, correct?

17   A    I suppose he is.  I don't know.  I don't follow him that

18   close.

19   Q    But you do follow politics enough to also know who other

20   senators are, right?

21   A    A few.

22   Q    And Senator Sanders isn't the first senator you've ever

23   called, correct?

24   A    That's correct.

25   Q    Okay.  A couple of months before that, you had called

1    Bill Nelson, right?

2    A    That, I do remember.

3    Q    Told him to resign?

4    A    No.  He was getting fired because he was losing -- being

5    here in Florida, he's been around forever.  I always -- always

6    thought, well, you know, he's been here since I was a

7    teenager.  Goodbye, go home, on vacation, whatever.

8    Q    Well, and you didn't particularly care for Bill Nelson,

9    did you?

10   A    I don't know Bill Nelson.  I don't.  I have no idea.

11   Q    Well, sir, are you saying that when you called

12   Bill Nelson you didn't leave a voice mail that expressed that

13   you didn't like him?

14   A    Well, I don't remember.

15   Q    Do you remember when the agents talked to you, you

16   mentioned that you watch the news and sometimes you get mad

17   when you -- well, they asked you about Bernie Sanders,

18   correct?  Let me back that up.

19        They asked you about Bernie Sanders, right,

20   October 20, whenever -- when the agents first came to you?

21   Did they ask you about Bernie Sanders?

22   A    Yeah.

23   Q    And do you remember telling them that watching the news,

24   you get mad by the way -- I believe the words you said were,

25   these Communists are ruining our country?

1  A    No.  See -- now -- see, I remember when they were there

2  and they were asking, why did you call him?  I don't know why

3  I called him.  I don't remember calling him.  And they kept

4  just on and on and on.  And I said, well maybe I saw

5  something, if I called him.  At that time I still did not

6  believe I called him or anybody else.

7  Q    Okay.  Now -- and you don't remember -- you said you

8  don't remember making these calls, correct?

9  A    Right.

10 Q    So you couldn't testify to what you were thinking at the

11 time that you left this message, could you?  Because you don't

12 remember, right?  I'm sorry.  Go ahead.

13 A    What?

14 Q    You don't remember what you would have been thinking at

15 the time you left these messages, right?

16 A    Right.  I don't remember anything about that.

17        MR. CHIU:  I have no further questions.  Thank you.

18        THE COURT:  Redirect.

19                    REDIRECT EXAMINATION

20 BY MS. NAIR:

21 Q    Mr. Pratersch, you said you do remember calling

22 Senator Nelson.  Is that correct?

23 A    Yes.

24 Q    You did not threaten Mr. Nelson?

25 A    No, I did not.

ROBERT PRATERSCH - Redirect Examination by Ms. Nair          266

1   Q    You were testifying earlier, and I think you were cut

2   off.  You were saying that Mr. Nelson has been a politician

3   for a long time?

4   A    Yeah, yeah.  He's been around for a long time.  I mean,

5   everybody knows him in the state of Florida.

6   Q    Okay.  And you said you told him that he needed to retire

7   because he was losing a race?

8   A    Yeah, he was -- he -- he lost.

9   Q    Okay.

10  A    If I remember right, he lost.  Okay.  He lost, time to go

11  home, go on vacation, whatever, goodbye.

12  Q    Okay.  But in that conversation or in that voice message

13  with Mr. Nelson, you didn't tell him you don't like him?

14  A    No, I didn't.  I don't remember saying it.

15  Q    You didn't express any hate towards him?

16  A    I don't hate him.

17  Q    Do you have any hate or ill will in your heart towards

18  Mr. Sanders?

19  A    I don't hate anybody.

20  Q    And to this day, you don't know why you would have left

21  the messages you left?

22  A    I think about it every day.

23  Q    And you don't know why?

24  A    I don't know why.

25  Q    You're not a Republican, are you?

1   A    I am not any -- I'm not political, any way.

2          MS. NAIR:  No further questions.

3          THE COURT:  Feel free to be seated at counsel table.

4   All right.

5          All right.  Do you have any additional witnesses --

6   while he's on his way back to your table -- you plan on

7   calling at this time?

8          MS. NAIR:  No, Your Honor.  Defense rests.

9          THE COURT:  Defense rests.  Will the Government be

10  calling any additional witnesses in rebuttal?

11         MR. CHIU:  No, Your Honor.

12         THE COURT:  All right.  Ladies and gentlemen of the

13  jury, both sides have now rested.  That means you have all of

14  the evidence before you that you are going to consider during

15  your deliberations.  We have some matters that we're going to

16  take up at this time to make sure that when you arrive in the

17  morning, we can move towards the conclusion of the case.  So

18  if you'd be kind enough to report where you started this

19  morning, at 9:30 tomorrow morning, as soon as everyone's here

20  and accounted for I'm going to read you your final

21  instructions on the law, and the attorneys are going to make

22  their closing argument.  They should finish around lunchtime,

23  and then we'll go on ahead and provide you lunch while you

24  begin your deliberations.  So thank you all for your

25  attendance today.  We will see you tomorrow morning, again,

1    where you reported this morning, but at 9:30 tomorrow morning.

2    Have a good evening.  We'll see you in the morning.

3            THE COURTROOM SECURITY OFFICER:  All rise for the

4    jury.

5            THE COURT:  And please make sure you fill out a menu

6    downstairs so we can have your lunch for you here tomorrow.

7    Thank you.

8        (The jury retired from the courtroom at 4:20 p.m.)

9            THE COURT:  All right.  Please be seated and remain

10   seated while we're doing this.  I think for the majority of

11   the proposed jury instructions we will be in agreement.  So

12   the reason I gave the buffer for tomorrow morning is because

13   we're going to iron out these final issues in the morning.

14           So let's go over what is the uncontested language in

15   the preferred jury instructions.  I'll hear briefly on the

16   disagreements today, and then we can wrap it up tomorrow

17   morning.  So do you have a hard copy or at least an electronic

18   copy of the jury instructions in front of you?

19           MR. CHIU:  Yes, Your Honor.

20           THE COURT:  All right.  So let's start with page 1

21   of 22, the Court's instructions to the jury.  That is

22   standard.  Are there any objections from the Government on

23   that instruction?

24           MR. CHIU:  No, Your Honor.

25           THE COURT:  From the defense?

269

1          MS. NAIR:  No, Your Honor.  I just want to make sure
2     I'm clear on what the Court has in front of it versus, what --
3     I have document 26 in front of me.
4          THE COURT:  You have 26 pages?
5          MS. NAIR:  Well, no.  I have Doc. 26 in front of me.
6     Is there something else -- because this has 31 pages.  Is
7     there something else I should be reviewing?
8          THE COURT:  Let's just go through them one at a
9     time.  Mine might be different because I have a column with --
10    all right.  So e-mail me the most recent version.  I may
11    have -- be looking at the wrong one.  Hold on.  How long is
12    your document?  Ours are all 22.
13         MS. NAIR:  31 pages, Your Honor, in Document 26.
14         MR. CHIU:  Mine is too, Your Honor.
15         THE COURT:  Yours is what now?
16         MR. CHIU:  Mine is also 31 pages.
17         THE COURT:  All right.  Give them this.  I
18    understand.
19         When you sent in your preliminary jury instructions,
20    I put them in my format.
21         MS. NAIR:  Yes.
22         THE COURT:  And he's going to bring you the hard
23    copies of the ones that we're working on now.
24         MS. NAIR:  I understand.  Thank you.
25         THE COURT:  And I apologize for that.  I normally

1   give you the draft jury instructions at the beginning of the

2   trial, and I didn't do that this time.

3        All right.  So now you're looking at 22-page

4   document.  Let's go one page at a time.  Are there any

5   objections, Ms. Nair, as to the Court's instructions to the

6   jury, the intro paragraph on page 1 of 22?

7        MS. NAIR:  No, Your Honor.

8        THE COURT:  All right.  Instruction 1 and 1.5,

9   that's dependent on whether or not the defendant testifies.

10  The defendant has chosen to become a witness in this case.

11  Well, hold on.

12       Jury Instruction No. 1; is there -- and 1.5.  Are

13  you in agreement with me, we need to give the one where the

14  defendant testifies?

15       MS. NAIR:  Instruction No. 1, yes, Your Honor.

16       MR. CHIU:  Yes, Your Honor.

17       THE COURT:  All right.  So now we're moving on to

18  Instruction No. 2, Pattern instruction on reasonable doubt.

19       Any objection, Mr. Chiu?

20       MR. CHIU:  No, Your Honor.

21       THE COURT:  Ms. Nair?

22       MS. NAIR:  No, Your Honor.

23       THE COURT:  All right.  Instruction No. 3,

24  consideration of direct and circumstantial evidence, argument

25  of counsel, comments by the Court.

1          Any objection from the United States?

2          MR. CHIU:  No, Your Honor.

3          THE COURT:  Ms. Nair?

4          MS. NAIR:  No, Your Honor.

5          THE COURT:  All right.  Again, Instruction No. 4,

6     it's a pattern instruction, credibility of the witnesses.

7          Any objections, Mr. Chiu?

8          MR. CHIU:  No, Your Honor.

9          THE COURT:  Ms. Nair?

10         MS. NAIR:  No, Your Honor.

11         THE COURT:  All right.  Instruction No. 5, are

12    either of you going to be requesting this instruction?  I do

13    not recall during this very short trial where any witness was

14    impeached by prior testimony or statements, but if you want

15    the instruction, I'm going to ask you where we found that

16    during the trial.

17         So, Mr. Chiu, are you requesting Instruction No. 5?

18         MR. CHIU:  No, Your Honor.

19         THE COURT:  Ms. Nair?

20         MS. NAIR:  I would like to keep it, yes, Your Honor.

21         THE COURT:  All right.  And what happened during the

22    trial that would justify the giving of this instruction?

23         MS. NAIR:  The Government was questioning

24    Mr. Pratersch about when he met with the agents and

25    information that he gave about watching information on the

1    news and getting inflamed about the information that he saw on

2    the news versus the testimony that he was providing today.  So

3    just as an abundance of caution, if they might consider it, I

4    would rather have it in.

5             THE COURT:  All right.  Mr. Chiu?

6             MR. CHIU:  I've got no objection, Your Honor.

7             THE COURT:  All right.  Without objection, then

8    we'll keep that instruction.

9             Instruction No. 6, the note-taking instruction.

10            Is there any objection from Mr. Chiu?

11            MR. CHIU:  No, Your Honor.

12            THE COURT:  Ms. Nair?

13            MS. NAIR:  No, Your Honor.

14            THE COURT:  All right.  Instruction No. 7,

15   confession or statement of a single defendant.  The Government

16   alluded to the fact that -- I wouldn't call it a "confession,"

17   but in terms of, I guess I could have sent that, or I don't

18   remember not sending that or things along that line, based on

19   that is the Government requesting Instruction No. 7?

20            MR. CHIU:  Yes, Your Honor.  Really, I think it's

21   pertinent to the consent form the defendant signed.

22            THE COURT:  All right.  Ms. Nair, are you objecting

23   to my giving Instruction No. 7?

24            MS. NAIR:  I'm not sure how it's pertinent to the

25   confession form -- or to the consent form, excuse me.

273

1          THE COURT:  I mean, this is -- this is protection

2   for a defendant whenever a statement or a confession is made,

3   and I guess his point is that there was a statement, it was

4   the signed consent form for the seizure of the two items, the

5   phones.

6          So Government is asking for it, so I guess the

7   pertinent question is, Ms. Nair, are you objecting to my

8   giving it if the Government requests it?

9          MS. NAIR:  May I abstain from taking a position --

10         THE COURT:  Sure.

11         MS. NAIR:  -- right now, and if I can give the Court

12  an answer tomorrow?

13         THE COURT:  So you're voting present and that's

14  okay.  If you change your mind, let me know in the morning,

15  but it will remain unless I hear otherwise.

16         All right.  Instruction No. 8, which is page 10 of

17  22; 404(b) instruction, is the Government requesting this?

18         MR. CHIU:  No.  I don't think it's applicable here.

19         MS. NAIR:  Yes.

20         THE COURT:  You did bring up on cross-examination,

21  without a lot of detail, but apparently he made -- I wouldn't

22  say the evidence would indicate a threatening call, but an

23  unfriendly call to Senator Nelson.  That's probably what

24  that -- why that's there.

25         Are you requesting it, Ms. Nair?

1        MS. NAIR:  We are.

2        MR. CHIU:  I don't have any objection to it being

3   included.

4        THE COURT:  All right.  So the ball is in your

5   court, Ms. Nair.  Do you want it?

6        MS. NAIR:  Yes.

7        THE COURT:  All right.  It stays.

8        All right.  So moving on.  Instruction No. 9, on or

9   about a particular date or knowingly.

10        Is the Government requesting that?

11        MR. CHIU:  Yes, Your Honor.

12        THE COURT:  Ms. Nair, any objection?

13        MS. NAIR:  No.

14        THE COURT:  All right.  We're to where I think we're

15   going to begin parting ways.  We have two versions of this,

16   Instruction 10 and 10.5.

17        So, Mr. Chiu, why is this -- look, in terms of the

18   language that I think is where the battle lines are going to

19   be drawn is this voluntary intoxication instruction you have

20   at the bottom, as opposed to Ms. Nair's version of it.  So go

21   on ahead.

22        MR. CHIU:  If I can shortcut this.  I would

23   volunteer to remove that.  I don't want to -- I don't care to

24   fight that issue here.  I think there's an argument that it's

25   not applicable, but I think what I would -- I would rather

1    just concede that without having to have that decided and

2    allow the jury to consider that defense if it's -- you know,

3    to the extent it's applicable.

4              THE COURT:  All right.  So it's gone.

5              Ms. Nair, so let's start with this instruction.  Is

6    there something you would want added to it, seeing that

7    Mr. Chiu has conceded that last paragraph is gone?

8              MS. NAIR:  Yes, Your Honor.  I think our version of

9    the instruction is more --

10             THE COURT:  I think your version is the .5 version.

11   Read to me the specific language that you're asking for.

12             MS. NAIR:  That Bernard Sanders is a United States

13   official, that the defendant knowingly threatened to assault

14   and murder Bernard Sanders, and that the defendant did so with

15   the intent to intimidate Bernard Sanders and with the intent

16   to retaliate against Bernard Sanders because of the

17   performance of his official duties, and at the time the threat

18   was made, Bernard Sanders was engaged in the performance of

19   his official duties.

20             THE COURT:  All right.  One question for you.  On

21   paragraph 3, why shouldn't that be "or"?  I read it as needing

22   to be "or" instead of "and."

23             MS. NAIR:  I'm fine with that because of the

24   standing case law in the Eleventh Circuit where it says it can

25   be and/or.  The Government charged it as "and," but -- in

276

1   their indictment -- but I don't have a specific objection to

2   it being "or" knowing the case law on that issue.

3           THE COURT:  All right.  What's the Government's

4   position on her version?

5           MR. CHIU:  Well, paragraph 4 is the problem.  And

6   this goes back to the same argument we had on Rule 29,

7   regarding that the -- you know, the -- Bernard Sanders was

8   engaged in the performance of official duties at the time the

9   threat was made.

10          I don't believe that's an accurate statement of the

11  law.  And like I said, for the same reasons we argued at

12  Rule 29.

13          THE COURT:  All right.  I'll give you a version of

14  this because I knew this 10 and 10.5 was going to be where the

15  disputes arose.  I will consider your offerings, and I will

16  have a version of it in the morning.  We have enough time in

17  the morning to discuss it a little bit further.  But just so

18  you know, my default is always going to be tracking the

19  language in the statute, especially if there's not a pattern

20  instruction covering this specific instruction.  So I'll have

21  a version for you tomorrow morning and we'll go from there.

22          MR. CHIU:  Your Honor, the other objection I simply

23  would have is that, defining the term "knowingly."  Knowingly

24  has already been defined elsewhere in the instructions, and I

25  believe this definition of knowingly is based upon a Tenth

1    Circuit case; whereas, the other definition of knowingly

2    that's part of the pattern is based upon Eleventh Circuit case

3    law.

4           THE COURT:  Would you like to be heard on that,

5    Ms. Nair?

6           MS. NAIR:  I believe our definition, "knowingly" --

7    I don't want to misstate, but I believe we quoted that

8    information from *Elonis v. United States* when we were drafting

9    this jury instruction.  So I can look further, but the case

10   cite for *Elonis v. United States* is 135 Supreme Court 2001,

11   for the knowingly element for this instruction.  So --

12          THE COURT:  All right.  So Mr. Chiu, I have to ask.

13   Are you objecting to the definition being repeated here at

14   all, or are you just disagreeing with her version of defining

15   knowingly in this Instruction 10.5?

16          MR. CHIU:  I'm disagreeing with her version of

17   knowingly.  If we repeat the version of knowingly that's in

18   the earlier instruction, I believe that's Instruction 9 --

19          THE COURT:  All right.  Let me pull up

20   Instruction 9.

21          MR. CHIU:  I think it's unnecessary, but I don't

22   have an objection to it.

23          THE COURT:  Understand.

24          And, Ms. Nair, what's your position on repeating,

25   "The word 'knowingly' means that the act was done voluntarily,

278

1    intentionally and not because of mistake or by accident"?

2         MS. NAIR:  I would be okay with that being repeated

3    and taken away from our "knowingly" term.

4         THE COURT:  All right.  Mr. Chiu, she just wants

5    that language repeated under 10 or 10.5, whichever one we go

6    to.  What's your position on that?

7         MR. CHIU:  I have no objection to that.

8         THE COURT:  All right.  Then we'll do that.  All

9    right.

10        Instruction No. 11.  The only thing I'd point to

11   that in there is the addition of one particular statement

12   that's in the pattern instruction, where it says, "The

13   Government does not have to prove the defendant intended to

14   carry out the threat."

15        Mr. Chiu -- or, Ms. Nair, that's been added.  That's

16   in addition to what was submitted to the Court.  Do you want

17   to be heard on that?

18        MS. NAIR:  I understand that was in the pattern jury

19   instruction.  When Mr. Chiu submitted it to me, he didn't have

20   that language, so I figured the Government didn't want that

21   language.

22        THE COURT:  Mr. Chiu?

23        MR. CHIU:  I think it should be in there, Your

24   Honor.

25        THE COURT:  I mean, I -- generally, again, default

1  for me is the pattern and statutes, but I do want to -- I was

2  just curious as to why it was not in there.  Mr. Chiu is

3  requesting it.

4          Ms. Nair, do you want to state an objection or

5  position on that?

6          MS. NAIR:  No, Your Honor.

7          THE COURT:  Okay.  So it will stay.

8          Now, Instruction No. 12.  All right.

9          Mr. Chiu, do you want to be heard on Instruction

10  No. 12 at all?

11          MR. CHIU:  Your Honor, I think there's room for

12  debate as to whether or not there's the degree of

13  intoxication.  There's been evidence of a degree of

14  intoxication that warrants a voluntary intoxication

15  instruction, but I think given the amount of real estate and

16  paper we've spent on the issue, I'd be more comfortable having

17  this instruction, rather than having it floating for the jury

18  to wonder about.  I think the Instruction itself is an

19  accurate and fair statement of what the law is.

20          THE COURT:  Ms. Nair, do you want to be heard on --

21  it sounds like Mr. Chiu is fine with Instruction No. 12.

22  What's your position?

23          MS. NAIR:  My position is that we want it --

24          THE COURT:  Okay.

25          MS. NAIR:  -- as written.

1          THE COURT:  Okay.  And I think this -- I don't want

2    to endorse anyone's theory of the case from the bench, but I

3    think this gives you room, and I think both of you are

4    probably going to have a different argument as to what

5    happened here today, but I'm comfortable with it as drafted.

6    If there's no objection from either side, then I'll leave

7    Instruction No. 12.

8          All right.  Number 13; that's pattern.

9          Any objection from the United States?

10         MR. CHIU:  No, Your Honor.

11         THE COURT:  Ms. Nair?

12         MS. NAIR:  Only to the objection that we previously

13   stated with the multiplicity.

14         THE COURT:  All right.  And I'm going to -- I'll

15   make a decision on that.  You provided me with the *Blockburger*

16   case.  And I think, Mr. Chiu, you made your point rather

17   clearly that this is not a *Blockburger* situation in your view.

18   I'll have my version of it tomorrow morning, and if either of

19   you disagree and want to quickly state an objection for the

20   record to preserve or for potential appeal, I'll offer you

21   that opportunity in the morning.

22         All right.  So moving on to Instruction No. 14, the

23   explanatory instruction.

24         Are you requesting that, Mr. Chiu?

25         MR. CHIU:  Yes, Your Honor.

1    THE COURT:  Any objection, Ms. Nair?

2    MS. NAIR:  I do object because what we agreed upon

3  was that the transcript was for demonstrative purposes only

4  and was not going to be going back to the jury.  So this

5  appears that this will be able to go back with the jury.

6    THE COURT:  I guess the dilemma here is that if the

7  jury wants to watch the video or listen to the recording

8  again, the only way they're going to be able to listen to it

9  is through the format that the Government presented.  It's

10  going to have the words under it.  I think that's kind of --

11  so you're objecting to that?

12    MS. NAIR:  They can listen to it in open court, I

13  guess, as a guide to follow along, I don't have any objection

14  to that.  I have an objection with the actual written

15  transcript that the Government provided in the exhibit book

16  going and sitting with the jury.

17    MR. CHIU:  Your Honor --

18    THE COURT:  I think that's a reasonable compromise.

19    MR. CHIU:  Yeah.

20    THE COURT:  I mean, if she doesn't want a transcript

21  to go back, but if they want to watch it, she wants them

22  listening while they're reading under the --

23    Are you okay with that?

24    MR. CHIU:  Yes, Your Honor, I think that's

25  appropriate.  I think the instruction still is applicable, and

1   I think it's still necessary in that scenario because it's not

2   necessarily about them holding the transcript, it's about how

3   they consider the transcript.

4            THE COURT:  All right.  Ms. Nair, do you have any

5   objection as to --

6            MS. NAIR:  That's fair.

7            THE COURT:  -- my keeping this instruction, but not

8   sending the actual physical transcript back?

9            MS. NAIR:  I do not.  I'm in agreement with that.

10           THE COURT:  All right.  So I'll leave this

11  Instruction with the understanding that the actual physical

12  transcripts are not going back.  If they watch the video,

13  they'll see the language under the -- or if they watch

14  whatever you've presented, the language will be under.  All

15  right.  I understand.

16           MR. CHIU:  Your Honor, as far as the blanks go, it

17  would be Exhibits 4 through 6, identified as typewritten

18  transcripts of Exhibits 1 through 3.

19           THE COURT:  Exhibits 4 through 6, got it.  All

20  right.  Exhibits 4 through 6 have been identified and then the

21  next one is as Exhibits 1 through 3?

22           MR. CHIU:  Yes, Your Honor.

23           THE COURT:  All right.  So moving on to

24  Instruction 15, Closing arguments.  Are there any objections?

25  This is my instruction because I like to read the majority of

283

1   the instructions on the law so you can use them during your

2   closing arguments.

3            Mr. Chiu, any objection?

4            MR. CHIU:  No, Your Honor.

5            THE COURT:  Ms. Nair?

6            MS. NAIR:  No, Your Honor.

7            THE COURT:  And Instruction No. 16, Duty to

8   deliberate; pattern.

9            Any objection, Mr. Chiu?

10           MR. CHIU:  No, Your Honor.

11           THE COURT:  Ms. Nair?

12           MS. NAIR:  No, Your Honor.

13           THE COURT:  And Instruction No. 17; any objection,

14   Mr. Chiu?

15           MR. CHIU:  No, Your Honor.

16           THE COURT:  Ms. Nair?

17           MS. NAIR:  No, Your Honor.

18           THE COURT:  All right.  So the instructions that

19   we're going to have some discussions on tomorrow.  Voluntary

20   intoxication, we're clear on that now.  So Instruction 13,

21   Instruction 10.  We did agree that the similar fact is going

22   to remain.  It looks like it's just 10 and 13.

23           MS. NAIR:  Seven is something that I wanted to

24   provide an answer for tomorrow.

25           THE COURT:  Okay.  Seven, 10, and 13 are our

284

1    instructions.  I'll focus on that in my final version that I

2    have on there.  We'll redline it to the extent that we can to

3    make sure you can see what the changes are.

4              All right.  Is there anything further, Mr. Chiu?

5              MR. CHIU:  No, Your Honor.

6              THE COURT:  Ms. Nair?

7              MS. NAIR:  No, Your Honor.  Thank you.

8              THE COURT:  All right.  So the jury is not going to

9    be here until 9:30 to get started.  I don't think we need more

10   than half an hour.  I'm going to propose 9:00 a.m. if either

11   of you feel we need to start earlier, I'll certainly consider

12   that.

13             Mr. Chiu.

14             MR. CHIU:  No, I don't believe so, Your Honor.

15             THE COURT:  Ms. Nair?

16             MS. NAIR:  No, Your Honor.

17             THE COURT:  All right.  9:00.  We'll see everyone in

18   the morning.  Have a good evening.

19             MS. NAIR:  You too.

20        (WHEREUPON, this matter was concluded at 4:39 p.m.)

21                         *   *   *

22                   CERTIFICATE OF REPORTER

23   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-entitled matter.
24
     _/s/ Suzanne L. Trimble_____          10/10/19
25   Suzanne L. Trimble, CCR, CRR, RPR          Date
     Official Court Reporter